David W. Tufts (#8736)
Lyndon R. Bradshaw (#15097)
DENTONS DURHAM JONES PINEGAR P.C.
111 S. Main Street, Suite 2400
Salt Lake City, UT 84111
(801) 415-3000
david.tufts@dentons.com
lyndon.bradshaw@dentons.com

Stephen R. McAllister (*pro hac vice* forthcoming)
DENTONS U.S. LLP
4520 Main Street, Suite 1100
Kansas City, MO 64111-7700
(816) 460-2400
stephen.mcallister@dentons.com

Keith M. Woodwell (#7353)
Jake Taylor (#10840)
Thomas A. Brady (#12454)
Katherine E. Pepin (#16925)
CLYDE SNOW & SESSIONS
201 South Main Street, #2200
Salt Lake City, UT  84111
(801) 322-2516
kmw@clydesnow.com
jst@clydesnow.com
tab@clydesnow.com
kep@clydesnow.com

*Attorneys for Plaintiffs Rudy Larsen, Jena Larsen, Rubicon Contracting, LLC, Scandia Company, LLC, and Smart Rain Systems, LLC*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RUDY LARSEN, an individual; JENA LARSEN, an individual; RUBICON CONTRACTING, LLC, a Utah limited liability company; SCANDIA COMPANY, LLC, a Utah limited liability company; and SMART RAIN SYSTEMS, LLC, a Utah limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>SEAN D. REYES, an individual; LEO LUCEY, an individual; MICHAEL ADAM JETER, an individual; and KAYTLIN VIRGINIA BECKETT, an individual,<br><br>Defendants. | **COMPLAINT AND JURY DEMAND**<br><br>Case No. 2:25-cv-00963<br><br>Judge _____ |

{02318172-4 }

Plaintiffs Rudy Larsen, Jena Larsen, Rubicon Contracting, LLC, Scandia Company, LLC, and Smart Rain Systems, LLC (collectively, "Plaintiffs"), through undersigned counsel, complain against Defendants Sean D. Reyes, Leo Lucey, Michael Adam Jeter, and Kaytlin Virginia Beckett (collectively, "Defendants") as follows:

**INTRODUCTION**

This case is about government corruption and the abuse of the criminal justice system for the personal and political benefit of the Defendants. Defendants, state officials, conspired to manufacture bogus criminal charges to falsely inflate the public perception of the severity of human trafficking in Utah. Why? To try and justify the existence of and secure funding for the S.E.C.U.R.E. Strike Force of the Utah Office of the Attorney General ("SECURE"). SECURE was the pet project of then Attorney General Sean D. Reyes. In doing so, Defendants knowingly and improperly deprived Plaintiffs of vital rights under the United States Constitution.

Under Defendant Reyes' direction, the Utah Office of the Attorney General (the "AGO") maliciously prosecuted Mr. Larsen and Ms. Larsen not to pursue justice, but to (1) grandstand for the public, with the goal of obtaining funding for its investigative division, (2) put a positive spin on Reyes' close personal ties to embattled anti-trafficking activist Tim Ballard and Ballard's non-profit Operation Underground Railroad ("OUR"), and (3) divert the Utah Legislature's and the public's attention from Reyes' questionable conduct.

Plaintiffs are the victims here. Plaintiffs have never engaged in human trafficking. In full compliance with all laws, Plaintiffs employed hundreds of workers in real estate, construction, landscaping, snow removal, and related businesses. Plaintiff Rubicon Contracting, LLC ("Rubicon") participated in a federal program in which foreign workers received H-2B visas to work temporarily in the United States. Rubicon's use of legal foreign workers, however,

4929-3102-3733, v. 1

created the perfect target for the AGO to advance its agenda to artificially inflate the number of human trafficking victims in Utah.

Defendants launched an unwarranted human trafficking investigation against Plaintiffs that manufactured hysteria over Rubicon's lawful employment practices. Defendants prepared and submitted multiple applications for search warrants, *all* supported by affidavits riddled with blatantly false statements. Using these false affidavits, the AGO obtained sealed warrants to search the offices and seize the bank accounts of Rubicon, Plaintiff Scandia Company, LLC ("Scandia"), and Plaintiff Smart Rain Systems, LLC ("Smart Rain").

Defendants' raid on Rubicon's headquarters using the falsely obtained warrants was timed and staged to provide cover for Defendant Reyes and his embattled AGO. Leading up to November 2023, Defendant Reyes was under intense legislative scrutiny. He was the subject of frequent front-page negative publicity for his relationship with Ballard and his influence peddling on Ballard's behalf. In response to the growing scandals associated with Defendant Reyes' misconduct, including the AGO's receipt of millions of dollars from OUR, the Utah Legislature ordered an audit of the AGO on November 14, 2023.

The AGO obtained the search warrants in the Rubicon investigation three days later, on November 17, 2023. The affidavits in support of the warrants, written by Assistant Attorney General Kaytlin Virginia Beckett and signed under penalty of perjury by SECURE Investigator Michael Adam Jeter, were *directly* contradicted by evidence Defendants Beckett and Jeter possessed at the time. The false and fraudulent sworn statements in the affidavits were combined with misleading omissions. If the affidavits had been truthful and accurate, the magistrates reviewing the warrant applications would have known there was no probable cause to approve and issue the warrants. Further, in spite of the fact the warrants were *sealed*, Defendants notified

3

and invited the news media and others to witness, record, and report on the execution of the warrants at Plaintiffs' offices on November 20, 2023.

Also, both unusual and striking, only four days later, on November 24, 2023, the AGO filed first-degree felony charges against Mr. Larsen, Ms. Larsen, and five other members of Rubicon's management team, alleging over 50 violations of human trafficking laws. The execution of the unlawful and unsupported warrants, however, revealed no evidence of violations of the law. Defendants filed charges immediately anyway, using the same false statements in the affidavits allegedly supporting the warrants, but with no additional evidence obtained from the searches.

Defendants' conduct caused widespread negative publicity for Plaintiffs, with foreseeable and serious economic consequences. Moreover, the AGO took the aggressive and affirmative step of directly contacting Rubicon's clients and customers to discourage them from continuing to do business with Rubicon. The logical and foreseeable result was decimation of Rubicon's business and substantial damage to Rubicon's sister companies, Scandia and Smart Rain. In addition, Defendants' conduct foreseeably and directly caused emotional pain and suffering to Mr. Larsen and Ms. Larsen, requiring them both to obtain medical treatment.

In the criminal case, the court found the criminal defendants and intervenors met their substantial burden under *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978), for an evidentiary hearing by making a substantial showing that Defendants' affidavits contained false statements and material omissions that were knowingly and intentionally made or made with reckless indifference to the truth. The criminal court also found that, without even part of the allegedly false information, the warrants were not supported by probable cause. *The case was later dismissed by the AGO*.

4929-3102-3733, v. 1

The lack of probable cause for the search warrants and criminal charges, as well as bringing the press and others to watch state officials execute the warrants, violated Plaintiffs' federal constitutional rights.  Plaintiffs suffered substantial losses and damages as a result of these unconstitutional actions, including lost business profits, litigation expenses, and emotional distress, in an amount not less than $1,000,000,000.

**PARTIES**

1.	Plaintiff Rudy Larsen is an individual residing in Davis County, State of Utah.

2.	Plaintiff Jena Larsen is an individual residing in Davis County, State of Utah.

3.	Mr. Larsen and Ms. Larsen have been married for over 18 years and have three children together.

4.	Plaintiff Rubicon Contracting, LLC ("Rubicon") is a Utah limited liability company with its principal place of business in Bountiful, Utah.  Mr. Larsen and Ms. Larsen founded Rubicon in 2011 and built it into a company valued at more than $300 million at the time of the AGO's press-accompanied raid of its headquarters on November 20, 2023.

5.	Plaintiff Scandia Company, LLC ("Scandia") is a Utah limited liability company with its principal place of business in Bountiful, Utah.  Scandia is a real estate development and management company, which had more than $250 million in real estate development projects in progress in November 2023.

6.	Plaintiff Smart Rain Systems, LLC ("Smart Rain") is a Utah limited liability company with its principal place of business in Bountiful, Utah.  Smart Rain is a technology company, focused on irrigation management.

7.	Mr. Larsen and Ms. Larsen are members of Rubicon's Board of Directors and executive managers of Scandia and Smart Rain.

4929-3102-3733, v. 1

8. The Utah Office of the Attorney General (the "AGO") is an executive branch office of state government and is the chief law enforcement agency in the State of Utah.

9. The S.E.C.U.R.E. Strike Force ("SECURE") is an investigation unit within the Criminal Investigations Division of the AGO. SECURE was created to combat violent and other major felony crimes associated with illegal immigration and human trafficking.

10. Defendant Sean D. Reyes ("Reyes") was the Attorney General of the State of Utah from 2014 until the end of 2024. At all relevant times, Defendant Reyes' conduct occurred within the District of Utah. At all times alleged herein, Defendant Reyes was acting under color of state law.

11. Defendant Leo Lucey ("Lucey") was employed by the AGO as Chief of Criminal Investigations Division through the end of 2024.

 a. At all times alleged herein, Defendant Lucey was working in his assigned position and capacity as a member and supervisor of SECURE. At all times alleged herein, Defendant Lucey's conduct occurred within the District of Utah. At all times alleged herein, Defendant Lucey was acting under color of state law.

 b. Defendant Lucey was the chief investigator for SECURE when it was created. During the time he led the Criminal Investigations Division, Defendant Lucey investigated cases and made arrests for the purpose of obtaining funding and growing the size of the Criminal Investigations Division, including SECURE.

 c. In 2020, Defendant Lucey was named as a defendant in a federal civil action accusing him and others, including other AGO investigators, of

grant fraud.  *See* United States of America, *ex. rel.*, Reginald Williams v. Robyn Williams, et. al., 2:15-cv-00054-RSJ-DBP.

    d.    Defendant Lucey's LinkedIn page provides:

> Mentor, work with and manage all criminal investigators working for the Utah Attorney Generals [sic] Office. Serve as law enforcement liaison for the Utah Attorney Generals [sic] office with law enforcement, state, local and federal. Work with prosecutorial Division Chiefs in the Utah Attorney Generals [sic] Office providing whatever investigative resources they need.

12.    Defendant Michael Adam Jeter ("Jeter") is a criminal investigator employed by the AGO. Defendant Jeter is an assigned member of SECURE and, at all times alleged herein, was working in his capacity as a member of SECURE.  At all times alleged herein, Defendant Jeter's conduct occurred within the District of Utah. At all times alleged herein, Defendant Jeter was acting under color of state law.

13.    Defendant Kaytlin Virginia Beckett ("Beckett") is a prosecutor at the AGO and is assigned to prosecute alleged violations of human trafficking laws.  At all relevant times, Defendant Beckett's conduct occurred within the District of Utah.  At all times alleged herein, Defendant Beckett was acting under color of state law.  As alleged in this Complaint, in addition to her advocacy role as a prosecutor, Defendant Beckett also acted in an investigative role in the criminal investigation of Plaintiffs and acted as a witness in the criminal case against Plaintiffs.

## JURISDICTION

14.    This action alleges violations of the Constitution of the United States, and 42 U.S.C. § 1983 provides a cause of action for such claims. The Court has jurisdiction over these federal questions under 28 U.S.C. § 1331.

4929-3102-3733, v. 1

15.     Venue is proper in this Court under 28 U.S.C. §§ 1391(a) and 1391(b)(2), as all events, acts, and omissions alleged herein occurred within the District of Utah.

