# EXHIBIT 1

# (Application for a Search Warrant)

# UNITED STATES DISTRICT COURT

## for the

District of Utah

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. 2:24mj1219 CMR |
| | ) | |
| Property involved in investigation of Rubicon previously | ) | |
| seized and held as evidence by the Utah Attorney | ) | |
| General's Office | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment "A"

located in the _____ District of _____Utah_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment "B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18 USC § 1589 | Forced Labor |
| Title 18 USC § 1590 | Trafficking with respect to peonage, involuntary servitude, or forced labor |
| Title 8 USC § 1324(a) | Unlawful employment of aliens |

The application is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

☑ Delayed notice of \_\_365\_\_ days (give exact ending date if more than 30 days: \_12/23/2025\_ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/Jared Hatch

*Applicant's signature*

Jared Hatch, Special Agent HSI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: \_\_\_12/26/2024\_\_\_

*Judge's signature*

City and state: Salt Lake City, Utah

*Printed name and title*

| Print | Save As... | Attach | | Reset |
|---|---|---|---|---|

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IN THE MATTER OF THE SEARCH WARRANT TO SEIZE AND SEARCH PROPERTY INVOLVED IN THE INVESTIGATION OF RUBICON CONTRACTING, LLC (RUBICON) PREVIOUSLY SEIZED BY THE UTAH ATTORNEY GENERAL'S OFFICE | Misc. No. _2:24mj1219 CMR_<br><br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Jared Hatch, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant to seize and search items that have previously been legally seized by the Utah Attorney General's Office pursuant to a state-authorized search warrant, and which are stored currently at 5272 College Dr, Murray, UT 84123. This affidavit is made in support of an application for a search warrant to authorize the Utah Attorney General's Office to turn over the property previously seized as described in Attachment A, and to authorize federal law enforcement to search and examine that property, and to extract from that property electronically stored information as described in Attachment B.

2. I am a Special Agent with the Department of Homeland Security/Homeland Security Investigations (HSI), assigned to the Assistant Special Agent in Charge Office, located in Salt Lake City, Utah. I have been employed as a Special Agent with HSI since May 2022. Since being hired as a Special Agent with HSI, I have attended and graduated from HSI Special Agent Training (HSISAT) at the Federal Law Enforcement Training Center (FLETC) in Glynco,

1

Georgia. During this training I attended courses designed to provide specialized training in the area of labor and sex trafficking as defined in Title 18, United States Code, Sections 1589, 1590, and 1591. I also received specialized training regarding document and benefit fraud as defined in Title 18 U.S.C. 1002 and in the area of narcotics trafficking as defined in Title 21 United States Code, Section 841, and 846. I have more than seven (7) years of experience as a Federal Law Enforcement Officer. I worked as a U.S. Secret Service Agent (USSS) from June 2016 to May 2022. During the time I was employed with the U.S. Secret Service, I attended and graduated from the Criminal Investigator Training Program (CITP) at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. Additionally, I also attended and graduated from the Special Agent Training Course (SATC) at the James J. Rowley Training Center in Beltsville, Maryland.

3. I have more than nine (9) years of experience as a law enforcement officer for the State of Utah. I served as a law enforcement deputy for the Davis County Sheriff's office from July 2006 to June of 2016. I attended and graduated from Utah Peace Officer Standards and Training Academy (POST). I obtained a bachelor's degree in criminal justice from Weber State University.

4. As part of my duties as an HSI Special Agent, I am charged to investigate criminal violations relating to labor and sex trafficking as defined in Title 18, United States Code, Sections 1589, 1590, and 1591.

5. In the course of my employment as a sworn law enforcement officer, I have participated in the execution of numerous search warrants resulting in the seizure of physical evidence, and electronic evidence, including computers, magnetic storage media for computers, other electronic media, and other items evidencing violations of state and federal laws, including

2

various sections of Title 18, United States Code, sections 1590 and 1589, involving human trafficking and forced labor.

6.      The facts in this affidavit come from my personal observations, training and experience, and information I obtained from other agents, officers, and witnesses. This affidavit is intended to show that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.

7.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the items to be seized and searched contain evidence of violations of federal laws, including Title 18, United States Code, Sections 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor); 1589 (forced labor); 1546 (fraud and misuse of visas, permits, and other documents); Title 8 United States Code Section 1324(a) (unlawful employment of aliens); and violations of the Federal Labor Standards Act as enforced by Title 29 United States Code Sections 215 and 216. Specifically, the target(s) of the investigation appear to be involved in a scheme to recruit foreign nationals for the purpose of exploiting those foreign nationals for financial gain through forced labor and debt bondage.

