David W. Tufts (#8736)
Lyndon R. Bradshaw (#15097)
DENTONS DURHAM JONES PINEGAR P.C.
111 S. Main Street, Suite 2400
Salt Lake City, UT 84111
(801) 415-3000
david.tufts@dentons.com
lyndon.bradshaw@dentons.com

Stephen R. McAllister (*pro hac vice* forthcoming)
DENTONS U.S. LLP
4520 Main Street, Suite 1100
Kansas City, MO 64111-7700
(816) 460-2400
stephen.mcallister@dentons.com

*Attorneys for Plaintiffs Rudy Larsen, Jena Larsen, Rubicon Contracting, LLC, Scandia Company, LLC, and Smart Rain Systems, LLC*

Keith M. Woodwell (#7353)
Jake Taylor (#10840)
Katherine E. Pepin (#16925)
Vicki B. Zgodny (#19753)
CLYDE SNOW & SESSIONS
201 South Main Street, #2200
Salt Lake City, UT  84111
(801) 322-2516
kmw@clydesnow.com
jst@clydesnow.com
kep@clydesnow.com
vbz@clydesnow.com

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RUDY LARSEN, an individual; JENA LARSEN, an individual; RUBICON CONTRACTING, LLC, a Utah limited liability company; SCANDIA COMPANY, LLC, a Utah limited liability company; and SMART RAIN SYSTEMS, LLC, a Utah limited liability company, <br><br> Plaintiffs, <br><br> vs. <br><br> SEAN D. REYES, an individual; LEO LUCEY, an individual; MICHAEL ADAM JETER, an individual; and KAYTLIN VIRGINIA BECKETT, an individual, <br> Defendants. | **PLAINTIFFS' MOTION FOR LEAVE TO TAKE EXPEDITED PRESERVATION DEPOSITIONS** <br><br> Case No. 2:25-cv-00963 <br><br> District Judge Howard C. Nielson, Jr. <br><br> Magistrate Judge Jared C. Bennett |

SL_9099031.1

Plaintiffs Rudy Larsen, *et. al.*, through counsel and pursuant to Fed. R. Civ. P. 26(d)(1), 30(a)(2)(A)(iii), and 32(a)(4), seek leave to take expedited preservation depositions due to imminent and permanent loss of material third-party testimony.

### INTRODUCTION AND RELIEF REQUESTED

Key witnesses in this case—H-2B visa workers that Defendants falsely claimed were being trafficked by Plaintiffs—are currently present in the United States on temporary visas that will soon expire, compelling them to return to their home countries and making them unavailable for examination in this country. Fed. R. Civ. P. 30(a)(2)(A)(iii) allows for early depositions, with leave of court, for witnesses that are "expected to leave the United States and be unavailable for examination in this country after [the usual time for depositions specified in Rule 26(d)]." Plaintiffs request leave of this Court to depose some of these key witnesses before their departure from the United States.

In 2023, the Utah Attorney General's Office ("AGO") needed funding for its SECURE Strike Force, the unit tasked with investigating and prosecuting human trafficking cases, a signature issue for Defendant Sean Reyes, former Utah Attorney General. Every trafficking victim the AGO could certify would provide federal grant money, so the AGO created "victims." Many of these "victims" are about to lose their temporary immigration status in the United States and will be forced to leave the country.

The "victims" were workers that Rubicon legally employed through the United States Department of Labor's H-2B visa program.  Contrary to the manufactured allegations in the now dismissed criminal case brought by Defendants, not only did Rubicon properly pay the "victims," Rubicon far exceeded the legal requirements for H-2B workers by providing care packages, facilitating housing for the temporary workers, and arranging and paying for travel to

Utah and back to the workers' home country.  Weeks prior to the filing of the contrived criminal case, some of the "victims" appeared in promotional videos extolling their experience with Plaintiffs and encouraging others, including friends and relatives, to apply.  In addition, while the contrived criminal case was pending, and again after its dismissal, one of the "victims" asked to return to work with Plaintiffs.  Workers who encourage friends and relatives to apply and who themselves re-apply to work with Plaintiffs are *not* human trafficking victims.