## BACKGROUND

### Defendant Reyes and the AGO Seek Positive Press and New Funding.

16.     Soon after taking office in 2014, Defendant Reyes made human trafficking his signature issue as Utah Attorney General.  Defendant Reyes worked hard to promote an image that he was "Utah's top cop" and was pursuing serious, violent criminals—particularly human traffickers.  For instance, to demonstrate the supposed severity of human trafficking, he personally took part in investigations, including, bizarrely, traveling to South America where he purportedly took part in a privately funded covert operation.  He also publicized himself appearing incognito at the Sundance Film Festival as part of an investigative team.  In addition, he accompanied AGO investigators to execute search warrants and would frequently appear in public wearing investigator apparel and tactical gear.  Public image mattered a great deal to Defendant Reyes.

17.     In support of his efforts to promote the image that he was fighting human trafficking, Defendant Reyes teamed up with Tim Ballard and Operation Underground Railroad ("OUR").  OUR is an anti-human trafficking organization that Ballard founded in 2013.  OUR and Ballard have been criticized for conduct during sting operations, some of which included Defendant Reyes, and have been accused of exaggerating claims regarding their work.

18.     During Defendant Reyes' tenure as Utah's Attorney General, OUR and Ballard provided millions of dollars to law enforcement agencies in Utah, particularly to the AGO to fund the operations and mission of SECURE.

8

4929-3102-3733, v. 1

19.     OUR's donations to the AGO ostensibly helped to fund AGO and SECURE human trafficking investigations, but those donations also masked the benefits OUR was receiving from Defendant Reyes at the time.  Defendant Reyes involvement with Ballard and OUR generated innumerable intangible benefits in addition to the millions of dollars in donations it generated for OUR.  That included Defendant Reyes endorsing OUR, running interference for OUR, peddling influence for OUR, intimidating OUR critics, advocating and fundraising for OUR, and agreeing not to investigate or question OUR's potentially fraudulent fundraising activities.

20.     Eventually, Ballard became the subject of criminal investigations by Davis County, Salt Lake County, and the FBI (but not the AGO) after former OUR employees accused him of human trafficking for sex, sexual harassment, spiritual manipulation, grooming, and sexual misconduct.  He resigned as OUR's CEO because of the investigations.  OUR and Ballard were later named in two separate lawsuits alleging that he sexually assaulted, groomed, and coerced women into sexual acts during OUR operations.  Defendant Reyes was named as a defendant in one of these lawsuits due to his alleged knowledge of and support for Ballard's actions.  In a December 2023 statement posted on its website, OUR said an independent law firm reached the conclusion that Ballard had "engaged in unprofessional behavior that violated OUR's policies and values."

21.     In addition, since 2020, OUR and Ballard have been the subject of criminal fraud investigations by county and federal investigative agencies regarding allegations of misleading donors.  Upon information and belief, these investigations are ongoing.

4929-3102-3733, v. 1

22.     On November 14, 2023, shortly after the negative news surrounding Defendant Reyes, OUR and Ballard surfaced, the Utah Legislature authorized a legislative audit of the AGO to investigate how the AGO used funds received from OUR.

23.     The AGO receives some of its funding through federal grants.  SECURE was initially funded through a federal grant in 2009.  When the lavish donations to the AGO from OUR ceased in 2023 because of the growing scandals and investigations, Defendant Reyes, the AGO, SECURE, and Defendant Lucey took steps to obtain additional federal funding.  This included the actions of Defendants to provide false and misleading information in the affidavits for the warrants in the criminal case against Plaintiffs.

24.     In a federal grant application with the Office for Victims of Crimes, the AGO represented that human trafficking victims in AGO investigations had gone from 69 in 2021 to 26 in 2022, and then increased dramatically to 310 in 2023.  This represents over a 1,000% increase in trafficking victims from 2022 to 2023.  Because federal grants are based in part on the number of victims, bringing false criminal charges against Mr. Larsen, Ms. Larsen, and others helped the AGO secure a $999,994 federal grant in 2024.

25.     Upon obtaining the warrants based on Defendants Jeter's and Beckett's false sworn statements, the AGO, SECURE, and Defendant Lucey worked closely with media organizations to publicize their work on the Rubicon criminal case to try to deflect the negative press and attention away from Defendant Reyes and the AGO.  Working closely with the press, Defendant Reyes and the AGO further engaged in this conduct to justify and promote the Criminal Investigations Division—particularly SECURE.

26.     The AGO also used the false criminal charges against Mr. Larsen, Ms. Larsen, and the others Rubicon officials to seek additional state funding.  Daniel Burton, who was part of

4929-3102-3733, v. 1

Defendant Reyes' inner circle and the General Counsel to the AGO, testified at a hearing of the Utah House Judiciary Committee on February 13, 2024, in support of a bill to provide additional funding to the AGO and SECURE. During this testimony to the committee, Burton cited the Rubicon criminal case as a reason that additional funding was needed and falsely claimed that Rubicon officials had confiscated and withheld over 150 passports and visas from H-2B workers to prevent them from leaving the job and returning home. In particular, Burton falsely testified to the Committee:

> So, these employees were brought here legally through the H-2B process. And then once they were here, they handed over their passports and their visas to their employer, and the employer essentially had them by the neck.

27.    In May 2023, the same month the Rubicon criminal case was opened for investigation, the AGO promoted Defendant Beckett to a new role, Section Director. Facing a more than 50% decrease in human trafficking victims from 2021 to 2022, Defendant Beckett knew she needed to fix this "problem" since her new division relied on state and federal grant money linked to the number of victims. Acting on directions from Defendant Lucey and other senior leadership of the AGO, Defendant Beckett was motivated to knowingly bring manufactured, unsupported criminal charges against Mr. Larsen, Ms. Larsen, and other Rubicon officials. These actions allowed the AGO to artificially inflate the trafficking victim count to 310 in 2023, an increase of over 1,000% in a single year, thus ensuring Defendant Beckett would save the funding for SECURE, her new position, and her accompanying pay raise.

28.    The corrupt manner in which the AGO, SECURE, and Defendants pursued trafficking cases at the expense of Mr. Larsen, Ms. Larsen, and their companies to obtain funding following the eruption of negative press and attention surrounding OUR and Ballard runs afoul of vital Constitutional protections.

11

**The Fourth Amendment Requires a Truthful Factual Showing
to Establish Probable Cause.**

29.     Before an arrest warrant or search warrant can be lawfully issued, the Fourth Amendment requires a truthful factual showing in a sworn affidavit or affirmation to establish probable cause to secure the warrant.

30.     The search warrant must be supported by an affidavit that there is probable cause to believe that the person, property, or evidence to be seized was unlawfully acquired or is unlawfully possessed, has been used or is possessed for the purpose of being used to commit or conceal the commission of an offense, or is evidence of illegal conduct.

31.     Issuing magistrates look at what is presented in the affidavit or affirmation in support of a warrant to determine whether probable cause exists to issue the warrant.

32.     In conducting their independent review of search warrant applications for probable cause, magistrates presume the veracity of the information sworn and provided by law enforcement in affidavits supporting those applications.

33.     It is not the magistrate's job to vet the information in the affidavits for truth, accuracy, or completeness.

34.     Affidavits are, after all, sworn under penalty of perjury, which incentivizes—or should incentivize—the affiant to be truthful and complete in setting forth material facts necessary to establish probable cause.

35.     The Constitution prohibits a law enforcement officer from making perjurious or recklessly false material statements or omissions in support of a warrant.

36.     Where an officer knows, or has reason to know, that they materially misled a magistrate in finding probable cause based on false sworn statements, the shield of qualified immunity disappears.

4929-3102-3733, v. 1

37.    Likewise, where a prosecutor steps outside their advocacy role and engages in investigative conduct or conduct that does not fall within their duties as a prosecutor, the prosecutor loses absolute prosecutorial immunity.

**<u>Defendants Engaged in Malicious Prosecution of<br>Mr. Larsen and Ms. Larsen in Violation of<br>the Fourth Amendment.</u>**

38.    Under the United States Constitution and Bill of Rights, malicious prosecution is a violation of an individual's Fourth Amendment rights.  Government agencies entrusted with law enforcement powers are prohibited from bringing criminal charges against a person without reasonable grounds or probable cause to believe that the person has committed the criminal offense.  However, Defendants did exactly that—they conspired to charge Mr. Larsen, Ms. Larsen, and other Rubicon officials with first degree felonies that could have resulted in the imposition of life sentences, despite the complete lack of reasonable grounds or probable cause to charge Mr. Larsen and Ms. Larsen with these crimes.

39.    Beginning in May 2023, Defendants conducted a six-month long investigation of Plaintiffs, looking for any evidence that would support human trafficking charges. This investigation included interviews of dozens of H-2B current and former Rubicon visa workers and interviews with current and former U.S.-based Rubicon employees.  The investigation uncovered no evidence to support probable cause for human trafficking, or for any other crime.

40.    Despite the failure of the investigation, Defendants nevertheless applied for warrants that would allow them to search Rubicon's headquarters, seize the personal bank accounts of Mr. Larsen and Ms. Larsen and the corporate bank accounts of Rubicon, Scandia, and Smart Rain, and arrest Mr. Larsen, Ms. Larsen, and five other Rubicon employees.

41.    The warrant applications prepared by Defendants were supported by affidavits written by Defendant Beckett and signed under penalty of perjury by Defendant Jeter.  These

13

affidavits were riddled with false statements and material omissions regarding the evidence obtained during the investigation.

42.     The magistrate judges who reviewed the search warrant applications relied upon the false statements and material omissions of Defendants Jeter and Beckett in the affidavits when determining that probable cause existed to support the issuance of the warrants.  If the search warrant affidavits had contained truthful and complete information, the magistrates would have properly concluded that there was no probable cause, and they would not have issued the warrants.

43.     The searches, seizures, arrests, and 16-month long malicious prosecution that followed the issuance of the fraudulently obtained warrants caused significant harm to Plaintiffs. This harm was compounded by Defendants' efforts to widely publicize the raid on Rubicon's headquarters, the arrests of Mr. Larsen, Ms. Larsen, and the other Rubicon employees, and the subsequent prosecution. Rubicon, Scandia, and Smart Rain lost most of their customers and contracts as a result of Defendants' illegal actions and suffered crippling financial losses.  Mr. Larsen and Ms. Larsen suffered devastating harm to their reputation, physical health, and finances.

44.     Even after the criminal charges against Mr. Larsen and Ms. Larsen were finally dismissed in February 2025, following an unbroken string of losses by the AGO's prosecution team in the criminal case, the financial and reputational harm to Plaintiffs stemming from the illegal actions of Defendants continues unabated.

45.     The reputation and public image of Plaintiffs will never fully recover. The legal costs for defending against the baseless charges and the direct financial losses and lost opportunities suffered by the companies can never be fully recovered. The emotional distress and

14

4929-3102-3733, v. 1

anxiety of being wrongly accused has been life altering and will continue to have a lasting psychological impact.

**Details of Defendants Jeter's and Beckett's**
**False Sworn Statements to Obtain**
**the Search Warrants.**

46.    On November 17, 2023, the AGO, SECURE, Defendant Beckett, and Defendant Jeter applied for, and courts issued, ten warrants (collectively, the "Warrants") to search Rubicon's offices and other properties, seize records, seize corporate and personal bank accounts, and search and seize the personal devices and electronics of certain Rubicon employees.

47.    The AGO, SECURE, Defendant Beckett, and Defendant Jeter claimed to be seeking evidence of, and seizing property and funds related to, aggravated labor trafficking and benefitting from labor trafficking.

48.    The ten affidavits in support of the Warrants (the "Affidavits") are virtually identical in setting forth alleged facts that purported to establish probable cause.

49.    Under Defendant Lucey's supervision and direction, Defendant Jeter was the lead investigator and affiant for each of the Affidavits.

50.    The Affidavits included the following language: "This affidavit has been reviewed by Kaytlin Beckett of the Utah Attorney General's Office [sic], and it has been approved for presentation to the court."