## IDENTIFICATION OF THE DEVICES AND DOCUMENTS TO BE EXAMINED

8.      As listed in **Attachment A**, the items to be searched are:

- Cell phone from Adam Perea's desk (Black Motorola) (Stored in PR/11-B)
- Laptop from Adam Perea's desk (Black Dell) (Stored in PR/11-C)
- Two journal style notebooks from Adam Perea's desk (Stored in PR/11-C)
- Book safe containing electronic storage devices from Adam Perea's desk (Stored in PR/11-B)
- Miscellaneous documents from room 9 Rudy Larsen's desk (Stored in PR/11-C)
- Eight  binders/documents from room 9 Rudy Larsen's desk (Stored in PR/11-C)
- One thumb drive from room 9 Rudy Larsen's desk (Stored in PR/11-B)

- Checks and financial cards from room 9 Rudy Larsen's desk (Stored in PR/11-C)
- Additional miscellaneous documents from room 9 Rudy Larsen's desk (Stored in PR/11-C)
- Miscellaneous documents from Brenda Garcia's desk from room 1 (Stored in PR/11-C)
- Miscellaneous documents from room 1 (Stored in PR/11-C)
- Box containing I94's and other documents from room 1 Luis Velasquez's desk (Stored in PR/11-C)
- Laptop from Tyler Brinkman's desk (Microsoft) (Stored in PR/11-B)
- Laptop from Claytons Phillip's desk (Microsoft) (Stored in PR/11-B)
- Miscellaneous documents from room 11 desks (Stored in PR/15-B)
- Documents and financial cards from Jena Larsen's desk room 7 (Stored in PR/11-C)
- Binder containing miscellaneous documents from Tyler Brinkman's desk room 2 (Stored in PR/11-C)
- Miscellaneous documents from Adam Perea's desk room 1 (Stored in PR/11-C)
- Box of documents from room 2 (Stored in PR/15-B)
- Box of documents from Conference room 7 (Stored in PR/ 15-B)
- Box of documents from the cabinet in room 7 (Stored in PR/11-B)
- Cell phone from Clayton Phillip's person (Apple iPhone) (Stored in PR/11-B)
- Cell phone from Adam Perea's person (Apple iPhone) (Stored in PR/11-B)
- Cell phone from Tyler Brinkman's person (Apple iPhone) (Stored in PR/11-B)
- Box of scanned documents (copies of originals) (Stored in PR/15-B)
- 3 evidence bags of scanned documents (copy of originals) (Stored in PR/15-B)
- Disk drive SanDisk 128 GB thumb drive (black and red) (Stored in PR/15-C)
- Hitachi hard drive in plastic container (Serial number IWR231117084) (Stored in PR/15-C)
- Book or tablet in black vinyl binder (Stored in PR/11-C)
- Six BD-R Discs labeled USB image 1-6 (Brand Verbatim) (Stored in PR/15-C)
- BD-R archive disc for IWR093491 (Brand Verbatim) (Stored in PR/15-C)

4

- Disk drives RCFL clone of item 6089-1 (Hitachi hard drive) (Brand WD) (Serial number WCC4E6PU2378) (Stored in PR/15-C)
- Two USBs with derivative evidence from item 6078-1 (Stored in PR/15-C)
- Archive tape of images from items 6089-1 and 6078-1 (Stored in PR/15-C)

9. These items were obtained by the Utah Attorney General's Office by execution of a legally obtained search warrant signed by Judge Rita Cornish on November 17, 2023. The search warrant was executed on November 20, 2023. These items have been stored as evidence by the Utah Attorney General's Office and have been kept in substantially the same state as when they were originally obtained by law enforcement.

10. The search warrant obtained by the Utah Attorney General's Office authorized agents to search the premises known as 801 N 500 W, Bountiful, Utah, 84010, also described as Clearwater Center and occupying the first floor of the building (801 N Office), and to seize, among other evidence, electronic devices such as cell phones, laptops, hard drives, and other electronic data storage devices. This federal warrant is being sought in an abundance of caution to ensure that federal agents have proper authorization to seize and to search the electronic devices. Nothing obtained from the state authorized search of the 801 N Office has been relied upon herein for showing probable cause to search.

11. To be clear, Homeland Security Investigations now seeks to conduct a new and separate forensic examination of the mentioned electronic devices that were previously seized by the Utah Attorney General's Office and identified in Attachment A, relying on the probable cause provided in this affidavit. Additionally, HSI seeks to seize and search all the other non-electronic evidence seized by the Utah Attorney General's Office also as identified in Attachment A.

## JURISDICTION AND SUBJECT OFFENSES

12.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is "a district court of the United States that has jurisdiction over the offenses being investigated," including under Title 18 U.S.C. § 1589 (forced labor), Title 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or force labor), Title 8 U.S.C. § 1324(a) (unlawful employment of aliens), and Title 18 U.S.C. § 1546 (fraud and misuse of visas, permits, and other documents), and Title 29 U.S.C. §§ 215, 216 (wage and hour violations).