The workers whom Defendants labeled as "victims" are a critical source of evidence that will prove that the trafficking designations were contrived.  Plaintiffs should have the opportunity to depose these "victims" prior to their mandated departure from the United States due to visa expirations in the next several months.  Plaintiffs are entitled to question the "victims" to ask about Defendants offering them T-visas, U-visas, housing, food, and money in exchange for cooperation against Plaintiffs in the contrived criminal case.  Given that the contrived criminal case has been dismissed, and federal authorities have stated in writing that they declined to prosecute Plaintiffs, these "victims" are no longer eligible for T- or U-visas and will not be able to remain in the United States.  Thus, unless Plaintiffs can depose these "victims" prior to their departure, there is a substantial risk that their testimony will be unavailable when discovery commences under the normal time frames prescribed by Rule 26(d).  The window to avoid losing the testimony is closing, and once the "victims" are back in their home countries, they will be outside this Court's subpoena power.[1]

---

[1] The risk that evidence in this case will disappear is not theoretical—it has already happened. While seized materials were in the AGO's exclusive custody, it lost an entire box of documents seized from Rubicon, together with four USB storage devices, and could not produce them when the property was finally gathered for transfer on May 21, 2026. *See* Notice of Claim, attached hereto as Ex. 1.

Accordingly, Plaintiffs request that the Court enter an order granting them leave under Rules 26(d)(1) and 30(a)(2)(A)(iii) to depose a limited number of witnesses, identified in Schedule A hereto, for the reasons explained in detail below.

## **BACKGROUND**

### *A. The Underlying Investigation and This Action.*

This action arises out of the AGO's investigation and prosecution of Plaintiffs for alleged labor trafficking.  Rubicon employed approximately 100 H-2B guest workers from Mexico and Central America.  In their Complaint, Plaintiffs allege that Defendants, officials and agents of the AGO, manufactured a criminal human-trafficking narrative to inflate Utah's human-trafficking victim counts, which in turn supported the AGO's applications for federal grant funding.  The Complaint sets forth these claims and the capacities in which each Defendant is sued. *See* Complaint ("Compl."), ECF No. 2, ¶¶ 1–13 (parties and capacities), ¶ 14 (42 U.S.C. § 1983 jurisdiction), and ¶¶ 208–246 (First through Fourth Claims for Relief, each a Fourth Amendment claim under § 1983 for illegal search, illegal seizure, press presence at the warrant execution, and malicious prosecution).

The funding motive is structural. The SECURE Strike Force of the AGO ("SECURE") was created in 2009 on expiring two-year federal stimulus money, with its legislative sponsor publicly conditioning renewal on results. It has survived ever since on annual reappropriation— roughly $860,000 per year in ongoing General Fund appropriations—renewed each year by the same Utah State Legislature to which the AGO must, by statute, report SECURE's case and victim statistics annually. *See* Utah Code Ann. § 67-5-22.7. In the fiscal year before Plaintiffs were charged, that mandatory report disclosed only three labor-trafficking cases statewide. Then the AGO's reported victim counts jumped from 26 identified victims in 2022 to 310 in 2023, an

4

increase of more than 1,000%, driven by the numerous manufactured felony charges filed against Plaintiffs. Compl., ECF No. 2, ¶ 24. The AGO monetized those numbers on both sides of the ledger. On February 13, 2024, while the criminal case was pending, the AGO's General Counsel pointed to the criminal investigation and prosecution before the Utah House Judiciary Committee in support of legislation seeking $240,000 per year in new state funding to the AGO. In September 2024, federal grant awards premised on the inflated victim narrative delivered $999,994 to the AGO and $949,999 to its victim-services partner, $1,949,993 in a single cycle, more than two full years of SECURE's entire state funding. All told, the victim designations at issue were deployed to seek or secure nearly $2.2 million.

Plaintiffs sue all four individual Defendants in their individual capacities. The AGO's investigative file identifies 93 alleged "victims" who were interviewed by the AGO as part of its corrupt criminal investigation into Plaintiffs. *See* AGO General Offense Report AG23-291, attached hereto as Ex. 2. At this time, Plaintiffs seek to depose only a limited subset of those witnesses whose testimony is material and whose availability is at risk.