51.    The AGO, SECURE, Defendant Beckett, and Defendant Jeter presented the Affidavits to various state judges throughout northern Utah.

52.    The Affidavits contained multiple material statements of fact that were false.

53.    Defendant Jeter, with the assistance and support of Defendant Beckett, knowingly and intentionally swore false material statements in the Affidavits to induce magistrates to find probable cause and issue the Warrants.

54.    Defendant Jeter and the other Defendants knew the material statements in the Affidavits were false or were reckless in their disregard for the falsity when Defendant Jeter swore to them.

55.    Defendant Jeter, with the assistance and support of Defendant Beckett, knowingly and intentionally omitted and withheld material information from the Affidavits that was necessary context for the courts to properly assess whether probable cause existed to issue the Warrants.

56.    Defendant Jeter and the other Defendants knew the Affidavits contained material omissions that were necessary to provide context for courts to determine whether probable cause existed to issue the Warrants.

57.    Defendant Jeter interviewed purported victims and witnesses and collected documents and other evidence, which informed him and the other Defendants of the exact opposite of what Defendant Jeter swore in the Affidavits.

58.    The Affidavits reference seven alleged victims of human labor trafficking.

59.    Defendant Jeter swore to no fewer than four categories of information in the Affidavits that were materially false:

> A.    Defendant Jeter falsely stated that Rubicon withheld from the seven "victim" H-2B workers their immigration and identification documents, including documents necessary for travel to their countries of origin;
>
> B.    Defendant Jeter falsely stated that Rubicon forced H-2B workers to live in housing that Rubicon provided and have rent deducted from their pay;

4929-3102-3733, v. 1

C.     Defendant Jeter falsely stated that Rubicon closed H-2B workers' online FinTwist accounts and kept any remaining money in the accounts; and

D.     Defendant Jeter falsely stated that Rubicon threatened the seven "victims" with deportation without disclosing material information that was necessary context for a determination of probable cause.

**A.     Defendant Jeter Falsely Stated That Rubicon Withheld from the Seven "Victim" H-2B Workers Their Immigration and Identification Documents, Including Documents Necessary for Travel to Their Countries of Origin.**

60.     The Affidavits falsely state that Rubicon withheld immigration and identification documents from workers, including documents necessary for travel from the United States. Specifically, Defendant Jeter swore that:

a.     "Victims did not have their I-797A forms which would allow them to travel to Mexico and back to the United States."

b.     "Victims also did not receive their I-797A form [sic] which is a government issued document and without it restricted their ability to travel back to Mexico and get back into the United States."

c.     "Scandia Company, Smart Rain, and Rubicon withheld government-issued documents."

d.     "Scandia Company, Smart Rain and Rubicon Contracting LLC, owners, and several employees . . . withheld government-issued identification documents."

61.     The foregoing sworn statements are blatant falsehoods which Defendants knew were false.  Not a single "victim" or other witness told Defendant Jeter, the AGO, or SECURE that Plaintiffs or anyone else confiscated or withheld any immigration or identification documents, including documents necessary for travel to their countries of origin.

62.     Defendants knew Defendant Jeter could not truthfully swear these "facts" when he submitted the Affidavits because nothing in his investigation, including interviews with "victims" and witnesses, revealed that Plaintiffs or anyone else had confiscated or withheld any immigration or identification documents.

17

4929-3102-3733, v. 1

63.     The only documented time Defendant Jeter asked a "victim" whether Rubicon had withheld any immigration documents, Defendant Jeter was given an unequivocal "no."

64.     In Defendant Jeter's interview of "victim" ADLP on June 23, 2023, Defendant Jeter learned ADLP kept all his immigration and identification documents, including what was necessary for travel:

> Jeter: "Okay. Did they take any of your documentation when you guys came in to – came to work for them, like passports or . . ."
>
> ADLP: "No, we kept it all."

65.     During an August 29, 2023 interview, a former Rubicon human resources employee told Defendant Jeter: "We didn't like keep their passports or anything like that."

66.     During an interview with IGG, another of the seven "victims," Defendant Jeter took a photograph of IGG's H-2B visa and passport. That was possible only because the visa and passport were in IGG's possession during the interview.

67.     In another interview between Defendant Jeter and a "victim," JMAM handed Defendant Jeter his Form I-94, an immigration document that verified JMAM's legal status as of the date he met with Defendant Jeter. Defendant Jeter made a copy of it, establishing that the I-94 was in JMAM's possession.

68.     Defendant Jeter did not ask all seven "victims" whether Rubicon or anyone else had confiscated or withheld immigration or identification papers.

69.     Of those Defendant Jeter did ask, not a single "victim" or "witness" claimed that Rubicon or anyone else had confiscated or withheld any immigration or identification documents from any H-2B workers.

18

70.     Contrary to his false statements in the Affidavits, Defendant Jeter later admitted on cross examination during a preliminary hearing in May 2024 that the I-797A Form was not necessary for travel back to Mexico.

71.     Defendant Jeter later admitted in testimony that workers could travel with just their passports.

72.     When Plaintiffs and others filed a *Franks* Motion in March 2024 challenging the veracity of the Affidavits and claims of probable cause to issue search warrants based on false and fraudulent material content, Defendant Beckett responded with the following allegations, which she knew or should have known were likewise blatant falsehoods:

a.     Contrary to Defendant Jeter's false representations in the Affidavits, it was not the Form I-797A Rubicon and others confiscated or withheld, but their Form I-94s.

b.     By withholding the I-94s, Rubicon and others restricted alleged victims' ability to travel between Mexico and the United States.

c.     By withholding the I-94s, Rubicon and others failed to "properly inform the identified victims of their expired visa status" and put "their continued access to the H2B program at risk."

d.     Rubicon allowed H-2B workers' visas to expire, rendering them "out of status."

73.     Neither the Form 1-797A nor the Form I-94 is necessary to travel to the H-2B workers' countries of origin. Foreign visitors need only a passport, which Plaintiffs neither confiscated nor withheld from any H-2B workers, even though Defendant Jeter falsely swore Rubicon "withheld government identification documents" from the seven "victims."

74.     Rubicon never withheld the Form I-94 from any H-2B workers, including the seven "victims." All H-2B workers received a Form I-94, which was attached to the Form I-9 they filled out, when they began working for Rubicon.

19

4929-3102-3733, v. 1

75. No victim or other witness ever told Defendant Jeter that Rubicon had taken or withheld the Form I-94. As noted above, one "victim" even brought his I-94 with him to the interview with Defendant Jeter who photographed it.

76. As for the seven "victims":

   a. ADLP signed his I-9 and received his I-94 on February 6, 2023.

   b. EVRA signed his I-9 and received his I-94 on February 6, 2023.

   c. IGG signed his I-9 and received his I-94 on February 6, 2023.

   d. KJPS signed his I-9 and received his I-94 on February 7, 2023.

   e. JCJTL signed his I-9 and received his I-94 on December 27, 2022.

   f. JGCC signed his I-9 and received his I-94 on December 27, 2022.

   g. JMAM provided Jeter a copy of his I-94 on July 31, 2023.

77. Defendant Beckett's claim that, by withholding I-94s from H-2B workers, Rubicon allowed workers' visas to expire, leaving them "out of status," is likewise patently false.

78. Evidence establishing its falsity was within Defendants' possession well before Defendant Beckett and the other prosecutor representing the state in the criminal case, Assistant Attorney General Ché Arguello ("Arguello"), made the false representations in response to the *Franks* Motion.

79. On July 31, 2023, Defendant Jeter interviewed "victim" EVRA who said:

> It's worth noting that on March 31st, our visa was about to expire, which is why 15 days prior to that, we held a meeting, where Adam Perea, Clayton, J. Nino and Gaby were present. Adam and Clayton told us that there was going to be renovation work to do in the warehouses and that there was going to be a lot of work. The company was even going to buy 300 more trucks, saying that they were interested in renewing our contracts and that we should sign a sheet of paper, and whoever didn't sign it would be sent back to wherever we came from. As for me, I signed the sheet of paper so I

4929-3102-3733, v. 1

could continue to work throughout April without any document authorizing us to work legally.

**RUBICON**

**Comments on the H2B Visa Program & Opportunity for a Extension**

**March 17th, 2023**

Thank you for your work and participation in the H2B visa program. Since visas are about to expire, we would like to know who is interested in continuing to work with us, so we can request an extension. Also, we would like to know your opinion about your experience working with us. Please check the option that most applies to you.

**Please choose an option:**

☐ Option # 1. I am happy and very satisfied with the company. I would like to stay, renew my visa and continue working at Rubicon this summer.

☐ Option #2. I prefer to return to my country when my visa expires (March 31, 2023)

**If you selected option #2, please choose one of the following options:**

☐ It was a very good experience and I would like to return next season (October 31, 2023)

☐ It was a bad experience and I don't want to return next season (October 31 2023)

Please write your opinion or comment:

_____          03/  /2023          _____
Employee Name            Date                  Employee Signature

Thank you,

**Rubicon Team**

80.    Defendant Jeter later admitted in testimony that the H-2B workers attended the meeting referenced in paragraph 79 above and were told if they wanted to allow their visas to expire and return to their countries of origin, Rubicon would arrange for their travel.

81.    Defendant Jeter also later admitted in testimony that those workers who wanted to extend their visas were among the group for whom Rubicon's immigration attorneys had filed for extensions of their H-2B visas.

21

82.     Before Defendant Jeter swore to the Affidavits, he and the other Defendants were in possession of Form I-797C acknowledgement of the I-129 petitions to extend visas for several H-2B workers, including the seven "victims" who had expressed a desire to extend their visas.

83.     The I-797C form clearly informed Defendant Jeter and the other Defendants that Rubicon had petitioned for extensions on behalf of the H-2B workers whose names were listed on the Form I-797C, and that their legal ability to work under their H-2B visas automatically extended during the pendency of the I-129 petitions.

84.     Despite the foregoing evidence in Defendants' possession, Defendant Jeter initially denied knowing whether Rubicon had filed for visa extensions on behalf of H-2B workers.

4929-3102-3733, v. 1

85.     Defendant Jeter also had in his possession a letter from Rubicon's immigration counsel, KJ Partners, sent to all H-2B workers who wished to extend their visas that explained that, by operation of law, their visas were automatically extended by their inclusion on the I-129 petition to extend:



86.     Defendant Jeter acknowledged in testimony that he had this letter in his possession before he signed the Affidavits.

87.     Defendant Beckett was aware of this letter before she misrepresented to the court that Rubicon allowed H-2B workers' visas to expire by withholding their I-94 Forms, rendering them "out of status."

88.     Finally, in issuing her ruling granting the criminal defendants' *Franks* Motion, the judge said:

23

4929-3102-3733, v. 1

Movants have come forward with a sufficient proffer of evidence that Agent Jeter's statements to the effect that defendants or the companies withheld or denied H-2B workers access to their immigration documents were knowingly false or stated with a reckless disregard for their falsity. There are several examples including proffers of proof where alleged victims and company witnesses told Agent Jeter that the immigration documents were not withheld. Defendants have also proffered evidence that, in some cases, alleged victims provided Agent Jeter their immigration documents to photocopy. There is also evidence that Agent Jeter was in possession of correspondence from the companies' lawyers to the alleged victims which explained their current immigration status, including the status of their visa renewals and their continuing ability to work legally for the companies. Based on those proffers of evidence, Movants have carried their burden of making a substantial showing that Agent Jeter's statements that the defendants withheld or denied H-2B visa workers access to their immigration documents were knowingly false or at a minimum made with a reckless disregard for the truth.

**B.   Defendant Jeter Falsely Stated That Rubicon Forced H-2B Workers to Live in Housing Provided by Rubicon and Have Rent Deducted from their Pay.**

89.   The Affidavits falsely stated:

   a.   "All 7 of the victims stated they were instructed/told they had to sign and participate in the 'Rent Deduction Policy.'"

   b.   "These 7 victims were forced to sign and participate in a 'Rent Deduction Policy' where they were assigned to a residence and paid between $650.00 to $700.00 dollars a month that was automatically deducted from their pay checks."