## PROBABLE CAUSE

13.     Based on my education, training, and experience, and the experience of other law enforcement officers as relayed to me, I know that individuals involved in human trafficking, forced labor, visa fraud, the unlawful employment of aliens, and wage and hour violations often use cellular telephones and computers to facilitate their criminal activity. I know that persons involved in human trafficking, forced labor, visa fraud, the unlawful employment of aliens, and wage and hour violations also utilize cellular telephones, computers, and other electronic devices to communicate with witnesses and possible co-conspirators before, during, and after the crime to maintain records of these contacts, and also records pertaining to victims of their crime. Additionally, physical evidence in the form of paper files, bank and financial records, immigration documentation, and other types of evidence of these crimes is often stored in corporate offices

6

where persons involved in these crimes conduct their business that facilitate human trafficking, forced labor, visa fraud, the unlawful employment of aliens, and wage and hour violations.

## OVERVIEW OF TARGETS' CORPORATE OPERATION

14.     Based upon information received from former Rubicon employees Joshua Nix, Logan Kimzey, Crystal Massey, and Jeremy Shaw, and others, I submit that a company known as Rubicon Contractors (Rubicon) is part of a family of companies owned and operated by Rudy Larsen and Jena Larsen that was operated out of the 801 N Office. The parent company of Rubicon is Scandia Company (Scandia). Scandia was reported by Jeremy Shaw as the investment arm of the family of companies. Scandia was also reported by Jeremy Shaw and Crystal Massey to be the parent company of Smart Rain Systems (Smart Rain). Scandia, Rubicon, and Smart Rain were all headquartered in Davis County, UT.

15.     It was reported by former Rubicon employees Jeremy Shaw and David Valderrama that Rudy Larsen was the ultimate decision-maker for all Scandia-related companies. Temporary certifications filed with the U.S. Department of Labor list Tyler Brinkman as owner of Rubicon Contracting LLC. Former employees Crystal Massey, Julio Nino (J. Nino), and Sol Aguilar reported that Adam Perea (Perea) was the Human Resources director for Rubicon. It was reported by Jeremy Shaw that Clayton Phillipps was the Chief Operations Officer for Rubicon. It was reported by Jeremy Shaw that Kirk Simmons was the Chief Financial Officer for Scandia. Crystal

7

Massey reported that Jena Larsen was over the accounting department for the Scandia-related companies.

16.     The above-mentioned companies and individuals will collectively be referred to as "target" or "the target(s)" as they have been identified as having direct involvement.

17.     According to multiple employees, Rubicon is largely a snow removal company that also engaged in light construction work and landscaping during non-winter months. According to Jeremy Shaw and Joshua Nix, Rubicon's greatest area of profit was marking up the cost of salt to its snow removal clients. Rubicon marketed itself by the availability of its labor force throughout Northern Utah. In order to meet the demands of that marketing, Rubicon needed access to a significant labor force.

**OVERVIEW OF THE H2-B VISA PROGRAM**

18.     The H2-B program is a non-immigrant program that permits employers in the United States to hire non-immigrants from foreign countries to perform nonagricultural labor or services in the United States. To qualify, the employer must take certain steps to show that they are unable to fill their vacant positions utilizing U.S. citizens. The company then provides the government with a contract as part of their petition to hire nonimmigrant workers. The employment

8

of the H2-B workers must be temporary in nature for a limited period, a onetime occurrence, or seasonal.

19.     Based on the Wage and Hour Division of the Department of Labor, some of the relevant requirements[1] of employers that employ H2-B workers are as follows:

- If the workers are paid on piece rate, commissions, bonuses, or other incentives, the employer guarantees a wage earned every work week that equals or exceeds the offered wage.

- The employer must make all deductions from the workers' paycheck that are required by law. Other additional deductions should be reasonable and need to be disclosed in the job order. "The wage requirement" will not be met where unauthorized deductions, deposits, rebates, or refunds deduce the wage payment below the offered wage, or where the worker "kicks back" any part of the wages to the employer or another employee for the employer's benefit.

- The job opportunity is a bona fide full time, temporary position of at least 35 hours per workweek.

- The employer must guarantee to offer the workers employment for a total number of work hours equal to at least 75% of the workdays in each 12-week period.

- The employer must provide to workers, without charge or deposit, all tools, supplies, and equipment required to perform the duties assigned.

20.     Rubicon utilized the H2-B program to meet the company's purported need for a significant labor force. Based on correspondence provided by the Department of Labor (DOL)

---

[1] There are many additional requirements that are not listed.

between Rubicon and DOL between January 21, 2021, to March 31, 2021, Rubicon was authorized to hire 27 H2-B workers. Between November 1, 2021, to March 31, 2022, Rubicon was authorized to hire 75 H2-B workers. Between October 3, 2022, to March 31, 2023, Rubicon was authorized to hire 150 H2-B workers. This information shows that between January 21, 2021, and March 31, 2023, Rubicon was authorized to hire no less than 252 H2-B workers.