### B. The Witnesses' Statements and the Certifications Do Not Match.

Records available to Plaintiffs show a *wide* gap between what these witnesses described to the AGO and how the AGO later characterized those descriptions. For example, the sworn statement of Carlos Antonio Guzman Medina (AG23-291, Victim #34) describes a pay-and-reimbursement dispute—an alleged hourly rate shortfall of roughly one to two dollars—and contains no allegation of force, threat, coercion, document confiscation, or restraint. *See* Ex. 3. Yet the AGO's certification to U.S. Citizenship and Immigration Services ("USCIS") for that same witness, signed under penalty of perjury, certified trafficking and involuntary servitude.

5

*See* Ex. 4. These records came from the AGO, and the discrepancy is apparent on the face of the documents. Testimony from this witness is needed to explore how the discrepancy arose.

In addition, two witnesses have described being offered lucrative immigration benefits in exchange for statements. In interviews, Ricardo Prieto Hernandez (Victim #32) and Ramero Herrera described offers of T-visa and U-visa assistance along with housing, food, and financial help, in exchange for cooperation. *See* Exs. 5-6. Defendant Michael Adam Jeter is documented as stating that he would personally complete the certification forms for the visas. *See* Ex. 7. These accounts go to the heart of Plaintiffs' claim that victim status was entirely induced.

### C. The Immigration Status of the Witnesses, and the Federal Declination.

Based on records currently available to Plaintiffs, the witnesses' immigration postures differ and bear directly on the urgency of preserving the testimony of these witnesses. First, at least one witness, Diego Medina (Victim #92), holds Continued Presence status, a temporary deferred-action status, not a T-visa. The corresponding I-797A form shows a validity period of February 7, 2025 through February 6, 2027, issued in care of an AGO agent. *See* Ex. 8. Continued Presence is a temporary measure tied to an active law-enforcement need; it is not lawful permanent status and is subject to expiration. Without an active criminal investigation, there is no justification for Continued Presence.

Second, other witnesses entered the United States on H-2B status that has lapsed or will soon lapse, and several were offered but, on the present record, have not been shown to have received any durable status. The complete immigration records, including any certifications, Supplement B law-enforcement declarations, and related communications, are held by Defendants and/or the AGO and are not yet available to Plaintiffs.

6

Third, on April 8, 2026, a Deputy Chief of the Department of Justice's Human Rights and Special Prosecutions Section confirmed in writing that its investigation of Plaintiffs "premised on allegations of visa fraud and forced labor" was closed, that the D.O.J. declined prosecution, and that the United States Attorney for the District of Utah likewise declined prosecution. *See* Ex. 9. Because Continued Presence and similar temporary measures depend on an ongoing investigation or prosecution, the declination makes renewal of these witnesses' temporary status substantially less likely and their imminent departure more likely.

Fourth, the AGO's own limited production confirms how little is actually known about these witnesses' status and how much information related to the witnesses' immigration status remains in Defendants' hands. In the criminal case, the AGO produced approximately 50 T- and U-visa applications and certifications (Forms I-914 and I-918, including I-918 Supplement B law-enforcement certifications) (Bates AG_180001 *et seq.*) but did not produce complete information on visa status for many of the witnesses. Critically, only one of the produced applications corresponds to any of the witnesses Plaintiffs seek to depose, and none of the produced applications shows that USCIS granted T-visa or U-visa status to anyone. Instead, the forms reflect requests for status, not approvals. The only confirmed, durable grant anywhere in the present record is the Continued Presence issued to Diego Medina, which expires February 6, 2027. Plaintiffs thus have no basis to assume that any proposed deponent holds approved, long-term status; the only documented status is temporary and expiring, and the balance of the immigration records, including any applications or adjudications for the proposed deponents, remains with Defendants and the AGO. *See* Compl., ECF No. 2, ¶ *202(g)* (alleging the AGO withheld victim-visa communications in the criminal case).

7

Plaintiffs do not contend that any witness is legally barred from seeking other immigration relief; USCIS adjudicates such applications independently. Plaintiffs contend that, on the current record, the combination of temporary status, lapsing authorization, and the federal declination make the permanent loss of this testimony a realistic and imminent prospect rather than a speculative one.