90.   Defendant Jeter knew these statements were false before he signed the Affidavits.

91.   Defendant Jeter did not ask all seven "victims" the necessary questions to be able to represent, under oath, that each of them was "forced" to live in housing provided by Rubicon and pay rent through payroll deductions.

92.   Defendant Jeter only asked two of the seven "victims" about Rubicon's Rent Deduction Policy, and the answers from those two "victims" did not support Defendant Jeter's false statements in the Affidavits.

4929-3102-3733, v. 1

93. Defendant Jeter later admitted in testimony that H-2B employers are not obligated under federal regulations to provide housing to H-2B workers.

94. In testimony, Defendant Jeter admitted that documents in his possession before he signed the Affidavits demonstrated that Rubicon gave prospective H-2B workers the choice whether to arrange for their own housing or live in housing provided by Rubicon and have rent deducted from their pay. This includes, but is not limited to, the following document:

**RUBICON**

Revision 1
10/4/2022

I understand the above policy and authorize the company to deduct an Income Deduction of $312.00 from my paycheck each pay period. I further understand that I am responsible for any property damage as noted above and authorize a deduction for property damage to be made if warranted.

I understand that I cannot change my selection during my first 12 months and must give 90 days notice if I wish to change at the end of the 12 months.

Select one:

☐ I choose to participate in the housing program provided by the company and agree to the terms of the above policy.

_____     _____     _____
Employee Name    Employee Signature    Date

0

☐ I choose NOT to participate in the above rent deduction policy and will be responsible for finding and acquiring my own housing. I understand that I am fully responsible for all my accommodation costs, as well as making sure I can get to and from work on my own

My address is: _____

My transportation method is: _____

_____     _____     _____
Employee Name    Employee Signature    Date

1343 W 75 N, CENTERVILLE, UT 84014 | 801.928.2800 | RUBICONCONTRACTORS.NET

ACTIONS. NOT WORDS

95. In testimony, Defendant Jeter later admitted that prospective H-2B workers could opt out of the housing provided by Rubicon.

4929-3102-3733, v. 1

96. Defendant Jeter also admitted in testimony that prospective workers, including the seven "victims", signed the opt-in/opt-out documents before they traveled to the United States or were employed by Rubicon.

97. The seven "victims" signed the opt-in/opt-out document as follows:

a. ADLP signed on January 23, 2023, and his H-2B visa issued at the consulate in Mexico more than a week later, on February 1, 2023.

b. EVRA signed on January 24, 2023, and his H-2B visa issued at the consulate in Mexico a week later, on February 1, 2023.

c. KJPS signed on January 23, 2023, and his H-2B visa issued at the consulate in Mexico a week later, on February 1, 2023.

d. IGG signed on January 24, 2023, and his H-2B visa issued at the consulate in Mexico a week later, on February 1, 2023.

e. JCJTL signed on October 21, 2022, and his H-2B visa issued at the consulate in Mexico more than a month later, on November 23, 2022.

f. JGCC signed on October 21st, 2022, and his H-2B visa issued at the consulate in Mexico on more than a month later, on November 23, 2022.

g. JMAM signed on February 11, 2023, and H-2B visa issued at the consulate in Mexico more than a week later, on February 21, 2023.

98. Defendant Jeter later admitted in testimony that "victim" JMAM was not "forced" to agree to live in Rubicon housing and have his rent deducted, and that JMAM told Defendant Jeter he had a choice whether to live in the housing provided by Rubicon and have rent deducted from his paychecks:

Jeter: "Okay, when you decided to work for Rubicon, did they have you fill out this rent paperwork?"

JMAM: "Yes."

Jeter: "And were you given instructions on which option to select"

ADLP (interpreter): "Were you told which one to choose or given a choice?"

JMAM: "Yes, yes, I was given a choice.

ADLP (interpreter): "yes?"

JMAM: "Yes."

Jeter: "What were you told?"

ADLP (interpreter): "What did they tell you?"

JMAM: "No, they just sent it to me by mail and told me that I had to fill it out . . . (inaudible) choose the program (inaudible) in here I wrote that it is . . . a box."

99.    As the court in the criminal case explained in determining there was sufficient

evidence for an evidentiary hearing on the *Franks* Motion:

> Even if it is technically true that certain alleged victims felt compelled to sign the policy, which is different from being forced to do so, Agent Jeter omitted material information about the timing of their agreement to use company housing. As written, the affidavits suggest that defendants used some undue influence such as threatening deportation or withholding immigration documents to force alleged victims to sign a rent deduction policy. At least, that is what is implied by the affidavits as they stand. At the very least, the affidavits imply that the defendants waited until the H-2B visa workers had arrived in Utah and were faced with having no accommodations and, therefore, were forced to sign the rent deduction policy or have nowhere to live.
>
> Even if technically true that some alleged victims felt compelled or coerced to sign the rent deduction policy, the nature and extent of that compulsion was misleading because the remainder of the affidavits was misleading about the type and kind of leverage that the defendants had over the alleged victims at the time they made the decision to sign it. Agent Jeter failed to include information in his possession that alleged victims made the election prior to applying for or receiving their H-2B visas when at home in their country of origin. In other words, the only compulsion they would

have felt was the motivation to arrange housing so that they could participate in the H-2B visa program, which is a materially different representation and story than what is portrayed by the affidavits, which is that they were compelled to do so by either the withholding of their immigration documents, the withholding of their funds or money, or otherwise.

C.   **Defendant Jeter Falsely Stated That Rubicon Closed H-2B Workers' Online FinTwist Bank Accounts and Kept (Stole) Any Remaining Money in the Accounts.**

100.   Defendant Jeter falsely swore in the Affidavits that Rubicon stole money belonging to H-2B workers by closing their virtual bank accounts with FinTwist Solutions ("FinTwist") after the workers left Rubicon's employ.

101.   Defendant Jeter falsely swore that if H-2B workers "left the company Rubicon would close the account even if there was still money in the account belonging to the victims."

102.   These sworn statements are blatant falsehoods.

103.   Not a single piece of evidence supported Defendant Jeter's false representations.

104.   Most Rubicon H-2B workers did not have a bank account in the United States and lacked the ability to open an account until they could meet sufficient qualifications to satisfy bank requirements.

105.   To solve this problem, Rubicon provided virtual bank accounts through FinTwist. The H-2B workers owned and controlled these FinTwist accounts once they registered and opened the accounts.

106.   FinTwist provides Comdata MasterCards issued by Regions Bank.

107.   The FinTwist MasterCards operated much the same as debit cards.

108.   Hence, through its payroll company, Paycom, Rubicon provided a means to pay the H-2B workers using their FinTwist accounts/cards instead of checks, which the workers

4929-3102-3733, v. 1

would be unable to cash or could cash only at a substantial fee, or cash, which would create its own set of problems.

109.    The FinTwist website explains:

> Though employers implement the FinTwist digital payment solution, the card belongs to the employee (or cardholder) once they activate their card. This means that employees can take their card with them to their second job, or to their next job, regardless of whether they still work for the original employer. Additionally, cardholders can have government benefits or tax refunds deposited onto their paycard by using the routing and account number.
>
> The American Payroll Association states that paycards are "80% less expensive than check cashing services." With the Fintwist digital payment solution, employees get access to bill pay, online purchases, money management tools, and P2P transfers at no cost to the employer.  Save money by avoiding check-cashing fees and money orders.

110.    Defendant Jeter had in his possession the FinTwist paperwork which he failed to disclose in the Affidavits. This paperwork provided instructions to H-2B workers as follows:

> To begin using your new FinTwist card simply follow these steps. 1. Validate. You cannot use your card to transfer money into or out of your account until we have validated it. If you do not want to use the card please destroy it at once by cutting it in half and please contact your employer. Validate your card by calling the phone number on the sticker located on the front of your card. 2. Enter. Enter your card number and the confirmation number provided by your program administrator. 3. Listen. Follow instruction to setup a 4-digit PIN for use with your card. You can also sign up to receive text alerts if you like. 4. Use. Use your card at any of the millions of locations around the world where Mastercard is accepted.

111.    For each pay period, Paycom deposited the H-2B workers' paycheck into their FinTwist accounts at Regions Bank, and the H-2B workers could then use the FinTwist cards to purchase items, pay bills, and withdraw cash.

4929-3102-3733, v. 1

112.    When H-2B workers stopped working for Rubicon, Paycom automatically limited the former employees' access within the Paycom app because the workers were no longer on Rubicon's payroll.

113.    Former H-2B workers could still access some information, but they no longer had full access to the entire Paycom system.

114.    However, the former H-2B workers continued to own and have full access to the funds deposited into their FinTwist accounts and the ability to spend or withdraw those funds using their FinTwist cards.

115.    Rubicon never took money from the former employees' FinTwist accounts after the H-2B workers left Rubicon, and no evidence in Defendants' possession suggested otherwise.

116.    Indeed, in the Affidavits, Defendant Jeter claimed that the H-2B workers only had access to change the PIN number of the FinTwist account. But when pressed on cross examination, Defendant Jeter admitted that the individual whose statement Defendant Jeter used for this point never tried to change anything in his account. Defendant Jeter also admitted that a person he claimed did not have access to his FinTwist account actually told Jeter he could withdraw money, shop, and use the card for purchases.

117.    Finally, in her ruling setting an evidentiary hearing for the *Franks* Motion, the judge said:

> Movants have carried the burden of making a substantial showing by offer of proof that Agent Jeter's statements that defendants threatened to and did withhold earnings from the alleged victims if they had left employment with the companies were false. The H-2B visa workers' access to Rubicon's payroll portal was disabled when they left employment, but they retained access to all earnings in their FinTwist account. Moreover, Movants have proffered evidence that Agent Jeter was in possession of information regarding the FinTwist cards, how they worked, and statements by alleged victims that were contrary to his representations to the court. Accordingly, there has

30

been a sufficient proffer of evidence that, at the time Agent Jeter made the statements, he either knew that they were false or had information in his possession that would have contradicted what he said, and he had a reckless disregard for the truth.

**D.** **Defendant Jeter Falsely Stated That Rubicon Threatened the Seven Alleged Victims with Deportation Without Disclosing Material Information that Was Necessary Context for a Determination of Probable Cause.**

118. Defendant Jeter made multiple materially false omissions in the Affidavits regarding alleged threats of deportation. He swore:

 a. "During their employment [all seven victims] had been threatened by Adam Perea and Clayton Phillips (sic) they would be sent back to Mexico. One victim was told if he was sent back to Mexico he would be met with Law Enforcement because being sent back is worse than crossing the border illegally."

 b. "Victims were threatened to be deported and even told if they were deported, they would be met with local law enforcement because being sent back was worse than if they had come into the country illegally."

 c. "Adam Perea . . . handled recruitment, direct involvement with H2B workers, set up bank card and threatened to deport them back to Mexico. Clayton Ray Phillipps . . . had direct involvement and threatened to deport H2B workers back to Mexico."

 d. "Scandia Company, Smart Rain and Rubicon Contracting LLC, owners, and several employees . . . threatened deportation and made threats of law enforcement against the victims. . . ."

119. Defendant Jeter omitted that all alleged "threats" of deportation were instances where someone explained to H-2B workers that if they failed to appear for work or took work outside the scope of their visa, Rubicon was legally required to report them to the Department of Labor, which is a correct statement of applicable law and an employer's obligation under the H-2B visa program.

31

120. The omitted information completely changes the context of the alleged threats, even if it were a technically true statement that someone told "victims" they may be deported if they failed to appear for work.