## **BACKGROUND OF THE INVESTIGATION**

21.     This application is submitted in connection with an on-going investigation by Homeland Security Investigations (HSI) on the Target(s). In May of 2023, an anonymous reporting party contacted Federal Agents at the Department of Homeland Security. The reporting party gave agents the name of Josh Nix (Employee A), an employee of Rubicon. Upon being contacted by federal agents, Employee A agreed to meet with federal agents at the DHS building located at 2975 S Decker Lake Dr. West Valley City UT, 84119. Supervisory Special Agent Nicholas Minckler had knowledge of an on-going state investigation that had been initiated by the Utah Attorney General's Office, based on information provided in a tip sent into the National Human Trafficking Tipline. The Utah Attorney General's Office was contacted and responded to the Department of Homeland Security building to conduct an interview with Employee A.

22.     I participated in the interview of Employee A and listened to statements made by Employee A recalling that the H2-B workers were being subjected to paying approximately $400.00 biweekly for rent to Rubicon for housing in which they lived in groups of 4 to 8 people while Employee A was working at Rubicon. Employee A stated that, in some circumstances, the residences did not have any furniture, basic appliances were missing, and there was no heat during the winter months in some of the company-run housing. Employee A reported seeing one of these locations and hearing about the conditions of other locations.

10

23. Employee A also described a flat rate or piece rate system that was being used to pay the H2-B workers that at times caused the H2-B workers who agreed to an hourly rate to work additional hours without being paid. According to Jeremy Shaw, the flat-rate policy was instituted by Clayton Phillips. Jeremy Shaw also defined the flat-rate policy as one that dictated that a client of Rubicon would be quoted a certain number of hours, and if an employee was able to complete the project in fewer hours, they would be paid the full number of hours. If, however, the employee took longer than the quoted hours, they would only be paid for the number of hours quoted to the client.

24. Homeland Security Investigations did not immediately open an investigation following the interview with Employee A, but offered continued assistance to the Utah Attorney General's Office as they investigated Rubicon. The Utah Attorney General's Office has a task force dedicated to the investigation and prosecution of human trafficking throughout the State of Utah. The Task Force investigates tips received from the National Trafficking tipline in conjunction with federal agencies and investigators. Because of this expertise, the case was pursued through the state process initially. In 2024, I began assisting the Utah Attorney General's office with the investigation. It was during this time that I discovered that the investigation had uncovered potential violations of federal labor trafficking statutes and other federal statutes that cannot be prosecuted in the state system.

25. I participated in the interview of an additional former Rubicon employee, Jeremy Shaw (Employee B) who also had come forward to provide information regarding the H2-B workers employed by the target(s). Employee B was employed by Rubicon as the Chief Operations Officer from early February 2023 to July 2023. Employee B provided and confirmed information

about the corporate structure of the companies, describing Scandia as the parent company and the other companies as subsidiaries.

26. Employee B also stated that Rudy Larsen and Brandon Floyd had expressed that it was their goal to grow Rubicon into a nationwide company. Employee B recognized that, during his employment, Rubicon utilized the H2-B workers for most of its labor force. Employee B stated there was not enough consistent work to be recruiting so many H2-B employees. The H2-B workers were primarily used for landscaping, light construction, and snow removal. During winter months when there was no snow, there was very little work for the H2-B workers, and in the summer months, there was insufficient landscaping contracts to provide the necessary hours.

27. Employee B had other local employees come to him and express concern about not having a plan in place to meet Rubicon's contractual agreement with the H2-B workers regarding providing them 40-hour work weeks. Employee B shared these concerns and expressed them in a Rubicon management meeting. Employee B stated that these concerns were ignored by other members of Rubicon's management as plans were made instead to petition for additional H2-B workers.

28. Employee B also described a management meeting with Rudy Larsen and Brandon Floyd where they discussed paying the H2-B workers using a flat rate system. Employee B explained that this system would determine that a project should take X number of hours to complete. If the employees took additional time to complete the job they would not be paid for the additional time. If employees had to return to a project to correct a mistake, they would not be paid for that time either. The flat rate system also resulted in the H2-B workers not being paid for travel time between jobs. This information corroborated statements provided by Employee A.

12

29.     Employee B also was involved in meetings where Rubicon management discussed the H2-B workers' visas. Adam Perea had attempted to renew or extend the H2-B workers visas. Employee B also discovered additional companies that were being formed by Adam Perea under the direction of Rudy Larsen. Employee B stated that he was told that these companies were being created for the purpose of hiring additional H2-B workers for Rubicon.

30.     Employee B specifically remembered Cicero as one of these companies. Over the course of this investigation, the U.S. Department of State has confirmed that the targets used both Cicero and Smart Rain to petition for H2-B workers. Yet, according to Employee B and other employees that came forward, neither company had a need for manual labor employees and the H2-B workers were actually working for Rubicon.

31.     Interviews with the H2-B workers revealed that their pay checks were being direct deposited into "Fintwist" accounts. Fintwist is an app-based payroll system. These accounts were set up by the target(s). Through Fintwist, the H2-B workers had access to their money, but the target(s) had control over the accounts.