### D. Contemporaneous Business Records Contradict the Trafficking Narrative.

Defendants' own records, created in the ordinary course of business, long before any investigation/prosecution, are fundamentally inconsistent with the involuntary servitude the AGO later alleged. For example:

- **Irving Diaz** (charged victim AV10 / Victim #19): On a March 17, 2023 Rubicon H-2B survey, Irving Abraham Baeza Diaz elected to return home when his visa expired and affirmatively indicated that his time at Rubicon "was a very good experience" and that he "would like to return next season." Ex. 10.

- **Axel Lopez-Palomares** (charged victim AV1 / Victim #1): On April 7, 2023, Axel emailed Rubicon HR to recommend a friend from Mexico for employment, providing the referral's name and contact information; HR replied that the referral had been "added to our list." Ex. 11.

- **Fabian Rodriguez Ponce** (charged victim AV9 / Victim #15): Rubicon HR records reflect that Ponce voluntarily resigned on February 15, 2023, with travel home arranged; then, on May 18–19, 2023, Ponce emailed Rubicon asking for information about "the new visas," expressing interest in returning. Exs. 12-13. A worker who leaves of his own accord and then asks to return was not held by force.

- **Jesus Omar** (charged victim AV13 / Victim #66): Omar participated in a recruiting video with Rubicon's operations team. Rubicon produced a recruiting video titled "H2b Experience" featuring multiple Rubicon workers, which included Omar's personal testimony that "the company [Rubicon] will help you" and "this company [Rubicon] represented a better future." Someone who was trafficked doesn't volunteer to participate in a promotional video, encouraging others to work for the company. (Video Link: https://www.youtube.com/watch?v=7WYtQGSGbYc).

4903-4141-8948, v. 2

- **Jorge Breton Hondal** (charged victim AV14 / Victim #22): Long after the AGO certified him as a trafficking victim, Hondal has twice sought to return to work for Plaintiffs.  On February 27, 2025, he applied through Indeed.com for an Irrigation Technician position with Rubicon in Bountiful, Utah—an application reflecting that he had also applied to two of Rubicon's other openings. Ex. 14.  In July 2026, he applied again to work for Rubicon. Ex. 15. These applications occurred well after the filing of the AGO's criminal charges where Hondal was named as a "victim" of human trafficking. Hondal's desire to return to work with Rubicon in 2025 and 2026 refutes the AGO's certification to USCIS that he was a trafficking victim.

These records contradict the trafficking allegations in the contrived criminal case and support Plaintiffs' allegation that the victim designations were entirely induced. Plaintiffs need to depose these witnesses to investigate the cause of these discrepancies by Defendants.

### E. Defendant Jeter Told Interviewees That the Truthfulness Admonition Did Not Matter.

During recorded interviews with alleged victims, Defendant Jeter walked H-2B workers through the written admonition that precedes a sworn statement pursuant to Rule 1102 of the Utah Rules of Evidence, the admonition that giving a false statement is a crime, and told the interviewees, in substance, not to worry about it. This was confirmed by Jeter's own testimony at the May 24, 2024 preliminary hearing. During cross-examination, a recording of Jeter's December 18, 2023 interview with some of the H-2B workers was played in which Jeter tells the workers the sworn-statement warning is nothing to fret over: "If you were lying, if we chose to, we could charge you, you know, with a misdemeanor, but that's not for really this type of case that we're worried about that. It's just a generic form." Under oath, Jeter admitted saying it, admitted he "didn't tell them what the charges were," and admitted he never told the workers their statements would be used, in place of live testimony, to support first-degree felony charges against the Larsens. *See* Ex. 16.

An instruction from Defendant Jeter that witnesses need not worry about the requirement of truthfulness, given immediately before those witnesses provided the statements that became

9

sworn trafficking certifications, goes to the very heart of Plaintiffs' claim that the certifications were manufactured.  Only the witnesses who heard that instruction can testify to how it shaped what they said, which is why they should be deposed before they depart the country.