121. Inclusion of the omitted information in the Affidavits would completely change the context and understanding of the allegations, rendering the Affidavits without probable cause on the issue of threatened deportation.

122. Defendant Jeter specifically asked alleged victim ADLP if anyone from Rubicon had threatened him. His answer was: "Not really."

123. Defendant Jeter admitted that ADLP had not been threatened with deportation.

124. Defendant Jeter specifically asked alleged victim JMAM whether he had been threatened by anyone at Rubicon, and his response was: "They just told us if we left the company, that we would be reported."

125. Defendant Jeter later admitted in testimony that JMAM's response was a correct statement of the law: employers are required to report H-2B workers who violated or were out of compliance with their visas, which included abandoning their employment with the designated employer.

126. Nowhere in the evidence did any alleged victim claim they were told they would be met at the border by law enforcement.

127. Contrary to the false representations in the Affidavits, all seven alleged victims were not threatened, and Defendant Jeter lied about the content of supposed "threats," including using "deported" where he should have said "reported."

128.    In the AGO's response to the *Franks* Motion, Defendant Beckett and Arguello defended Defendant Jeter's material omissions by making a new false assertion, without any citation to evidence, that "none of these identified victims had abandoned their jobs."

129.    This statement was demonstrably false based on documents and other evidence in Defendants' possession at the time Defendant Beckett filed the response.

130.    The following contrary facts establish the falsity of Defendant Beckett's claim that none of the workers had abandoned their jobs.

131.    In May 2023, Rubicon sent multiple emails and text messages to H-2B workers requesting they come to work.

132.    By this time, several H-2B workers had refused to show up for work and were working illegally for EVRA's brother, contrary to the terms of their H-2B visas.

133.    For example, this email from Rubicon to JGCC went unanswered while he worked elsewhere but continued living in Rubicon housing rent free:

4929-3102-3733, v. 1



134.    JGCC admitted to Defendant Jeter that, when Adam Perea ("Perea") and Clayton Phillipps ("Phillips"), senior employees of Rubicon who were charged as codefendants with Mr. Larsen and Ms. Larsen, went to a home to collect rent, Perea and Phillipps had come "since we are already working somewhere else."  In other words, the employees had abandoned their work with Rubicon in violation of their H-2B visas, necessitating Rubicon's reporting of the job abandonment to the Department of Labor.

4929-3102-3733, v. 1

135.   A May 17, 2023, email from Rubicon to ADLP, JCJTL, JGCC, IGG and KJPS

(who had not come to work for more than five days) said:

| From: | Clayton Phillipps |
|---|---|
| Sent: | Tuesday, May 16, 2023 8:21 PM |
| Subject: | trabajo responsibilidades |

Dear friends,
We wonder why you haven't been working for Rubicon this week. This informational email is to help you know what is expected of you each day.

You are expected to bring personal tools every day when needed.

As we schedule work, your manager will let you know what work you need to do the night before no later than 8 p.m. Typically, you will work from 6-7 a.m. to 4-5 p.m. Monday through Friday. If your direct manager doesn't get back to you, reach out to them. If you can't get them, please contact the next level manager. On rare occasions of snow removal, this is a 24/7 service. You are expected to arrive on time and ready to perform your scope of work until the end. **If you do not have a PRJ on your application, you must come to the office so you can be assigned to work when you are available. 1343 West 75 North, Centerville UT.**

**Chain of Command Communication**
↓ Field Technician
↓↑ Foreman
↓↑ Production Manager
↑ Operations Manager

136.   As the judge in the criminal case said in setting a hearing for the *Franks* Motion:

[Agent Jeter] made material omissions in the Subject Warrant affidavits that changed the meaning of those statements in a way that would have affected the probable cause determination. Movants proffered evidence that Agent Jeter was told by alleged victims and by witnesses that the threats of deportation were instances where someone explained to the alleged victims that if they failed to appear for work or took work with a different employer outside the scope of their visa, that the company sponsoring the H-2B visa would need to report them to the Department of Labor. . . .

The proffer of information and evidence by Movants of many instances where Agent Jeter stated that alleged victims complained they were threatened with deportation, the omitted material information that the alleged threats were made in the context of them being informed of the companies' obligation to report to the Department of Labor if they violated their contracts, left work with the company or failed to appear for work, completely changes the context. Even if it were a technically true statement that the company told the alleged victims they may be deported if they failed to appear for work, including the omitted information completely

35

4929-3102-3733, v. 1

changes the context and the understanding of allegations, such that the statements no longer support probable cause of labor trafficking.

137. The magistrates who reviewed the Affidavits were misled by Defendants' materially false statements and material omissions in the Affidavits.

138. Based on the materially false statements and omissions in the Affidavits, the magistrates issued the Warrants under seal.

### The AGO, SECURE, Defendant Jeter and Defendant Lucey Execute the Warrants Based on Jeter's False Sworn Statements.

139. The AGO, SECURE, Defendant Jeter, Defendant Lucey, and others from the AGO executed the Warrants on November 20, 2023, and searched various premises, including Rubicon's corporate offices, and seized millions of dollars and extensive electronic and hard-copy corporate records.

140. Even though the Warrants were sealed, the AGO, SECURE, and Defendant Lucey notified and invited members of the media to cover, record, and report on the execution of the Warrants at Plaintiffs' private property.

141. In a video posted by Fox 13 News on November 30, 2023, a reporter riding in a law enforcement vehicle stated: "Leo Lucey invited Fox 13 to be part of today's operation, was in charge of this investigation."

142. While conducting the search pursuant to the Warrants, Defendant Lucey brought members of the Fox 13 news crew inside the Rubicon offices. When a Rubicon official asked the Fox 13 news crew to vacate the premises, Defendant Lucey adamantly insisted that the Fox 13 news crew would not leave the building and could go wherever they wanted. During the search, Defendant Lucey also told a manager of Scandia that "neither you nor the owner have

4929-3102-3733, v. 1

any right to privacy and if you have a problem with it call your f***ing attorney and I'll call my f***ing attorney and you will f***ing lose because I do this every day!"

143.    The AGO, SECURE, and Defendant Lucey's purpose in notifying and inviting the media to record and participate in the execution of the Warrants at Plaintiffs' place of business was to bring widespread public attention to the execution of the Warrants, the anticipated criminal charges, and no-bail arrest warrants for seven individuals with no prior criminal history.

144.    The negative publicity for Plaintiffs herein was intended by the AGO, SECURE, and Defendant Lucey to help exonerate the AGO under Defendant Reyes and deflect negative attention concerning its and his malfeasance.

145.    The AGO, SECURE, and Defendant Lucey also sought to influence the pool of potential jurors against the individuals who were criminally charged four days after execution of the Warrants.

146.    Officials from Child Protective Services were present during the execution of the Warrant at Rubicon because the AGO, SECURE, Defendants Jeter and Lucey believed they would be arresting Mr. Larsen and Ms. Larsen, who are the parents of three minor children.  Mr. Larsen and Ms. Larsen were out of town for the Thanksgiving holiday and were not present at the time the Warrant was executed.

147.    The AGO, SECURE, Defendant Jeter, and Defendant Lucey arrested three Rubicon officers who were present during the search: Tyler Brinkman, Phillips, and Perea. These individuals were incarcerated without bail at the Davis County Jail for 11 days, which included the Thanksgiving holiday and weekend.

148.    The Warrants authorized the AGO to seize various bank accounts belonging to Plaintiffs.  The AGO seized more than $5 million from Rubicon, Scandia, Smart Rain, and other businesses under the Warrants. The seizure of the companies' operating accounts resulted in the businesses bouncing checks to vendors, employees, and partners due to insufficient funds.

149.    The communications of Defendant Jeter and other employees of the AGO revealed that Defendants seized Plaintiffs' personal and business accounts to inflict pain and bankrupt the Plaintiffs.  Defendants also intended to embarrass Mr. Larsen and Ms. Larsen personally and publicly by inviting the media and disgruntled ex-employees of Rubicon to show up and watch the raid and arrest. Specifically, Defendant Jeter told Crystal Massey ("Massey"), a disgruntled former employee of Rubicon, the date of the raid in a text message even though the Warrants were filed under seal. Massey then invited other ex-employees, including Joshua Nix ("Nix"), to watch from the parking lot as the Warrants were executed.

> Jeter: Perfect thank you…. the plan is for Monday just fyi.

> Massey: You're welcome, and thank you for the heads up. If it helps they did just bring in investors – they posted it on Linkedin which is how I know about it.

150.    Defendant Jeter also told Massey that all the companies would likely stop operating and would essentially have to file for bankruptcy because of the actions he took by falsely swearing under penalty of perjury on the warrants.

> Jeter: It won't be shut down today but when this is over probably.

> Massey: Thank you. I just wondered if everyone will continue working or if everyone was sent home. Is Rubicon shut down for now? I understand if you can't tell me.

4929-3102-3733, v. 1

**The AGO and Defendant Beckett File Formal Charges and Amended Charges,
Which Contain False Sworn Statements That Mirror the False Sworn
Statements in the Affidavits.**

151.    On November 24, 2023, the AGO filed formal criminal charges that alleged seven counts of aggravated human trafficking, first-degree felonies under Utah's human trafficking laws, against Mr. Larsen, Ms. Larsen, and five other Rubicon employees.  Upon filing the formal charges, the AGO obtained no-bail arrest warrants for all charged individuals, all of which had no criminal backgrounds.  Defendant Beckett prepared the statements of probable cause and criminal charges with Defendant Jeter's assistance.

152.    The statements of probable cause in the charging documents contained the same and similar false material statements and omissions set forth in the Affidavits.

153.    The criminal charges filed by the AGO included second degree felony money laundering charges against Mr. Larsen despite having no evidence to support a money laundering charge in the case summary and final investigative report prepared by Defendant Jeter and no recommendation in the final investigative report to include a charge for money laundering.

154.    Although the money laundering charge was later dropped, the extensive media reporting on the money laundering allegations against Mr. Larsen caused extensive damage to his professional reputation and the loss of business opportunities.

155.    On May 10, 2024, after the defendants and intervenors in the criminal case had filed and fully briefed the *Franks* Motion, the AGO, Defendant Reyes, Defendant Beckett, and Arguello filed amended and second amended criminal charges against the criminal defendants.

156.    The amended and second amended criminal charges contained the same false material statements and omissions set forth in the Affidavits, despite the fact that Plaintiffs had

4929-3102-3733, v. 1

provided Defendants detailed, indisputable proof that the allegations were based on blatant falsehoods, and Defendants knew the misrepresentations and omissions were false.

157.    Defendant Beckett and Arguello prepared the statements of probable cause and criminal charges in the amended and second amended information having notice and full knowledge that factual statements and omissions necessary to establish probable cause for the criminal charges were false.

**<u>Defendants Violated Plaintiffs' Constitutional Rights by Contacting Customers<br>and Clients of Rubicon for the Purpose of Interfering<br>with and Damaging Those Relationships.</u>**

158.    After they obtained the Warrants, Defendants contacted some of Rubicon's biggest customers, including business entities with which Rubicon had longstanding relationships and contracts, for the purpose of damaging or destroying those relationships.

159.    For example, on or about November 30 or December 1, 2023, the AGO notified Walmart's government affairs office about the criminal charges. In an email, a Walmart attorney stated: "Walmart was informed that the [AGO] had commenced a criminal action against several executives of Rubicon regarding human trafficking allegations."  The attorney also stated: "…all payments to Rubicon have been put on hold as we continue to work with the [AGO] and other government agencies regarding this matter" and "[i]t is critical that Walmart follow all guidance from all involved governmental agencies in this matter…"

160.    Plaintiffs sought production of the AGO's communications with Walmart through a public records request and discovery requests.

161.    Although Arguello declared in court that the AGO had "nothing to hide," the AGO has not produced its communications with Walmart.