32.     An interview was conducted with employee Crystal Massey (Employee C) who worked in the accounts payable department for Scandia. Employee C stated that even though she technically worked for Scandia she was over accounts payable for Scandia, Smart Rain, Rubicon, Park Place and Larsen Home.

33.     Employee C described some of the deductions taken from the H2-B workers' paychecks. Rent was the major reoccurring deduction, but the company also took deductions for tire replacement, cell phones, and tools. (Based on information gathered in interviews, Rubicon marked up the tools 15% when charging the H2-B workers.) Employee C also stated they made deductions from the H2-B workers' paychecks when they got in vehicle accidents. Deductions for

accidents were made even though the target(s) sometimes also filed a claim with the insurance company. Employee C stated that Kirk Simmons made sure the deductions were made from the employees' paychecks.

34.     Employee C disclosed that Rubicon was housing between six and eight people in a residence which allowed Rubicon to make a profit from the rent deductions taken from the H2-B workers' paychecks. Rubicon utilized the housing of the H2-B workers in their sales pitch explaining to potential customers that they would house their employees near their location to ensure a quick response time.

35.     Employee C provided an example where a two-bedroom dwelling would have 6 adults living in the space with each being charged approximately $700 a month for rent. Employee C stated that when collecting rent deductions from multiple individuals living in the same residence resulted in an excess of money, this money went back to Rubicon. Additionally, if the H2-B employee was not scheduled enough hours to pay their rent, they would owe a debt to Rubicon to be collected the next time they were paid.

36.     Multiple H2-B employees were interviewed, and many described feeling pressured to sign the rental agreement for company-provided housing. Axel Lopez Palomares (Victim 1) described feeling as though he would not be hired if he didn't sign the rental agreement because, as a foreign national from Mexico, he had nowhere else to live, and was told that he would have to provide his own transportation to and from work if he resided anywhere other than the company housing.

37.     Several H2-B employees interviewed stated that they asked to be released from the rental agreement, and they were told no. Jose Carlos Lopez (Victim 2) described a situation where

14

Adam Perea and Clayton Phillips came to his residence and threatened to have him deported if he didn't give them money for rent even though he hadn't been scheduled any hours for work.

38.     Employee C stated that when some H2-B workers would leave the company, Rubicon would close the Fintwist payroll account for that employee and keep the balance remaining in the account claiming the individual still owed rent.

39.     Employee A, Employee B, and Employee C all provided statements that Cicero and Titus were companies that were created with the purpose of being able to petition for more H2-B work visas. Nevertheless, all H2-B workers would come to the U.S. and be put to work for Rubicon.

40.     In an interview with David Valderrama (Employee E) who worked for Rubicon as the "Operations Manager" from February 2022 to July of 2022, he disclosed that the H2-B workers were experiencing hardships while employed by the targets. These hardships included living in houses with no furniture, having to rely on food banks to obtain food, owing the company more than they were earning due to lack of hours, and not being able to send money home to their families due to lack of hours. Employee E stated that these concerns were dismissed and that it was explained to him that the hardships served a purpose, it benefited Rubicon if the H2-B worker went home voluntarily.

41.     Employee E provided the example that if Rubicon was awarded 150 H2-B visas and then sent 50 H2-B workers back to their home country because there was not enough work, they would only be awarded 100 H2-B visas the next time they applied. If the H2-B workers went home voluntarily, however, Rubicon would still be able to apply for 150 visas. In a situation where Rubicon had too many H2-B workers and not enough work, the target(s) viewed it better to leave

15

the workers' hardships unaddressed in hopes the workers returned home voluntarily rather than send them to their home country admitting they didn't have enough work.

42. I participated in an interview of a former H2-B employee (Victim 1) of Rubicon. Victim 1 was recruited by Adam Perea's family while living in Mexico. This corroborates several other local employees who stated that approximately 80% of the H-2B workers originally recruited to Rubicon were recruited by Adam Perea's family. Victim 1 stated that Rubicon promised to reimburse him for travel expenses he incurred while traveling to the United States, a promise that Rubicon did not keep. Victim 1 arrived in Utah in debt and dependent on making money while working for Rubicon.

43. Victim 1 stated that he was offered employment with Rubicon at the rate of $18.00 an hour, working a 40-hour work week with the possibility of occasional overtime. Victim 1 was given two options for housing; Victim 1 could live with family living in the area, or he could sign a rental agreement to rent housing from Rubicon. Victim 1 signed the rental agreement because victim 1 had no family living in Utah. The agreement was that Rubicon would provide housing and $358.00 would be deducted from each paycheck.

44. Victim 1 estimated he received on average $200.00 a paycheck. Victim 1 stated that this was because Rubicon did not have enough work to offer 40 hours of work each week. This lack of work placed the H2-B workers in a situation where they would work even if they were sick or if they hadn't gotten any sleep. Most of the H2-B workers had families dependent on their income. (Employee C stated she viewed paychecks where H2-B workers were paid as little as $8 for a two-week pay period.)