## **LEGAL STANDARD**

Generally, "[a] party may not seek discovery from any source before the parties have conferred as required by [Fed. R. Civ. P.] Rule 26(f)." Fed. R. Civ. P. 26(d)(1). However, "a court may exercise its broad discretion to 'alter the timing, sequence, and volume of discovery[,]' including granting expedited discovery." *Vivint, Inc. v. Sunrun, Inc.*, No. 2:24-cv-0034, 2024 WL 3069228, at *1 (D. Utah June 20, 2024) (quoting *Qwest Commc'ns Int'l, Inc. v. WorldQuest Networks, Inc.*, 213 F.R.D. 418, 419 (D. Colo. 2003)). "The party seeking expedited discovery has the burden to show 'good cause from the requested departure from usual discovery procedures.'" *Id*. (quoting *Sunstate Equip. Co., LLC v. Equip. Share*, No. 2:19-cv-00784, 2020 WL 429479, at *2 (D. Utah Jan. 28, 2020)). This Court has previously recognized that "[g]ood cause may exist … where physical evidence may be consumed or destroyed with the passage of time." *Id*. (quoting *Doe 1 v. Miles*, No. 1:18-cv-00121, 2019 WL 201567, at *1 (D. Utah Jan. 15, 2019)). Courts apply several factors in determining whether to grant a request for expedited discovery, including: "(1) whether a preliminary injunction is pending; (2) how far in advance of the typical discovery process the request was made; (3) the purpose for requesting the expedited discovery; (4) the breadth of the discovery requests; [and] (5) the burden on the defendants to comply with the requests." *Id*.

4903-4141-8948, v. 2

## ARGUMENT

### I. The Federal Rules Authorize Preservation of a Departing Foreign Witness's Testimony.

Plaintiffs' request is not an *ad hoc* accommodation; it invokes a preservation mechanism the Federal Rules already endorse. Rule 30(a)(2)(A)(iii) singles out, for pre-conference treatment, the deposition of a witness "expected to leave the United States and be unavailable for examination in this country."  Rule 32(a)(4) in turn makes such deposition testimony usable at trial when the witness is abroad or beyond the reach of a subpoena, so long as the proponent did not procure the absence.  Together these rules reflect a considered judgment that the testimony of witnesses who are about to leave the country should be preserved, supplying both the good cause Rule 26(d)(1) requires and a principled, rule-grounded basis for relief that cannot fairly be characterized as an end-run around immunity.

The "not procured" requirement is readily satisfied here, and the declination underscores it: any departure of these witnesses follows from the expiration of temporary immigration status and the collapse of the AGO's investigation/prosecution and DOJ's refusal to further investigate, events entirely outside Plaintiffs' control.  Plaintiffs have neither caused nor encouraged any witness to leave the United States.

### II. Good Cause Is Established: The *Vivint, Inc.* Factors Weigh in Favor of Expedited Depositions in this Case.

The factors this Court outlined in *Vivint, Inc. v. Sunrun, Inc.*, No. 2:24-cv-0034, 2024 WL 3069228, at *1 (D. Utah June 20, 2024), for determining whether to grant a request for expedited discovery weigh in favor of granting the motion. First, the testimony sought through this motion is not needed for a preliminary injunction but is needed to preserve evidence of witnesses that may soon become unavailable. Second, Plaintiffs have attempted to conduct a Rule 26(f) conference with Defendants and have sought a stipulation to allow for the early depositions of

11

these departing witnesses, but Defendants have not provided a meaningful response to the requests. *See* July 23, 2026 Email from Plaintiffs' counsel and August 3, 2026 response from Defendants' counsel, attached as Ex. 17. Third, the purpose for requesting the expedited discovery is a purpose specifically contemplated by Rule 30(a)(2)(A)(iii) as argued above. Fourth, the requests are narrowly tailored as outlined in Section IV of the Argument, below. Fifth, the burden on Defendants is minimal as outlined in Section V of the Argument, below.

The proposed testimony is central to Plaintiffs' claims and is not cumulative of any source within Plaintiffs' control:

- **The certification-versus-statement gap**. The witnesses can explain how a documented wage dispute (Ex. 3) became a sworn trafficking certification (Ex. 4), a comparison provable on the AGO's own records.

- **Direct inducement testimony**. Prieto Hernandez and Herrera describe benefit-for-statement offers (Exs. 5-6), the testimonial core of Plaintiffs' inducement theory.