40

162.   As a direct and proximate result of Defendants' contacting clients and customers of Rubicon, including Walmart, Rubicon lost tens of millions of dollars in ongoing business.

### Defendants Lied About Housing and Work Conditions to Damage Plaintiffs' Public Image and Reputation.

163.   Defendant Jeter and Defendant Beckett drafted false statements in the Affidavits, Warrants, and charging documents to harm Plaintiffs' public image and reputation even though Defendant Jeter and Defendant Beckett had evidence in their possession that contradicted the false statements before drafting, signing and submitting the charging documents to the court.

164.   These false statements include:

 a.   "The training provided to the victims upon arrival was almost entirely in English."

 b.   "J.N. [Nix] stated the workers were given videos in English and no other training. J.N. stated that one employee was tasked with voicing over the videos with Spanish."

165.   Nix never made these statements, and Defendants had evidence in their possession to prove these statements were false.

166.   For example, in a recorded interview with Defendant Jeter, Juan Niño ("Niño"), who worked in Human Resources for Rubicon, said:

> [M]y responsibility was be there, make sure that they, you know, went to the videos, took all the exams from the videos and so created like a, you know, make like different teams and I sent to different supervisors and I was in charge to make sure that, you know, kind of like taking attendance, you know, who showed up.

167.   IGG, an H-2B worker and one of the alleged victims in the criminal case, said in his own sworn statement that he was provided training: "They showed us videos of the company and played video tutorials on how to use snow plowing tools, in addition to permission to use the company's equipment and vehicles."

4929-3102-3733, v. 1

168.    Defendants knew or should have known that all employees were trained and were required to pass exams that demonstrated that training before they could work for Rubicon.

169.    Rubicon's business records that were seized by Defendants include approximately 1,200 unique test results showing all Rubicon employees were trained and passed documented tests.

170.    Rubicon's training videos for six different types of winter training were posted on YouTube and publicly available in both English and Spanish.  All the alleged victims in the AGO's investigation were required to view these training videos.

171.    In addition, Defendants falsely claimed that the homes where Rubicon's H-2B workers lived were "subhuman" and not in a livable condition.  Defendant Reyes made statements in press releases and to the media which were demonstrably false.  Defendant Reyes claimed that:

> The treatment of these workers is appalling … We intend to prove the victims are innocent people who came to America using a legal immigration process to work hard, earn a living, and contribute to society. But, instead, we believe they were exploited in subhuman living and working conditions as indentured servants in a labor trafficking scheme.

172.    However, Defendant Reyes and the other Defendants knew these statements were false. Defendant Jeter himself admitted under oath at the preliminary hearing that Plaintiffs were not required to provide housing and were not in charge of the cleanliness of the homes.

173.    Niño said the following in a recorded interview with Jeter:

> So Rubicon gave them like some groceries the very first day they got here and like a couple of blankets, a pillow and a couple of groceries. They last for like, I don't know, four or five days.

174.    JMAM, another H-2B worker who was included as an alleged victim in the criminal charges, said in a sworn statement that the H-2B workers were not required to live in

42

Rubicon provided housing: "They gave us the choice of living in a house that they were going to provide, or we could look for our own house to rent."

175.   Defendants and other AGO employees searched the homes of Rubicon H-2B workers on November 22, 2023, before filing the criminal charges. They took photos and videos of the living conditions, which included photos showing beds, clean homes, and pantries stocked with food.

176.   In fact, Rubicon voluntarily provided H-2B workers with furniture, food, pots and pans, and anything else workers needed, free of charge. In 2023 alone, Rubicon spent more than $100,0000 on H-2B workers to support their various needs, including food, clothing, furniture and more.

177.   Defendants knew, and Defendant Jeter acknowledged during his testimony at the preliminary hearing, that there was no requirement under the H-2B visa program that Plaintiffs provide food, clothing, furniture, or other household goods free of charge to H-2B visa employees.



43

4929-3102-3733, v. 1

**<u>Defendants Made False Statements to Mislead the Court</u>**
**<u>and to Obtain No-Bail Arrest Warrants.</u>**

178.    Defendants made false statements in the charging documents to mislead the Court

and to improperly secure no-bail arrest warrants against Mr. Larsen and Ms. Larsen.

179.    Mr. Larsen and Ms. Larsen have no criminal record. However, Defendant Jeter,

Defendant Beckett and the AGO made false statements about them to secure no bail arrest

warrants. These false statements include:

      a.    "There is substantial evidence to support the felony allegations, including witness statements, video/audio recordings, and statements of the defendant."

      b.    "The Defendant [Mr. Larsen] has connections to other jurisdictions, which would allow him to flee the jurisdiction easily."

      c.    "The Defendant [Mr. Larsen] has repeatedly referenced how he has engaged in illegal conduct and made direct and overt threats of force and intimidation against victims and witnesses."

      d.    "The Defendant is married to a co-defendant, presenting a unique risk."

      e.    "Thus, the Defendant is not currently a risk that can be safely managed by any other means, except pretrial detention."

180.    None of the above statements are true about Mr. Larsen or Ms. Larsen.

181.    There was no evidence to establish probable cause that either Mr. Larsen or Ms.

Larsen had committed any of the crimes with which they were charged.

182.    Mr. Larsen and Ms. Larsen have no connection to any other jurisdiction.

183.    Mr. Larsen and Ms. Larsen have never threatened anyone or used intimidation

against any victims or witnesses.

184.    Mr. Larsen and Ms. Larsen are married to each other, but this fact does not

present a unique risk justifying a no-bail arrest warrant.

4929-3102-3733, v. 1

185.    Mr. Larsen and Ms. Larsen were not a risk to the safety of the public, nor did they pose a flight risk given their deep connections with the community in which they live.

186.    Defendant Jeter later admitted that Mr. Larsen had never spoken to, threatened, or taken the passports of any of the alleged victims:

> Q    Mr. Jeter, referring to these seven alleged victims -- and I'm going to expand it -- my question to the 14 from the Amended Information, so total of 14 -- I'm happy to go through these names, but you know who I'm referring to when I talk about Alleged Victims 1 through 14 from the Information?
> A    Yes.
> Q    Okay. Not one of those 14 alleged victims has told you that Rudy Larsen was involved in their recruitment, correct?
> A    Correct.
> Q    Not one of the alleged 14 victims has told you that Rudy Larsen threatened them with any harm, correct?
> A    Correct.
> Q    Not one of those 14 alleged victims has told you that Rudy Larsen withheld their passport or other immigration documents, correct?
> A    Yes. Sorry.
> Q    Is that correct?
> A    Correct.
> Q    Not one of the 14 alleged victims has told you that Rudy Larsen threatened them with deportation, correct?
> A    Correct.
>          MR. CRANE: Your Honor, I'll pass the witness.

187.    The Court in the criminal case indicated that there was insufficient evidence to support a finding of probable cause necessary to issue the broadly-worded warrants that were the predicate to the criminal charges. Also, the Court's February 2025 Order dismissing all criminal charges recognized that, "the State prematurely filed charges before having adequate evidence to support them" and cited the State's admission of this fact as "a reasonable ground to dismiss the charges as the State has requested."

45

4929-3102-3733, v. 1

188.   Defendants also manufactured false statements about Mr. Larsen that were specifically designed to cause outrage and turn public opinion against him.  These false statements included the false allegation that Nix told Defendant Jeter about an event where Mr. Larsen removed his pants in a business meeting and supposedly told employees to suck on his "genitals".

189.   The alleged statement from Nix was completely made up.  When Nix was deposed in May of 2024 in a separate civil case, he denied that he had made this statement to Defendant Jeter and stated: "I have been a little confused as to where exactly the quote came from".

**Defendants Damaged Plaintiffs' Reputation, Hurt Their Businesses, and Damaged Relationships Including Rubicon's Private Equity Investor.**

190.   On September 11, 2023, Rubicon received a capital investment from a private equity group (the "Investor"). The Investor provided a multi-million dollar investment of capital in exchange for a 6% minority equity position in Rubicon.

191.   Seventy days later, Defendants raided Rubicon's headquarters and seized its business records and bank accounts, causing irreparable harm to the business. In addition, Defendants seized the records and bank accounts of Scandia and Smart Rain, causing similar harm to those businesses.

192.   After learning about the criminal case, the Investor's chief investment officer requested that Mr. Larsen, Ms. Larsen, and any others charged in the criminal case be removed from the Rubicon Board of Directors.

193.   Mr. Larsen and Ms. Larsen's efforts to clear their name and rebuild trust with their investors and partners were made even more difficult because Defendant Beckett secured a

4929-3102-3733, v. 1

restraining order against Mr. Larsen, Ms. Larsen, and other owners and executives that prohibited them from speaking with one another. This order caused chaos for the companies. At the very moment when Rubicon, Scandia and Smart Rain were losing most of their customers and revenues, and when management needed to be communicating the most, many of the owners and managers of the businesses could not strategize or even talk to each other about how to solve the problems at hand.

194. Mr. Larsen, Ms. Larsen, and other owners and key executive managers were not able to:

     a. Sit in a management meeting or board meeting together and discuss the challenges they faced.

     b. Sit in the same office as one another.

     c. Discuss basic business matters with one another.

     d. Say "hello" to one another while passing in the hallway at work.

195. The restraining order was intended to and did cause corporate paralysis; an inevitable and foreseeable result of the inability to communicate, get and give approvals, and discuss key decisions, at a time when communication was paramount to the survival of all the businesses.

196. After approximately four months of not being able to speak to one another, the criminal defendants obtained modifications to the restraining order, allowing them to speak to other owners and managers about business matters. Even so, this four-month embargo on critical communications caused substantial harm to the businesses.

197. The improper request for a restraining order, the extensive media coverage the AGO requested for the execution of the Warrants, and the outreach to Rubicon's customers by

4929-3102-3733, v. 1

the AGO encouraging them to cancel their contracts with Rubicon was intended to damage the reputation of Plaintiffs and did in fact do so.

198.    The foregoing actions by Defendants continue to harm Plaintiffs.

199.    Rubicon, Scandia and Smart Rain had near perfect credit at the time of the raid. They were well-operated, successful businesses that always paid all bills, vendors and suppliers on time.

200.    The actions of Defendants resulted in diminished credit quality and reporting platforms continuing to keep manufactured human trafficking charges on their business credit which has harmed their businesses. This continues to result in denied credit even to this day.

COMPANY EVENTS

The following information was reported on: 05/08/2025

The Utah Secretary of State's business registrations file showed that Rubicon Contractors, LLC was registered as a Limited Liability Company on December 6, 2010, under the file registration number 7849015-0160.

Business started 2010.

RUDY LARSEN. Antecedents not available.

TYLER C BRINKMAN. Antecedents not available.

CRIMINAL PROCEEDINGS: According to a published report dated Nov 28, 2023, Rudy Larsen, Tyler Brinkman, and five co-defendants have been charged by the Utah Attorney General's office. Larsen is facing seven first-degree felony counts of aggravated human trafficking, one second-degree felony count of pattern of unlawful activity, and one second-degree felony count of money laundering. The other defendants are each facing seven counts of aggravated human trafficking. Brinkman and two co-defendants also were charged with one count of pattern of unlawful activity.

Business address has changed from 86 S 1250 W, Centerville, UT, 84014 to 801 N 500 W Ste 101, Bountiful, UT, 84010.

201.    The reputational and financial damage suffered by Plaintiffs can never be fully repaired or undone.

## Defendants' Malicious Prosecution of the Criminal Charges Against the Plaintiffs Included Gross Negligence and a Litany of Errors and Oddities.