45. Victim 1 mentioned that Clayton Phillips and Adam Perea would threaten to send home anyone who caused trouble. Victim 1 said Clayton Phillips fired one of the H2-B workers

16

for complaining. This frightened Victim 1 because if he was deported, he would not be able to pay back the loan he obtained to travel to the U.S. to work for Rubicon, this would create additional financial hardship for his family in Mexico.

46.     Many of the H2-B workers interviewed by law enforcement, including Ignacio Gonzalez-Gonzalez (Victim 2), explained that they wanted to look for new jobs because they weren't being scheduled enough hours working for Rubicon. The H2-B workers, like Victim 1 and other local employees of Rubicon that have been interviewed, described a meeting where Rudy Larsen told the H2-B workers that they would be deported if they looked for work outside of Rubicon. Several of the H2-B workers interviewed stated they were told that they would experience severe legal penalties if Rubicon sent them back to their home countries.

47.      Based on my participation and review of interviews conducted with H2-B workers and other local employees, I believe that targets have made significant threats of deportation and immigration harm toward H2-B workers. I believe that the evidence shows that targets intentionally managed their businesses to exploit the H2-B workers for profit. Rubicon serving as the H2-B workers' landlord and employer placed the H2-B workers in a form of debt bondage as the H2-B workers incurred debt even when the company was not scheduling the employee sufficient hours to work such that they would be able to pay that debt.

48.     The targets actively recruited individuals in Mexico using family members of an employee to recruit people to work as H2-B workers for Rubicon. The targets fraudulently promised the H2-B workers an hourly wage and fulltime 40-hour work weeks with the potential to work overtime for overtime pay.

49.     I believe that the targets utilized a scheme that included creating new companies and using existing subsidiaries to obtain additional visas to be able to bring additional H2-B

workers into the United States to work for Rubicon knowing that there was insufficient work for those workers.

50.     Based on statements made by several employees, I also believe that the targets delayed or failed to disclose to the H2-B workers that their applications to renew their visas had been denied or were not properly filed. During an interview with Sol Aguilar (Employee F), a former human resources employee of Rubicon, she recalled a meeting with Rubicon management discussing that the H2-B Visa extensions had been denied. Employee F also recalled that, a month after that meeting, Rubicon sent letters to H2-B Visa employees telling them that their visas were in the process of being renewed. Based on the knowledge that the visa renewals had been denied or improperly filed, the targets knowingly continued to employ individuals that had overstayed their visa and were not legally permitted to be working in the United States.

51.     I submit there is probable cause to believe that the target subjects who operate the Utah based companies Scandia, Smart Rain, Rubicon Contracting LLC (Rubicon), and other related companies have developed a coercive scheme to utilize these companies to recruit, transport, and exploit foreign nationals working in the United States on H2-B visas for financial gain. Specifically, Rudy Larsen, Jena Larsen, Tyler Brinkman, Kirk Simmons, Brandon Floyd, Clayton Phillips, and Adam Perea, while serving in a managerial or decision-making level in the above companies knowingly directed the business operations of the above mentioned company(s) to directly benefit from the forced labor (the force being threats of deportation and legal distress) of foreign nationals and additionally benefit from deductions taken from the paychecks of the foreign nationals in the employ of the above mentioned companies. These deductions paired with a lack of available work resulted in the H2-B workers living in unacceptable conditions, including overcrowded company-run housing with little to no furniture, relying on food banks and donations

for food and toiletries. The H2-B workers also suffered serious financial hardship in the U.S. and in their home country because as a non-immigrant they still had financial obligations in their home countries as well.

52.     The targets utilized the H2-B program to obtain temporary work performed by nonimmigrants, and the targets were involved with the process of applying for the authority to utilize the H2-B worker program. The targets were also involved in the process of H2-B workers obtaining and renewing their H2-B visas to work for the target companies. Because the workers were foreign nationals, the H2-B visa was required to legally work in the United States. The target(s) had knowledge that the H2-B workers in their employ had overstayed their visas and that the renewal applications for many of the workers had been denied and through deception convinced the H2-B workers to remain in the United States in their employ.

### ELECTRONIC STORAGE AND FORENSIC ANALYSIS

53.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

54.     There is probable cause to believe that information once stored on the electronic devices listed herein may still be stored there, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can often be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data

19

contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

55. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices seized were used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices seized because:

20

e. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

f. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

g. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

h. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge

about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.    Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

56.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the electronic devices listed herein consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

57.    *Manner of execution.* Because this warrant seeks only permission to examine electronic devices, digital media, and physical evidence already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

58.    Based on the forgoing, I request that the Court issue the proposed search warrant. This will allow Homeland Security Investigations to secure and examine the evidence currently in the possession of the Utah Attorney General's Office and continue the investigation into the potential violations of federal statutes.