- **The certifying-official link**. A named Defendant (Jeter) is documented stating he would personally complete the certifications (Ex. 7).

- **The funding motive**. The AGO's victim-count narratives and the subsequent federal grant awards supply the motive linking individual certifications to federal funding (Exs. 18-19), a pattern reinforced by a prior civil settlement (Exs. 20-21). *See* Complaint ¶¶ *24, 27 (victim-count inflation and grant motive); ¶ 11(c) (Defendant Lucey's prior federal grant-fraud action).* The structure sharpened the incentive: SECURE's state funding is reappropriated annually by the Legislature that receives the AGO's victim statistics, and the FY2024 federal awards premised on the reported jump to 310 victims — $999,994 to the AGO and $949,999 to its victim-services partner — exceeded two full years of SECURE's entire state funding. Only these witnesses can testify to how they became the numbers for the AGO's funding efforts. (*See* Background Section A, above.)

Moreover, Plaintiffs' contemporaneous records—surveys electing to return, referral emails recruiting new workers, voluntary resignations followed by requests to come back, an employer-paid trip home, and a favorable recruiting video (*see* Background Section D, above)—are affirmatively inconsistent with the certified trafficking narrative; and a named Defendant

12

(Jeter) is recorded telling interviewees not to worry about the truthfulness of a statement immediately before they gave their statements. (*See* Background Section E, above). The documents show what these witnesses did and what they were told; these witnesses can testify to why they nonetheless adopted the trafficking narrative sought by the Defendants and whether, as Plaintiffs allege, the victim designations were induced by the promise of immigration benefits. That testimony is the keystone linking the documentary record to Plaintiffs' grant-fraud claims, and there is no comparable or alternative source from which that testimony can be obtained.

These considerations apply with greatest force to the fourteen charged victims, the individuals whose alleged victimization the AGO used to support first-degree felony counts against Plaintiffs Rudy and Jena Larsen, each of which carried a potential sentence of up to life imprisonment. *See* Compl. ¶ *151*. For those fourteen "victims", their testimony is not merely material to Plaintiffs' grant-fraud theory; it is the evidentiary foundation for the contrived criminal charges. If the charged "victims" describe wage disputes and induced statements rather than trafficking, that testimony goes to the heart of both the alleged grant and visa fraud and the integrity of the prosecution itself. The fourteen charged "victims," together with the other proposed deponents, are identified in Schedule A.

## III. Critical Evidence May be Lost Without Expedited Discovery.

The risk is neither speculative nor open-ended. The Continued Presence status of at least one "victim" is set to lapse on February 6, 2027. Other witnesses' H-2B authorization has lapsed or will soon lapse, and the federal declination letter removes the predicate that would support renewal of any temporary status. Once any witness departs the United States, he or she is beyond this Court's subpoena power, and Plaintiffs will have no means to compel their testimony. Unlike documents, the recollections of departing foreign nationals cannot be retrieved later. The record in this case forecloses the usual answer that the documents, at least, are safe. In this case,

13

4903-4141-8948, v. 2

key documents have already been lost and the evidence contained on electronic devices has already been altered while in the AGO's exclusive possession. *See* Notice of Claim, attached as Ex. 1. Given this, preservation of the testimonial record from these foreign-national witnesses with temporary legal status in the United States is warranted and appropriate.

## VI. The Proposed Depositions Are Narrowly Tailored and Subject to Protective Conditions.

To minimize any burden and to keep the relief within proper bounds, Plaintiffs propose the following limitations, and do not oppose their inclusion in the Court's order:

- **Limited number.** Plaintiffs seek to depose the eighteen witnesses identified in Schedule A: the fourteen charged victims who underpinned the contrived first-degree felony counts against the Larsens, plus three additional victim-witnesses tied to specific documentary evidence (Victims #32, #34, and #92) and one non-victim corroborating witness (Herrera), rather than the full 93-person roster.

- **Limited scope.** Examination confined to the witness's own knowledge of the events, statements, and any offers or inducements bearing on the certifications—including the witness's knowledge of, and the contents of, any documents the witness signed, was shown, provided, or created, whether or not those documents remain in existence—and not Defendants' deliberative or merits material.