202.    Contacting Rubicon's customers was just one of many irregularities with how Defendants pursued Mr. Larsen, Ms. Larsen, and the other defendants in the criminal case.  In addition to the numerous false sworn statements by Defendant Jeter, the improper seizure of over $5 million in business and personal funds, executing the Warrants with much publicity,

4929-3102-3733, v. 1

utterly false testimony by Burton to a legislative committee regarding Rubicon to obtain funding for human trafficking investigations, obtaining no-bail warrants for individuals with substantial Utah ties and no criminal histories, including individuals with minor children, executed during the week of Thanksgiving, other errors and oddities from the AGO's investigation and malicious prosecution of this case include:

a.    Defendant Jeter improperly acted as his own "taint team" after Defendants failed to establish a "taint team" prior to executing the Warrants. Defendants knew they would be seizing corporate records from Rubicon's offices, which would undoubtedly contain attorney-client privileged communications.  Following the seizure of the corporate records, counsel for Rubicon, Scandia and Smart Rain promptly notified Defendant Beckett that the seized documents included attorney-client privileged records and requested that a "taint team" be set up to identify privileged records. Despite repeated requests, Defendants refused to establish a "taint team" until the court ordered them to do so upon motion by the criminal defendants and intervenors. In response to the motion, the AGO produced a report by Defendant Jeter explaining that, even after the claims of privilege, Defendant Jeter reviewed the seized records and segregated any records that appeared to be attorney-client communications. Defendant Jeter claimed that he did not further review those records. As any reasonable investigator or prosecutor would know, such a procedure creates the very taint that an appropriately designed privilege review by a "taint team" is designed to avoid.

b.   In February 2024, Defendant Beckett and Arguello moved to stay the criminal case.  In support of the motion, Defendant Beckett and Arguello asserted that Rubicon's counsel should be disqualified due to a purported conflict of interest because counsel briefly represented both Mr. Larsen and Ms. Larsen when the Warrants were executed without warning while Mr. Larsen and Ms. Laren were out of town. Defendant Beckett and Arguello argued that the case should be stayed until the motion to disqualify was resolved. The motion was quickly and summarily denied by the court.

c.   Ms. Larsen was not listed as a suspect in the final case summary that Defendant Jeter prepared two weeks before executing the Warrants. Defendant Jeter's case summary detailed the findings of his investigation and listed the suspects and the charges he believed were supported by probable cause based on his investigation. The final case summary is presented to the prosecutors who are screening the case to decide which charges should be filed against which suspects.  Despite Ms. Larsen's absence from Defendant Jeter's final case summary, she was inexplicably charged with seven first-degree felonies for aggravated human trafficking. At the preliminary hearing, Defendant Jeter testified that he simply "forgot" to include her in the final case summary.

d.   During a pretrial conference on February 6, 2024, Arguello told the judge that the AGO had "nothing to hide" and that, accordingly, it would produce all discovery. However, numerous documents were not produced,

50

including the AGO's communications with Walmart's attorney. In a later hearing, when asked about the AGO's failure to produce any of its communications with the media regarding the case, Arguello insisted that neither he nor Defendant Beckett had ever communicated with the media about the case. Despite the fact that a local television news crew had literally been invited to "ride along" with the AGO, SECURE and Defendant Lucey during the execution of the search and seizure, Arguello argued that it was the criminal defendants and intervenors, not the AGO, who had brought media attention to the case.

e.   At the pretrial conference, Arguello agreed that the AGO would produce its list of witnesses and exhibits one week prior to the preliminary hearing. However, despite the court's order, the AGO did not produce its list of witnesses and exhibits until after the criminal defendants filed a motion to exclude any undisclosed witnesses or exhibits the day before the start of the preliminary hearing.  Instead, the AGO handed out thumb drives five minutes before the start of the preliminary hearing with incorrectly identified exhibits.

f.   One week before the preliminary hearing, the AGO filed an amended criminal information that added charges related to seven new victims who were identified only by numbers.  When defense counsel requested the identities of the new victims, Arguello and Defendant Beckett refused to provide any additional information.  As a result, Mr. Larsen, Ms. Larsen, and the other defendants did not receive adequate notice regarding crucial

51

components of the AGO's case until the preliminary hearing. During the preliminary hearing, when asked to identify the 14 victims, Defendant Jeter could not remember the names. The court called for a recess and ordered the AGO to provide a complete list of the 14 victims to the court and criminal defendants. The AGO produced a written list of the victims, which both Defendant Jeter and Defendant Beckett confirmed on the record as accurate. After several hours of cross-examination of Defendant Jeter regarding statements from these victims, the AGO informed the court that six of the victims on the list were misidentified and that defense counsel would have to redo their cross examination of Defendant Jeter with the correct list of victims.

g.    The AGO incentivized the purported victims in the criminal case to provide statements by offering T-Visas and U-Visas. These visas offer victims of human trafficking significant benefits, including permanent lawful status in the U.S. Despite repeated requests in the criminal case for all communications with victims regarding promises of visas and assistance with visa applications, and in violation of the AGO's Brady/Giglio obligations, the AGO failed to produce these communications. The AGO also failed to produce all witness interviews conducted as part of Defendant Jeter's investigation.

### DAMAGES

203.   Plaintiffs have been severely damaged by Defendants' conduct in clear violation of the United States Constitution.

52

204.    The harm suffered by Mr. Larsen and Ms. Larsen include, but are not limited to, the following:

a.    Mr. Larsen and Ms. Larsen were out of town when the AGO, SECURE, Defendant Jeter, and Defendant Lucey executed the Warrants.

b.    When Mr. Larsen and Ms. Larsen learned about the Warrants, they also learned that other Rubicon officers were arrested and that investigators were looking to arrest them.  In addition, they learned that Child Protective Servies officials were working with investigators to take custody of their three minor children, ages 6, 9, and 12 at the time.

c.    Mr. Larsen and Ms. Larsen later learned about the no-bail warrants issued for their arrest.  To protect their children, they executed paperwork that would enable relatives to take custody of their children if Mr. Larsen and Ms. Larsen were arrested.

d.    While Mr. Larsen and Ms. Larsen sought to understand what was happening, they searched for legal counsel who could immediately intervene to negotiate a bail amount that would allow them to self-report, rather than being arrested and taken into custody in front of their children.

e.    Through their door-cam, Mr. Larsen and Ms. Larsen learned that law enforcement officers had come to their house while they were out of town.  According to text messages obtained later, Defendant Jeter continued to look for Mr. Larsen and Ms. Larsen to arrest

53

4929-3102-3733, v. 1

them even after counsel had filed an appearance and tried to negotiate a self-surrender.

f.   On November 24, 2023, legal counsel for Rubicon tried to contact Defendant Beckett to set up a self-surrender.  Defendant Beckett refused to respond or communicate because she was on vacation. Later, Defendant Beckett sent derogatory messages to legal counsel including comments saying Mr. Larsen and Ms. Larsen "have more money than Jesus Christ".

g.   On November 28th, 2023, one day before a bail hearing and after multiple attempts to set up a self-surrender, Defendant Jeter continued to try to arrest Mr. Larsen and Ms. Larsen.  Defendant Jeter told former Rubicon employees that he was still looking for Mr. Larsen and Ms. Larsen to arrest them.

h.   Soon after the charges were reported by local news media, an unknown man driving a late-model Honda began to frequently appear at Mr. Larsen and Ms. Larsen's residence.  Mr. Larsen and Ms. Larsen now worry about the possibility of individuals who intend to harm them coming to their home, which has added to their painful mental and emotional trauma.

i.   Soon after charges were filed, Ms. Larsen received a notice from the Davis School District informing her that she could no longer volunteer at the district due to the criminal charges and that she

54

was not allowed on any district property to volunteer, including her children's elementary schools.

Dear Ms. Larsen,

Based on a recent notice from the Bureau of Criminal Investigation (BCI), the district received information that indicates you may have criminal charges and/or convictions that may relate to your volunteering in Davis School District. To confirm the accuracy of this information, the district is requesting a statement from you about an incident on November 30, 2023, relating to human trafficking.

Your volunteering is suspended during this investigation, and you are not allowed to volunteer again until specifically notified by Human Resources.

Please respond in writing regarding the details of the circumstances surrounding this incident and provide a copy of the police report. You may include any information you wish the district to take into consideration. Your response should be submitted to me in Human Resources at jheyne@dsdmail.net or by mail no later than December 18, 2023. Failure to provide satisfactory information by the requested date may result in termination of your volunteering. It is your obligation to participate in this district investigation.

You are welcome to contact me at 801-402-5322 or jheyne@dsdmail.net if you have questions regarding this matter.

Sincerely,

Jocelyn Heyne
Human Resources Specialist

j.　　For approximately fourteen (14) months, Ms. Larsen was unable to attend school volunteer functions due to the wrongful criminal charges against her, which was very hard emotionally on both Mr. Larsen and Ms. Larsen.

k.　　Due to the freeze on their personal bank accounts and credit card accounts, Mr. Larsen and Ms. Larsen could not purchase Christmas presents for their children in 2023.

l.　　Defendants' wrongful conduct has caused Mr. Larsen and Ms. Larsen to suffer PTSD. For example, Mr. Larsen, who was thirty-five years old at the time, was in top physical shape before the Warrants were executed and the charges were filed. For several weeks following the search and the charges, Mr. Larsen would sweat profusely, a symptom of PTSD. He would sweat so much

55

4929-3102-3733, v. 1

that he had to sleep on towels which were soaked through when he awoke. Mr. Larsen also experienced breakouts, lost 10 pounds because of his inability to eat, and began to suffer from high blood pressure, hypertension, and heart issues for which he has sought and obtained medical treatment.

m. For several weeks following the search and the charges, Ms. Larsen could not sleep and, instead, would lay in bed crying. Ms. Larsen was distraught to the point that her children recognized that something was very wrong and worried about the health and safety of their mother.

n. For several months following the search and the charges, Mr. Larsen and Ms. Larsen could not return to work. When Mr. Larsen returned to work, it was only for brief periods of time—no more than two hours at the office. Whenever he went to work, the trauma that he had experienced would resurface. To date, Ms. Larsen remains unable to return to work.

o. As a direct and proximate result of Defendants' conduct, Mr. Larsen and Ms. Larsen have sustained damages for pain and suffering, both emotional and physical, and reputational damage in an amount to be determined at trial.

205. The harm suffered by Smart Rain includes, but is not limited to, the following:

a. Smart Rain was established in 2012 and, over the next eight years, Smart Rain built the leading technology in the smart irrigation industry and

56

invested tens of millions of dollars in the technology. In 2020, Smart Rain released its full system after years of development and investments.

b. Smart Rain developed new technology and secured approximately 20 patents on its proprietary technology.

c. Smart Rain provides hardware products, but the core of its business is software as a service to its enterprise level customers.

d. Between 2020 and 2023, Smart Rain grew very fast and secured national contracts with large customers, including the largest third-party apartment management company in the United States.

e. Between the full release of Smart Rain's technology in 2020 to 2023, Smart Rain had growth of 532%.

f. However, due to the acts of Defendants and the resulting damage to the company's reputation, Smart Rain only grew by 5% from 2023 to 2024.

g. The media coverage and false statements of Defendants regarding the company's connections to alleged human trafficking has resulted in the loss of customers and new business opportunities, severely impacting Smart Rain's business.

h. Smart Rain's largest customers learned about the allegations Defendants had made about Smart Rain, Mr. Larsen, and Ms. Larsen. In August 2024, prior conversations about the allegations came to a head and the customers expressed their concern about Smart Rain's leadership team and the customers' ability to continue to use Smart Rain.

i.  Smart Rain attempted to secure financing it needed to continue to support the growth of the business. However, after approximately 30 conversations, it became clear the damage Defendants had done had taken full effect and the company would not be able to obtain additional financing.

j.  In July of 2024, Daniel Gamelin of Resolve Growth sent the following email to Mr. Larsen and Smart Rain:

Rudy & Dan,

Apologies for the delay here. In full transparency, came across this fairly recent news article – understand that the legal process may be fluid, but given this I think we'll have to pause the conversation around the Smart Rain capital raise from our side.

https://www.ksl.com/article/50801140/owner-partners-of-utah-contracting-business-charged-with-labor-trafficking

**Daniel Gamlin**

k.  The publicity that Defendants sought and obtained regarding the fraudulently obtained Warrants and unfounded criminal charges has continued to damage lending relationships and customer relationships for Smart Rain.

l.  Smart Rain is member of several industry associations, including the Institute of Real Estate Management ("IREM").  IREM holds industry events that Smart Rain regularly attended to network and continue to build relationships with current customers and future customers.

m.  In March 2024, IREM removed Smart Rain from IREM membership and barred Smart Rain from attending events or being involved in the organization, because of the actions of Defendants.