59.     The government will execute this warrant by serving the warrant to the Utah Attorney General's Office because they are currently in custody of the property. A copy of the warrant will also be provided to the targets.

### REQUEST FOR SEALING

I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

*/s/ Jared Hatch*_____
Jared Hatch
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me on  December 26th, 2024.

_____
THE HONORABLE
UNITED STATES MAGISTRATE JUDGE

23

## ATTACHMENT A

### Property to be Searched

Electronic devices and physical files seized from Rubicon Contracting LLC, 801 N 500 w Bountiful, UT 84010, and the persons of Adam Perea, Clayton Phillips, and Tyler Brinkman are currently in the secure custody of:

The Utah Attorney General's Office, located at 5272 College Dr, Murray, UT 84123

- Cell Phone from Adam Perea's desk (Black Motorola) (Stored in PR/11-B)
- Laptop from Adam Perea's desk (Black Dell) (Stored in PR/11-C)
- 2 journal style notebooks from Adam Perea's desk (Stored in PR/11-C)
- Book safe containing electronic storage devices from Adam Perea's desk (Stored in PR/11-B)
- Miscellaneous documents from room 9 Rudy Larsen's desk (Stored in PR/11-C)
- 8 Binders/Documents from room 9 Rudy Larsen's desk (Stored in PR/11-C)
- 1 thumb drive from room 9 Rudy Larsen's desk (Stored in PR/11-B)
- Checks and financial cards from room 9 Rudy Larsen's desk (Stored in PR/11-C)
- Additional miscellaneous documents from room 9 Rudy Larsen's desk (Stored in PR/11-C)
- Miscellaneous documents from Brenda Garcia's desk from room 1 (Stored in PR/11-C)
- Miscellaneous documents from room 1 (Stored in PR/11-C)
- Box containing I94's and other documents from room 1 Luis Velasquez's desk (Stored in PR/11-C)
- Laptop from Tyler Brinkman's desk (Microsoft) (Stored in PR/11-B)
- Laptop from Claytons Phillip's desk (Microsoft) (Stored in PR/11-B)
- Miscellaneous documents from room 11 desks (Stored in PR/15-B)
- Documents and financial cards from Jena Larsen's desk room 7 (Stored in PR/11-C)
- Binder containing miscellaneous documents from Tyler Brinkman's desk room 2 (Stored in PR/11-C)
- Miscellaneous documents from Adam Perea's desk room 1 (Stored in PR/11-C)

- Box of documents from room 2 (Stored in PR/15-B)

- Box of documents from Conference room 7 (Stored in PR/ 15-B)

- Box of documents from the cabinet in room 7 (Stored in PR/11-B)

- Cell phone from Clayton Phillip's person (Apple iPhone) (Stored in PR/11-B)

- Cell phone from Adam Perea's person (Apple iPhone) (Stored in PR/11-B)

- Cell phone from Tyler Brinkman's person (Apple iPhone) (Stored in PR/11-B)

- Box of scanned documents (copies of originals) (Stored in PR/15-B)

- 3 evidence bags of scanned documents (copy of originals) (Stored in PR/15-B)

- Disk drive SanDisk 128 GB thumb drive (Black and Red) (Stored in PR/15-C)

- Hitachi Hard Drive in plastic container (Serial number IWR231117084) (Stored in PR/15-C)

- Book or tablet in black vinyl binder (Stored in PR/11-C)

- 6 BD-R Discs labeled USB image 1-6 (Brand Verbatim) (Stored in PR/15-C)

- BD-R archive disc for IWR093491 (Brand Verbatim) (Stored in PR/15-C)

- Disk drives RCFL clone of item 6089-1 (Hitachi hard drive) (Brand WD) (Serial number WCC4E6PU2378) (Stored in PR/15-C)

- 2 USBs with derivative evidence from item 6078-1 (Stored in PR/15-C)

- Archive tape of images from items 6089-1 and 6078-1 (Stored in PR/15-C)

**ATTACHMENT B**

**Particular things to be Seized**

1.      All records and information on the electronic devices and included in the physical files as described in Attachment A that relate to violations of the subject offenses described in the Affidavit, including Title 18, United States Code, Section 1590 (Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor); Section 1589 (Forced Labor); Section 1546, (Fraud involving visas and documents); Title 8 United States Code Section 1324(a) (Unlawful employment of aliens); and violations of the Federal Labor Standards Act as enforced by Title 29 United States Code Sections 215 and 216 (Wage and Hour violations), (combined and referred to as the "Subject Offenses") including information pertaining to the following:

    a.  All electronic files containing in any form, information or correspondence pertaining to the operation of Rubicon or its related entities, including parent corporation Scandia, but also any latter created entity, located at Rubicon Contracting LLC operated at 801 N 500 W Bountiful, UT 84010.