- **Defendants' participation.** Defendants may attend and examine but will not be required to produce anything or to be deposed.

- **Immunity reserved.** The order may provide that the depositions are without prejudice to any immunity defense and shall not be cited against any Defendant on the pending dispositive motion absent further order.

- **Sealing.** Transcripts may be filed under seal pending resolution of the motion to dismiss.

- **Witness protections.** Qualified interpreters will be provided; examination will be confined to the noticed scope; and questioning will not touch any witness's immigration status except as necessary to establish availability, consistent with the federal guidance that such status is not to be used as leverage.

14

4903-4141-8948, v. 2

**V.   The Requested Relief Does Not Implicate the Qualified-Immunity Discovery-Stay Doctrine.**

Defendants are expected to argue that their pending immunity motion bars all discovery. That doctrine, properly understood, does not reach the narrow, non-party relief Plaintiffs seek.

**A.   *The Stay Doctrine Protects Officials from the Burdens of Litigation—Burdens These Depositions Do Not Impose.***

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation," and for that reason discovery is ordinarily stayed while a threshold immunity motion is pending. *Jiron v. City of Lakewood,* 392 F.3d 410, 414 (10th Cir. 2004), *overruled in part on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *see also Harlow v. Fitzgerald,* 457 U.S. 800, 817–18 (1982); *Ashcroft v. Iqbal,* 556 U.S. 662, 685–86 (2009).  The rationale is to protect the official defendant from the distraction, expense, and intrusion of litigation.  That rationale is not engaged here.  Plaintiffs seek no document or testimony from any Defendant. The deponents are independent third-party witnesses.  Defendants' only involvement is the option, not the obligation, to attend and examine.  The depositions therefore impose none of the burden the doctrine exists to prevent.

**B.   *The Tenth Circuit Recognizes that Narrowly Tailored Discovery May Proceed Notwithstanding a Pending Immunity Motion.***

Even where immunity is asserted, a district court retains discretion to permit discovery that is narrowly tailored and does not offend the doctrine's purpose. *See Maxey v. Fulton,* 890 F.2d 279, 282 (10th Cir. 1989); *Lewis v. City of Fort Collins*, 903 F.2d 752, 758 (10th Cir. 1990). Plaintiffs acknowledge that these authorities arise principally where limited discovery is needed to decide the immunity question itself, and Plaintiffs do not overstate them.  They are cited to confirm the Court's discretion to permit narrow discovery that does not burden the official defendants—discretion squarely applicable to non-party preservation depositions.

15

4903-4141-8948, v. 2

### C. An Assertion of Qualified Immunity Does Not Support an Argument That All Discovery Must Be Stayed.

Even if a defendant asserts qualified immunity, existing case law does not "stand for the proposition that all discovery as to all defendants must be stayed pending a court's resolution of an assertion of qualified immunity." *See Cruz v. City of Deming,* 687 F. Supp. 3d 1155, 1168–69 (D.N.M. 2023). The risk of permanent loss of material third-party testimony must be weighed against the Defendants' assertion of qualified immunity. In any event, Defendants' assertion of qualified or absolute immunity should not prohibit Plaintiffs from conducting limited discovery of third parties. *See Warnick v. Briggs*, No. 2:04-CV-360 DAK, 2006 WL 8459329, at *1 (D. Utah Mar. 14, 2006) ("[q]ualified immunity is not a shield from *all* discovery."); *see also Graham v. Gray*, 827 F.2d 679, 681-682 (10th Cir. 1987) ("[e]ven if Gray had been dismissed as a defendant by reason of qualified immunity, there would appear to be no abuse of discretion in the district court's refusal to grant him immunity from deposition on the matters here sought … the scope of discovery permitted by the district court appears to be neither oppressive nor unnecessary, and equally appropriate if sought from a nonparty.")

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant leave to take expedited preservation depositions due to imminent and permanent loss of material third-party testimony. In particular, Plaintiffs respectfully request that the Court enter an order: (1) granting them leave under Rule 26(d)(1) to depose a limited number of witnesses, identified in Schedule A; (2) reserving all immunity questions; (3) providing that the depositions shall not be cited against any Defendant on the pending *Motion to Dismiss* (ECF No. 37) absent further order; and (4) permitting the deposition transcripts to be filed under seal pending resolution of the *Motion to Dismiss*.