58

4929-3102-3733, v. 1

n.    In July and August 2024, Smart Rain held discussions with representatives of IREM to explain the situation surrounding the criminal charges and how the allegations were not truthful. Despite these efforts, IREM refused to allow Smart Rain to join and participate in future IREM events.

o.    Smart Rain has suffered and continues to suffer severe damage, including lost profits, cash losses, and reputational harm.

p.    As a direct and proximate result of Defendants' conduct, Smart Rain has suffered damages in an amount to be determined at trial.

206.    The harm suffered by Rubicon includes, but is not limited to, the following:

a.    In 2020, Rubicon revenues begin to grow very fast. Resulting in revenue growth of approximately 2,100% between 2020 until November 2023.

b.    At the time that the Warrants were executed, Rubicon was growing very fast both in total sales and total earnings.

c.    On September 11, 2023, Rubicon received a minority capital investment from the Investor in an arms-length, third-party transaction valuing Rubicon in a structured deal at $291,666,666 as of September 2023.

d.    Rubicon's business continued to grow thereafter. Between September and November 20, 2023, Rubicon doubled its business by adding more than 599 new customers, many of which were large customers, thereby doubling Rubicon's value from September 2023 to November 20, 2023.

e.    After the illegal search of Rubicon's business, the widespread negative publicity orchestrated by Defendants, and Defendants' contact with Rubicon's customers, approximately 70% of Rubicon's customers

59

cancelled their contracts with Rubicon as a result of Defendants' wrongful conduct.

f.    As a result, Rubicon's revenues dropped by approximately 90%.

g.    Rubicon was forced to lay off approximately 120 employees within a few months. Additional layoffs followed, resulting in additional harm to Rubicon.

h.    As the result of the illegal seizure of Rubicon's banks accounts, Rubicon bounced multiple checks for insufficient funds, causing a negative impact on vendors, employees, and owners, and further damaging Rubicon's good will, reputation and viability.

i.    Rubicon continues to struggle to retain the customers it has and to attract new customers because of the negative publicity and reputational damage caused by Defendants.

j.    As a direct and proximate result of Defendants' conduct, Rubicon has suffered damages in an amount to proven at trial.

207.    The harm suffered by Scandia includes, but is not limited to, the following:

a.    Prior to the illegal actions of Defendants, Scandia was a successful commercial real estate business, growing revenue by 7,757% between 2020 until 2022.

b.    Between 2020 and 2022, Scandia produced great profits while still building a large commercial real estate pipeline and investments in various projects.

4929-3102-3733, v. 1

c.    In addition, Scandia had projects that would have been worth more than $250 million underway with some already under construction.

d.    After the AGO executed the Warrants and seized Scandia's banks accounts, Scandia bounced checks for insufficient funds, damaging Scandia's goodwill with vendors, employees, and owners and threatening Scandia's viability.

e.    On December 19, 2023, the AGO moved for forfeiture and attempted to take all of Scandia funds.

f.    Further, as a result of the unfounded criminal action, Scandia had to forgo all of its real estate development projects that would have been worth more than $250 million and was forced to sell the land and projects currently under construction at distressed prices.

g.    Because of the criminal action, customers and vendors declined and have continued to refuse to do business with Scandia, resulting in additional damages.

h.    As a direct and proximate result of Defendants' conduct, Scandia suffered damages in an amount to be proven at trial.

**FIRST CLAIM FOR RELIEF**
**(Fourth Amendment Violation – Illegal Search – No Probable Cause)**

208.    Plaintiffs incorporate the foregoing paragraphs.

209.    At all times relevant hereto, Plaintiffs had the right to be free from unreasonable searches and the direct and proximate consequences of unreasonable searches under the Fourth Amendment to the United States Constitution.

4929-3102-3733, v. 1

210. At all times relevant hereto, and in the performance of the acts set forth herein, Defendants acted under color of state law.

211. At all times relevant hereto, and in the performance of the acts set forth herein, Defendants actively and personally caused violations of the Plaintiffs' constitutional rights.

212. Defendants' investigatory conduct was objectively unreasonable and undertaken intentionally and with willful indifference to Plaintiffs' constitutional rights.

213. Defendants' investigatory conduct violated clearly established constitutional rights of Plaintiffs of which reasonable law enforcement officers, investigators, and prosecutors were and should be aware.

214. Defendants' unlawful investigatory conduct caused Plaintiffs to incur damages and out of pocket expenses, which Plaintiffs are entitled to recover, in an amount not less than $1,000,000,000.

215. Defendants' investigatory acts and omissions were the result of willful and malicious or intentionally fraudulent conduct, or conduct which manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

## SECOND CLAIM FOR RELIEF
### (Fourth Amendment Violation – Illegal Seizure of Plaintiffs' Person and Property)

216. Plaintiffs incorporate the foregoing paragraphs.

217. At all times relevant hereto, Plaintiffs had the right to be free from unreasonable seizures and the direct and proximate consequences of unreasonable seizures under the Fourth Amendment to the United States Constitution.

218. At all times relevant hereto, and in the performance of the acts set forth herein, Defendants acted under color of state law.

62

4929-3102-3733, v. 1

219. At all times relevant hereto, and in the performance of the acts set forth herein, Defendants actively and personally caused violations of Plaintiffs' constitutional rights.

220. Defendants' investigatory conduct was objectively unreasonable and undertaken intentionally and with willful indifference to Plaintiffs' constitutional rights.

221. Defendants' investigatory conduct violated clearly established constitutional rights of Plaintiffs of which reasonable law enforcement officers, investigators, and prosecutors were and should be aware.

222. Defendants' unlawful investigatory conduct caused Plaintiffs to incur damages and out of pocket expenses, which Plaintiffs are entitled to recover, in an amount not less than $1,000,000,000.

223. Defendants' investigatory acts and omissions were the result of willful and malicious or intentionally fraudulent conduct, or conduct which manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

### THIRD CLAIM FOR RELIEF
**(Fourth Amendment Violation – Inclusion of Press/Media in Execution of Warrants)**

224. Plaintiffs incorporate the foregoing paragraphs.

225. Rubicon's headquarters are Plaintiffs' private property.

226. At all times relevant hereto, Plaintiffs had the right to be free from unreasonable searches and the direct and proximate consequences of unreasonable searches of the private property under the Fourth Amendment to the United States Constitution

227. Defendants invited members of the media to join the AGO, SECURE, and Lucey in the execution of the Warrants at Rubicon's headquarters.

228. At the invitation and instructions of Lucey, the members of the media entered Rubicon's headquarters and filmed the raid and execution of the Warrants.

4929-3102-3733, v. 1

229. During the execution of the Warrants, a Rubicon employee asked the members of the media to leave because they were trespassing upon Plaintiffs' private property.

230. In ignorance of Plaintiffs' rights in regards to their private property, Lucey rejected Rubicon's request and insisted that the members of the media could remain on the property and continue to film Plaintiffs' private property.

231. The presence of the members of the media during the execution of the Warrants at Rubicon's headquarters served no legitimate law enforcement purpose.

232. The members of the media did not aid the AGO, SECURE, or Defendant Lucey in the execution of the Warrant.

233. Defendants' conduct violated clearly established constitutional rights of Plaintiffs of which reasonable law enforcement officers, investigators, and prosecutors were and should be aware

234. Defendants' conduct caused Plaintiffs to incur damages and out of pocket expenses, which Plaintiffs are entitled to recover, in an amount not less than $1,000,000,000.

235. Defendants' acts and omissions were the result of willful and malicious or intentionally fraudulent conduct, or conduct which manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

## FOURTH CLAIM FOR RELIEF
### (Fourth Amendment Violation – Malicious Prosecution)

236. Plaintiffs incorporate the foregoing paragraphs.

237. Defendants conducted a false and fraudulent investigation in order to initiate the criminal case against Mr. Larsen and Ms. Larsen, which was without probable cause.

4929-3102-3733, v. 1

238.    Defendants' unlawful investigatory conduct caused Plaintiffs to incur damages and out of pocket expenses, which Plaintiffs are entitled to recover, in an amount not less than $1,000,000,000.

239.    Defendants' motive for instituting the criminal case was malicious and wrongful. Defendants filed the criminal case against Mr. Larsen and Ms. Larsen—which included a combined 105 charges of first-degree, aggravated human trafficking, as well as other charges against seven defendants—to artificially inflate the public perception of Utah's human trafficking problem so as to justify the existence of and secure the funding for SECURE.

240.    Defendants also maliciously and wrongfully filed the criminal case to obscure and overshadow the negative press and attention surrounding Reyes, AGO, and SECURE's ties to scandal-entrenched Ballard and OUR.

241.    Defendants' malicious motive for instituting the criminal case was demonstrated by Burton's false testimony about Plaintiffs and the criminal case to the Utah House Judiciary Committee on February 13, 2024, in an effort to fraudulently obtain additional funding for the AGO and SECURE from the Utah State Legislature.

242.    Defendants' malicious motive is also demonstrated by Defendants' invitation to the media to accompany state officials when the latter executed the Warrants.

243.    The criminal case was terminated in favor of Mr. Larsen and Ms. Larsen.  All charges have been dismissed and there is no pending prosecution.

244.    Defendants maliciously prosecuted Mr. Larsen and Ms. Larsen without probable cause in violation of their Fourth Amendment rights.

4929-3102-3733, v. 1

245.    Defendants' unlawful conduct caused Plaintiffs to incur damages and out of pocket expenses, which Plaintiffs are entitled to recover, in an amount not less than $1,000,000,000.

246.    Defendants' acts and omissions were the result of willful and malicious or intentionally fraudulent conduct, or conduct which manifests a knowing and reckless indifference toward, and a disregard of, the rights of others.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request entry of judgment in their favor and against defendants as follows:

1.    Compensatory damages in an amount to be determined at trial, but no less than $1,000,000,000, which includes, but is not limited to, lost profits, litigation expenses in the criminal proceedings, and emotional distress;

2.    Punitive damages in an appropriate amount to punish Defendants' intentional and malicious conduct and to deter any future potential such misconduct by government officials;

3.    Prejudgment and post judgment interest on the judgment to the extent permitted by law;

4.    Plaintiffs' costs, including reasonable attorney fees and litigation expenses under 42 U.S.C. § 1988; and

5.    Any such other and further relief to which Plaintiffs are entitled.

## JURY TRIAL DEMANDED

Plaintiffs request a jury trial on all issues triable under the United States Constitution.

4929-3102-3733, v. 1

DATED:    October 28, 2025.

*/s/ David W. Tufts*

DENTONS DURHAM JONES PINEGAR P.C.
David W. Tufts
Lyndon R. Bradshaw

DENTONS U.S. LLP
Stephen R. McAllister

CLYDE, SNOW & SESSIONS
Keith M. Woodwell
Jake Taylor
Thomas A. Brady
Katherine E. Pepin

*Attorneys for Plaintiffs Rudy Larsen, Jena Larsen, Rubicon Contracting, LLC, Scandia Company, LLC, and Smart Rain Systems, LLC*

67

4929-3102-3733, v. 1