    b.  Records, documents, writings, envelopes, letters, electronic mail, chat logs, text logs, and correspondences with others pertaining to the operation of Rubicon and its parent company, subsidiaries, or related entities, current and former. Records may include, but is not limited to, job orders, inventory or supplies order requests and history, payroll records, employment documents, immigration documentation for temporary or permanent employees, advertising and marketing documents, training materials for employees, bills, leases, deeds, permits, licenses, telephone bills, tax receipts, or other similar documentation wherever it is found and stored.

    c.  Financial records including bank statements, cancelled checks, deposit records, check stubs, payment ledgers, checkbook registers, deposit slips, loans, cashier's

3

checks, money order records, wire transfer records, safe deposit records, receipts for personal property, negotiable instruments, MoneyGram or other electronic wire receipts, documentation of assets and liabilities, general ledgers, general journals, cash, cash receipts, cash disbursement journals, accounts receivable journals, accounts payable journals, contracts, billing information, and records of bills relating to the receipt of currency or other forms of payment.

d. Any and all photographs, letters, written narratives and computer text files or electronic matter which show or indicate evidence of the use of forced labor, debt servitude, peonage, wage and hour violations, visa fraud, immigration offenses, or unlawful employment as defined in the Subject Offenses.

e. Any and all records, documents, invoices and materials, in any format or medium (including, but not limited to, letters, e-mail messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including, but not limited to, software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

f. Storage combinations, passwords, and paperwork which indicate any other storage containers or facilities that could contain evidence of business operations.

g. Records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

h. For any computer hard drive, electronic server, cellular telephone, external electronic storage device or other electronic media (hereinafter, "MEDIA") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

    i. evidence of user attribution showing who used or owned the MEDIA at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, saved usernames and passwords, documents, and browsing history.

    ii. passwords, encryption keys, and other access devices that may be necessary to access the MEDIA.

    iii. documentation and manuals that may be necessary to access the MEDIA or to conduct a forensic examination of the MEDIA

i. Evidence in any form pertaining to the forced labor, debt servitude or general debts owed by any employees, current or former.

j. Evidence of correspondence between Rubicon, its employees, principals, entities—parent or subsidiary—with United States governmental agencies, state agencies, or local governmental agencies regarding work permits, visas, immigration documentation, regulatory requirements, drivers' licenses, insurance requirements, and safety training or similar requirements for employees.

k. Employment records, including contracts, agreements, proposals, applications for employment, job descriptions, background checks, contact information, references, resumes, hiring information, hire dates, fire dates, layoff dates, job descriptions, and job assignments.

l. QuickBooks, Excel, and other computer accounting files and records, including all spreadsheets relating to income, expenses, employees, or financial information.

m. Ledgers, profit distribution reports, financial statements, profit and loss statements, balance sheets, income statements, or work progress reports.

n. Assets that represent proceeds of forced labor, including foreign or domestic cash, currency, negotiable instruments, bank drafts, cashier's checks, personal checks, prepaid and value-added cards, jewelry and precious metals.

o. Payroll and payroll tax records including timecards, timesheets, handwritten hour summaries, payroll sheets/journals, payroll check registers, cancelled payroll checks, paycheck stubs, Forms W-2, Forms W-4, Forms 941, Forms 940, and Forms 1099.

p. Documents and other records regarding citizenship, identity, and nationality, including passports, visas, passport and visa applications, identification cards, driver's licences, marriage certificates, birth certificates, social security cards, and identification cards from foreign countries.

q. Records relating to the employment and payment of compensation including employment contracts, pay stubs, timesheets, work schedules, lists, books, booklets, letters, envelopes, binders, tablets, notepads, calendars, address books, and other writings containing names of employees, payments made to employees, debts owed by employees, money collected from employees, bank accounts opened in employees' names, cancelled checks for expense reimbursements, personnel files, associated health insurance, workers compensation insurance, and/or retirement plans.

6

r.  Business licenses, stock certificates, logs of stock purchases and redemptions, lease agreements, and employee sharing agreements.

s.  Calendar books, logbooks, appointment books, and telephone number listings reflecting employment information and vendor information.

t.  Documents reflecting travel and travel expenditures, including copies of tickets, itineraries, invoices, bills, ledgers, frequent flyer account documents, car rental information, receipts, reservation information, records of telephone calls, and all other materials comprising evidence of travel or travel-related expenditures and liabilities.

u.  Copies of tax returns and related tax preparation files to include work papers, schedules, receipts, and any other source documents comprising evidence of asset acquisition, expenditures, and sources of income.

v.  Notes payable and receivable, IOUs, loan agreements, debt records and ledgers, and other recordation of debts comprising evidence of loans, debts and expenses.

w.  Papers, records, documents, files, notes, memos, mail, bills, receipts, contracts, deeds, loan documents, lease agreements, vehicle registrations, photographs, keys or other materials representing residency, ownership, occupancy, dominion, or control of the premises referenced above and items described in Attachment A.

x.  Records or keys showing possession of safe deposit boxes, safes, storage units, and any other type of storage areas, including passwords and/or access codes for access during the searches.

y.  Photographs, video recordings, surveillance footage, or similar items.