16

DATED:        August 3, 2026.

/s/ David W. Tufts
DENTONS DURHAM JONES PINEGAR P.C.
David W. Tufts
Lyndon R. Bradshaw

DENTONS U.S. LLP
Stephen R. McAllister

CLYDE SNOW & SESSIONS
Keith M. Woodwell
Jake Taylor
Katherine E. Pepin
Vicki B. Zgodny

*Attorneys for Plaintiffs Rudy Larsen, Jena Larsen,
Rubicon Contracting, LLC, Scandia Company,
LLC, and Smart Rain Systems, LLC*

17

4903-4141-8948, v. 2

## CERTIFICATE OF SERVICE

I hereby certify that on August 3, 2026, I filed the foregoing with the Clerk of Court using the Court's CM/ECF filing system and which sent electronic notification of the filing to counsel of record in this matter.

/s/ Kristin Hughes

4903-4141-8948, v. 2

**SCHEDULE A — PROPOSED DEPONENTS**

Plaintiffs propose to depose the following eighteen witnesses.  The fourteen "charged victims" (shaded) are the individuals whose alleged victimization the AGO used to support the contrived first-degree felony counts; their testimony is both material to the grant-fraud allegations and foundational to the contrived criminal charges.  The remaining four are three victim-witnesses tied to specific documentary evidence and one non-victim corroborating witness.  Names are produced as spelled in AGO records; Plaintiffs reserve the right to refine this list as status information is confirmed.

| No. | Deponent (per AG23-291) | AGO # | Charged victim | Basis for inclusion / notes |
|---|---|---|---|---|
| 1 | LOPEZ-PALOMARES, AXEL DANIEL | #1 | YES — AV1 | Charged victim |
| 2 | GONZALEZ-GONZALEZ, IGNACIO | #7 | YES — AV2 | Charged victim |
| 3 | TOLENTINO-LOPEZ, JOSE CARLOS JONATHAN | #6 | YES — AV3 | Charged victim |
| 4 | CEBALLOS-CORONA, JOSE GUADALUPE | #5 | YES — AV4 | Charged victim |
| 5 | PLASENCIA-SANTOS, KEVIN JOAQUIN | #4 | YES — AV5 | Charged victim |
| 6 | RAMIREZ-ALVAREZ, EDER VLADIMIR | #3 | YES — AV6 | Charged victim |
| 7 | MONTES-AGUILAR, JORGE MIGUEL | #2 | YES — AV7 | Charged victim |
| 8 | RODRIGUEZ, CRISTIAN RAUL | #11 | YES — AV8 | Charged victim |
| 9 | RODRIGUEZ PONCE, FABIAN | #15 | YES — AV9 | Charged victim |
| 10 | BAEZA DIAZ, IRVING ABRAHAM | #19 | YES — AV10 | Charged victim |
| 11 | LEMUS ZAVALA, LAURA ELIZABETH | #27 | YES — AV11 | Charged victim |
| 12 | ALMANZA REGALDO, LUIS ADRIAN | #28 | YES — AV12 | Charged victim |
| 13 | PEREZ GODINEZ, JESUS OMAR | #66 | YES — AV13 | Charged victim |

4903-4141-8948, v. 2

| No. | Deponent (per AG23-291) | AGO # | Charged victim | Basis for inclusion / notes |
|---|---|---|---|---|
| 14 | **HONDAL, JORGE BRETON** | **#22** | **YES — AV14** | Charged victim |
| 15 | HERNANDEZ, RICARDO PRIETO | #32 | — | Inducement interview (Ex. 6); "Priteo" in interview. |
| 16 | GUZMAN MEDINA, CARLOS ANTONIO | #34 | — | Certification-vs-statement gap (Ex. 3 vs. Ex. 4). |
| 17 | MEDINA, DIEGO | #92 | — | Continued Presence holder; status set to lapse 02/06/2027 (Ex. 8). |
| 18 | HERRERA, RAMERO | — | — | Corroborating witness (Ex. 5); not designated a victim in AG23-291. |

4903-4141-8948, v. 2