# EXHIBIT 21

William L. Schmidt, Attorney at Law, P.C.
**William L. Schmidt, CA Bar No. 206870\*\***
P.O. Box 25001
Fresno, CA 93729
Tel.: 559.261.2222
Fax: 559.436.8163
Email: legal.schmidt@gmail.com

R. Shane Johnson, PLLC
**R. Shane Johnson, Utah Bar No. 14217**
75 E. 400 S., Ste 201
Salt Lake City, UT 84111
Telephone: 801.364.2222
Email: shane@utahdefense.com

\*\* Pro Hac Vice

Attorneys for Plaintiff,
United States of America, Ex Relator Reginald Williams

# UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| United States of America ex rel. Reginald Williams, <br><br> Plaintiff, <br><br> v. <br><br> Robyn Williams, et al., Defendants. | No. 2:15-cv-00054-RJS <br><br> **FIRST AMENDED COMPLAINT** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. SECTION 3730(b)(2)** |

## INTRODUCTION

1. This action is brought on behalf of the United States by Reginald Williams, a

1

prisoner in the Utah Dept. of Corrections, by and through his counsel, against numerous Utah State officials, in their individual capacities, private persons, and DOES 1-100, unnamed co-conspirators (collectively "Defendants") under the federal False Claims Act, 31 U.S.C. § 3729. et seq. (2010) ("FCA")[1]. The plaintiff also seeks relief for violation of his First Amendment right to investigate and bring this action, under 42 U.S.C. § 1983.

2.      Originally enacted in 1863, the FCA was substantially amended in 1986 to encourage private fraud detection by providing adequate incentives to whistleblowers with valuable information. In 2009, Congress again amended the FCA to protect from fraud funds appropriated under the American Recovery Reinvestment Act of 2009, Public Law 111-5 ("ARRA"). The purposes of the ARRA are to preserve and create jobs, promote economic recovery and to assist those most impacted by the recession. The most recent amendment to the FCA occurred in 2010, under the Patient Protection and Affordable Care Act ("PPACA"), which sought to further enhance fraud detection and enforcement by altering the FCA's "public disclosure" and "original source" rules. Public Law 111-148 § 1303 (j)(2), 124 stat. 901-02 (2010).

3.      In 2009, Utah officials employed at the Utah Commission on Criminal and

---

[1] A table of acronyms used in the First Amended Complaint is included as the last page of this document.

2

First Amended Complaint
No. 2:15-cv-00054-RJS

Juvenile Justice ("CCJJ") submitted grant applications to the United States Department of Justice ("DOJ"), Bureau of Justice Assistance ("BJA"), to receive funds authorized under the ARRA's, Justice Assistance Grant ("JAG") program. Congress reauthorized the JAG program under the ARRA in 2009. Pub. L.111-5 and 42 U.S.C. § 3751 (a). From 2009 to 2011, CCJJ officials submitted at least three applications for JAG funding. BJA approved and awarded CCJJ's funding requests set forth in the 2009, 2010 and 2011 grant applications. After receiving the JAG funding, CCJJ officials awarded subgrants to other Utah state agencies.

4. From 2009 to 2013, the Utah Attorney General's Office (the "UAGO") submitted grant applications to DOJ to receive JAG-ARRA funding for UAGO's Mortgage Fraud Task Force ("MFTF") and Internet Crimes Against Children ("ICAC") programs. The DOJ approved UAGO's grant applications and awarded the requested funds.

5. From 2009 to 2013, several Utah state officials, from various state agencies including Utah's Administrative Office of the Courts ("AOC"); Department of Public Safety ("DPS"); Division of Juvenile Justice ("DJJ"); Department of Corrections ("DOC") and UAGO, submitted subgrant applications to CCJJ to receive JAG-ARRA funding. CCJJ officials approved an award of JAG-ARRA funding to the above state agencies, which required a responsible state official to enter into a grant subcontract ("GSC") that identified the funding source as federal funds.

3

First Amended Complaint
No. 2:15-cv-00054-RJS

6.      Recipients of federal funds are impliedly and expressly required to comply with all legal, administrative, and programmatic requirements governing use of BJA funds. Approved BJA awards to Utah agencies contained the requirements to receive the funds requested in the grant applications, GSCs, and certifications signed by the Defendants.

7.      Instead of complying with the implied and express requirements of the grants, the Defendants engaged in a long-standing custom, pattern and practice of conspiring to defraud the federal government by knowingly submitting false and fraudulent claims, documents and statements to obtain BJA funds. The Defendants' actions violated the FCA and caused the United States more than $50,000,000.00 (fifty million dollars) in damages.

8.      Relator Williams seeks to recover damages and civil penalties on behalf of the United States arising from Defendants' misrepresentations to the federal government made to obtain federal funding.  Relator Williams became aware of Defendants' fraudulent conduct through his employment in the prison print shop and observing UDC employees, paid with grant funds, violating terms of the JAG-ARRA grant awards. None of Relator Williams' allegations have been "publicly disclosed," as defined in 31 U.S.C. §3730 (e)(4)(A).

9.      The false statements and claims described herein, which flow from Defendants' violations of the legal, administrative, and programmatic requirements are based on

4

First Amended Complaint
No. 2:15-cv-00054-RJS

Defendants' false and fraudulent certifications of compliance with the federal statutory non-supplanting mandate that JAG-ARRA grantees not use grant funds to replace state or local "funds that would, in the absence of federal funds, be made available for law enforcement activities," (42 U.S.C. §3752(1)); the statutory requirement that "all the information contained in the [grant] application is correct" *(Id.* §3752 (5)(B)); the statutory mandate of the ARRA to "preserve and create jobs and promote economic recovery" *(Id.* § 1512(c); of the ARRA to separately track and report use of ARRA Funds; BJA requirements to provide fiscal control over grant funds; and BJA requirements to expend grant funds only for purposes and activities covered by subgrantee's approved project activities and budget.

10. From 2009 to 2013, the Defendants applied for and received funds from BJA grant programs using a mosaic of false statements, fraudulent grant applications and certifications. In 2008, while the rest of the country lost jobs due to the economic recession, Utah officials throughout the law enforcement sector were conspiring to defraud the United States of tens of millions of dollars in BJA grant funding. Defendants falsely represented that the UAGO, AOC, DPS, DJJ and DOC lost jobs due to budget cuts. In each instance, the agency had a budget surplus or cuts were restored before grant funds expired. Defendants were engaging in several interlocking conspiracies to obtain millions of dollars in federal funds which the Utah state agencies were not entitled to

5

First Amended Complaint
No. 2:15-cv-00054-RJS

receive.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C.

§3732(a), 28 U.S.C. §1331, 28 U.S.C. §1345 and 42 U.S.C. § 1983. This Court has

personal jurisdiction over Defendants because, Defendants are in this District and

engaged in wrongdoing in this District. All Defendants are sued in their

individual/personal capacity.

12.     Venue is proper in this District under 31 U.S.C. §3732(a) and 28 U.S.C. §§1391

(b) and (c) and because acts proscribed by 31 U.S.C. §3729 occurred in this District.

## PARTIES

### Relator Reginald Williams *("Relator Williams")*

13.     Relator Williams is a prisoner held in the UDC. In 2012, Relator Williams worked

in the UDC print shop where UDC administrative staff sent budgeting, research and

employment records for copying. While helping with the copying tasks, Relator

Williams learned UDC had received JAG-ARRA funds to pay salaries of prison guards

familiar to Relator. Becoming suspicious UDC officials were misusing federal funds, the

Relator spent several thousand hours reviewing documents, questioning UDC

administrative staff and prisoners and observing prison guards paid with JAG-ARRA

funds, Relator Williams determined UDC officials obtained federal funds under false

6

First Amended Complaint
No. 2:15-cv-00054-RJS

pretenses.

14.     Upon further investigation, Relator Williams discovered UAGO, AOC, DPS, and DJJ officials schemed to defraud the United States of JAG-ARRA funds using identical false statements and documents used by the UDC officials to obtain federal funding. Relator Williams is the original source of the allegations in this amended complaint. The essential elements of his allegations, that dozens of Utah state officials conspired to defraud the United States out of millions of dollars in JAG-ARRA funds, have not been publicly disclosed. Relator Williams voluntarily provided the federal government with the information supporting his claims prior to filing of this amended complaint. Accordingly, Relator Williams is an "original source: of the information alleged in this amended complaint within the meaning of 31 U.S.C. §3730(e)(4)(A) and (B).

**Defendant Kim Allard ("Allard")**

15.     Defendant Allard is a Utah state employee, employed with the AOC. Allard was assigned as Project Director for Subgrant 9AR02 and was individually responsible for the day-to-day management of the grant program. Allard may be served at the AOC, 450 So. State St., Salt Lake City, Utah.

**Defendant Daniel Becker ("Becker")**

16.     Defendant Becker is a Utah state employee, employed with the AOC. Becker is the State Court Administrator and was the Utah state official authorized to sign the

7

First Amended Complaint
No. 2:15-cv-00054-RJS

certified assurances of Subgrant 9AR02. Becker may be served at the AOC, 450 So. State St., Salt Lake City, Utah.

**Defendant Alfred C. Bigelow ("Bigelow")**

17. Defendant Bigelow is a Utah state employee employed with the UDC. Bigelow is a UDC Warden responsible for investigating and responding to prisoner reports of staff wrongdoing. Bigelow may be served at the UDC 14717 Minuteman Dr., Draper, Utah.

**Defendant Craig Burr ("Burr")**

18. Defendant Burr is a Utah state employee employed with the UDC. Burr was a Deputy Director assigned to evaluate subcontractors to provide goods and services for Subgrant 9A21. Burr may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Billie Casper ("Casper")**

19. Defendant Casper is a Utah state employee employed with the UDC. Casper is the UDC Grievance Coordinator responsible for investigating and responding to prisoner reports of staff wrongdoing. Casper may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Daniel Chesnut ("Chesnut")**

20. Defendant Chesnut is a Utah state employee employed with the UDC. Chesnut was assigned as a Project Director for Subgrant 9AR05 and was individually responsible for the day-to-day management of the grant program. Chesnut may be served at the

8

First Amended Complaint
No. 2:15-cv-00054-RJS

UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Julie Christensen ("Christensen")**

21.    Defendant Christensen is a Utah state employee employed with the UDC. Christensen was assigned to evaluate subcontractors to provide goods and services for Subgrant 9A21. Christensen may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Tom Darais ("Darais")**

22.    Defendant Darais is a Utah state employee employed with the DJJ. Darais was Project Director for Subgrant 9AR04 and was individually responsible for the day-to-day management of the grant program. Darais may be served at the DJJ, 120 No. 200 W., Ste. 419, Salt Lake City, Utah.

**Defendant Jill Fraughton ("Fraughton")**

23.    Defendant Fraughton is a Utah state employee employed with the DPS, (currently with UAGO). Fraughton was the DPS Grants Manager, wrote the GSC for Subgrant 9AR03 and submitted all financial status reports ("FSR") and Quarterly programmatic reports (PMT") for the grant. Fraughton may be served at the UAGO, 5272 So. College Dr., Murray, Utah.

**Defendant Kerry Gallegos ("Gallegos")**

24.    Defendant Gallegos is a Utah state employee employed with the UAGO. Gallegos

9

was Project Director for the Grant 2009-SC-B9-0140 ("0140") and was individually responsible for the day-to-day management of the grant program. Gallegos may be served at the UAGO, 5272 College Dr., Murray, Utah.

**Defendant Curtis L. Garner ("Garner")**

25.     Defendant Garner is a Utah state employee employed with the UDC. Garner was assigned as the UDC Grievance Hearing Officer. Garner was responsible for investigating and resolving prisoner reports of UDC staff wrongdoing. Garner may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Ronald B. Gordon ("Gordon")**

26.     Defendant Gordon is a Utah state employee employed with the CCJJ. Gordon is the Executive Director of CCJJ and was the Utah state official authorized to sign all grant applications submitted to the federal government for BJA funds. Gordon may be served at CCJJ, Utah Capitol Complex, Senate Bldg., Ste. E330, Salt Lake City, Utah.

**Defendant Mike Haddon ("Haddon")**

27.     Defendant Haddon is a Utah state employee employed with the UDC. Haddon is a Deputy Executive Director of UDC, responsible for executive administrative decisions, including budgeting and staffing. Haddon was the Project Director for Subgrant 9A21 and was individually responsible for the day-to-day management of the grant program. Haddon may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

10

First Amended Complaint<br>No. 2:15-cv-00054-RJS

**Defendant Arnold Hansen ("Hansen")**

28.     Defendant Hansen is a Utah state employee employed with the UDC. Hansen was assigned as an Employment Placement Project ("EPP"), agent, funded by Subgrant 9AR05. Hansen may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Bach Harrison ("Bach")**

29.     Defendant Bach is a privately held company which submitted bids to provide goods and services for Subgrant 9A21. Bach may be served at 116 So. 500 E., Salt Lake City, Utah.

**Defendant R. Steven Harrison ("Harrison")**

30.     Defendant Harrison is responsible for management and marketing decisions of Bach. Harrison has the sole authority to bind Bach and receives most of the profits generated by Bach. Harrison can be served at 8400 Emigration Canyon, Salt Lake City, Utah.

**Defendant Jim Ingle ("Ingle")**

31.     Defendant Ingle is a Utah state employee employed with the UDC. Ingle was assigned as a Project Director for a Subgrant in 2010 and was responsible for day-to-day management of the grant program. Ingle may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

/

11

First Amended Complaint
No. 2:15-cv-00054-RJS

**Defendant Leo Lucey ("Lucey")**

32.     Defendant Lucey is a Utah state employee employed with the UAGO. Lucey was a Project Director for Subgrant 9AR01 and was responsible for day-to-day management of the grant program. Lucey may be served at the UAGO, 5272 So. College Dr., Murray, Utah.

**Defendant Dan Maldonado ("Maldonado")**

33.     Defendant Maldonado is a Utah state employee employed with the DJJ. Maldonado is the Executive Director of DJJ, responsible for executive administrative decisions, including budgeting and staffing. Maldonado is the state official authorized to sign Subgrant 9AR04. Maldonado can be served at 120 No. 200 W., Ste. 419, Salt Lake City, Utah.

**Defendant Rhett McQuiston ("McQuiston")**

34.     Defendant McQuiston is a Utah state employee employed with the UAGO. McQuiston was a Project Director for Subgrant 9AR01 and was individually responsible for day-to-day management of the grant program. McQuiston may be served at UAGO, 5272 So. College Dr., Murray, Utah.

**Defendant Geri Miller ("Miller")**

35.     Defendant Miller is a Utah state employee employed with the UDC. Miller was a Project Director for Subgrant 9AR05 and was individually responsible for day-to-day

12

First Amended Complaint
No. 2:15-cv-00054-RJS

management of the grant program. Miller may be served at UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Shane Nelson ("Nelson")**

36.     Defendant Nelson is a Utah state employee employed with UDC. Nelson was a Project Director for Subgrant 9AR05 and was individually responsible for day-to-day management of the grant program. Nelson may be served at UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Thomas Patterson ("Patterson")**

37.     Defendant Patterson is a Utah employee employed with the UDC. Patterson was the UDC Executive Director, responsible for executive administrative decisions, including budgeting and staffing. Patterson was the Utah state official authorized to sign Subgrant 9A21. Patterson may be served at UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Mike Rapich ("Rapich")**

38.     Defendant Rapich is a Utah state employee employed with the DPS. Rapich was the Project Director for Subgrant 9AR04 and was individually responsible for day-to-day management of the grant program. Rapich may be served at the DPS, 5272 So. College Dr., Murray, Utah.

**Defendant Rosemary Reilly ("Reilly")**

39.     Defendant Reilly is a Utah state employee employed with the UAGO. Reilly

13

First Amended Complaint
No. 2:15-cv-00054-RJS

submitted FSR and PMT for Subgrant 9AR01. Reilly may be served at the UAGO, 5272 So. College Dr., Murray, Utah.

**Defendant Glen Sexton ("Sexton")**

40.     Defendant Sexton is a Utah state employee employed with the UAGO. Sexton was the UAGO Grant Manager, wrote the application for Subgrant 9AR01 and prepared the FSR for submission. Sexton may be served at the UAGO, 5272 So. College Dr., Murray, Utah.

**Defendant Helen Shreve ("Shreve")**

41.     Defendant Shreve is a Utah state employee employed with the UDC. Shreve was the UDC Grant Manager and submitted the FSR and PMT for Subgrant 11A27. Shreve may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant London Stromberg ("Stromberg")**

42.     Defendant Stromberg is a Deputy Executive Director of UDC, responsible for executive administrative decisions, including budgeting and staffing. Stromberg is the state official authorized to sign Subgrant 11A27. Stromberg may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Kirk Torgensen ("Torgensen")**

43.     Defendant Torgensen is a Utah state employee employed with UAGO. Torgensen was a Chief Deputy of UAGO, responsible for executive administrative decisions,

14

First Amended Complaint
No. 2:15-cv-00054-RJS

including budgeting and staffing. Torgensen is the state official authorized to sign Subgrant 9AR01. Torgensen may be served at the UAGO, 5272 So. College Dr., Murray, Utah.

### Defendant Rich Townsend ("Townsend")

44.    Defendant Townsend is a Utah state employee employed with DPS. Townsend is the Deputy Commissioner of DPS, responsible for executive administrative decisions, including budgeting and staffing. Townsend is the state official authorized to sign Subgrant 9AR03. Townsend may be served at DPS, 5272 So. College Dr., Murray, Utah.

### Defendant Ken Wallentine ("Wallentine")

45.    Defendant Wallentine is a Utah state employee employed with the UAGO. Wallentine was the Chief of Law Enforcement Division for UAGO and was directly responsible for the division's budgeting and staffing during Subgrant 9AR01's application and implementation. Wallentine may be served at UAGO, 5272 So. College Dr., Murray, Utah.

### Defendant Doreen Weyland ("Weyland")

46.    Defendant Weyland is a Utah state employee employed with the CCJJ. Weyland is the CCJJ Grants Monitor, responsible for ensuring that the request for reimbursement is accurate and that proper documentation exists for reimbursements of BJA grant funds.

15

First Amended Complaint
No. 2:15-cv-00054-RJS

Weyland may be served at CCJJ, Utah Capitol Complex, Senate Bldg., Ste. E330, Salt Lake City, Utah.

### Defendant Robyn Williams ("Williams")

47.     Defendant Williams is a Utah state employee employed with the UDC. Williams was a Deputy Executive Director of UDC, responsible for budgeting and staffing decisions. Williams was the state official authorized to sign Subgrants 9AR05 and 10A27. Williams may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

### Defendant Jeffery Wilson ("Wilson")

48.     Defendant Wilson is a Utah state employee employed with the UDC. Wilson was a Project Director for Subgrants 9AR05 and 10A27, individually responsible for day-to-day management of the grant programs. Wilson may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

### Defendant David Worthington ("Worthington")

49.     Defendant Worthington is a Utah state employee employed with the UDC. Worthington was the Grant Manager for UDC, wrote the applications for Subgrants 9AR05, 9A21 and 10A27 and submitted the FSR and PMT for the grants. Worthington may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

### Defendant Jeffery Woodall ("Woodall")

50.     Defendant Woodall is a Utah state employee employed with the UDC. Woodall

16

First Amended Complaint
No. 2:15-cv-00054-RJS

was the supervisor of the UDC Print shop responsible for prisoner job assignments for the Print shop. Woodall may be served at the UDC, 14717 Minuteman Dr., Draper, Utah.

**Defendant Richard Ziebarth ("Ziebarth")**

51.  Defendant Ziebarth is a Utah state employee of the CCJJ. Ziebarth is the CCJJ Grant Manager, wrote the applications for BJA grants 2009-SUB-90045 ("90045"), 2011-DJBX-2082 ("2082") and 2009-DJBX-0140 and was responsible for monitoring the grants sub awardees' compliance with BJA terms and conditions. Ziebarth can be served at CCJJ, Utah Capitol Complex, Senate Bldg., Ste. E330, Salt Lake City, Utah.

**ALLEGATIONS COMMON TO ALL COUNTS**

52.  All the grants at issue were awarded under the Bureau of Justice Assistance ("BJA"), Justice Assistance Grant ("JAG") program awarded to states. In 2009, the country was experiencing an economic recession. To stabilize the economy, Congress passed the ARRA, which re-authorized the JAG program under the ARRA. The purpose of the ARRA was to preserve and create jobs and promote economic recovery.

53.  Eligibility for ARRA-JAG funds require grantees and subgrantees to certify the funds will be used to create jobs and comply with the ARRA's reporting requirements contained in Pub. L. 111-5 §1512 (c). Awardees of JAG-ARRA funding are required to enter into GSCs with a grantee agency. The GSC contained specific representations

17

First Amended Complaint
No. 2:15-cv-00054-RJS

about the work to be performed, reporting requirements and limitations restricting the use of JAG-ARRA Funds. The primary restriction on JAG-ARRA funding is compliance with the non-supplanting certification contained in 42 U.S.C. §3752(1).

**Fraud Under Grant 2009-SUB-90045 ("90045")**

54.     The CCJJ served as the Utah administrative agency for the JAG program. Gordon and Ziebarth's responsibilities regarding the JAG-ARRA program included preparation and submission of the state JAG application, distributing funds and monitoring subrecipients' compliance with all JAG special conditions and provisions. In applying for JAG-ARRA funding, Defendants Gordon and Ziebarth knew from the grant's solicitation that supplanting state funds with federal funds was not allowed. Despite this knowledge, Gordon and Ziebarth knowingly allowed state employees to bill the federal government for state employee salaries already appropriated by the Utah Legislature. Gordon and Ziebarth's grant applications contained a plethora of false statements and misrepresentations made to induce award of BJA grant funding.

55.     In April 2009, Ziebarth wrote 90045's grant application seeking $9,964,861 in JAG-ARRA funding. Gordon signed the application, certifying all information was true and correct. The application made numerous statements regarding the Utah economy including: "Budget cuts have occurred or will soon occur to all governmental and private criminal justice providers in the state;" "cuts are occurring every day;" and "most cuts

First Amended Complaint
No. 2:15-cv-00054-RJS

require the elimination of jobs." These statements were false and made to induce the federal government to approve JAG-ARRA funding for CCJJ. Gordon and Ziebarth knew from the JAG-ARRA solicitation that grant funds were available to create, retain and restore jobs and claims of "budget cuts" and "job losses" would likely influence the federal government's decision to approve Gordon and Ziebarth's grant application.

56. In June 2009, BJA approved Gordon and Ziebarth's application for $9,964,861, under Grant 90045, based on the application's claim that the award "will be able to fund up to 100 full-time criminal justice jobs with JAG-ARRA funding." The application identified five major "Quickstart" state projects for funding that involved "job creation, retention or restoration resulting in 45 jobs" at UAGO, AOC, DPS, DJJ and UDC. According to Gordon and Ziebarth's application, CCJJ gathered "input" on the loss of resources and personnel for these agencies. The application represented that 45 jobs would be created, retained or restored—which was false—90045 funds awarded to UAGO, AOC, DPS, DJJ and UDC were used to pay salaries of existing Utah state employees. The following representative examples illustrate how 90045 funds supplanted state funds:

**Subgrant 9AR01**

57. In June 2009, Torgensen and Lucey signed a CCJJ GSC for Subgrant 9AR01 to receive JAG-ARRA funding from Grant 90045 to form the Statewide Enforcement of

19

Crimes by Undocumented Residents Task Force ("SECUR"). From 2009 to 2011 UAGO received $1,782,000 in JAG-ARRA funds for the SECUR program. Torgensen and Lucey knew SECUR was federally funded because the GSC stated the funds were from the "JAG-ARRA Federal Stimulus Program."

58.     The application stated "UAGO will utilize JAG-ARRA funds to preserve existing jobs for three full time employees," identifying Lucey and Cord Skinner whose "positions would have been subject to RIF (reduction in force) if not for JAG-ARRA funding." No RIF occurred at UAGO.

59.     Shortly after receiving JAG-ARRA funding for SECUR, Lucey and Skinner were transferred to other UAGO positions and both were replaced by other existing UAGO employees whose jobs were not subject to RIF. The representations in the grant application that UAGO experienced RIF or budget cuts were false—the Utah Legislature had appropriated funding to UAGO for Lucey's and Skinner's salaries throughout the time the UAGO Defendants sought reimbursement for the same salaries from the federal government.

**Subgrant 9AR02**

60.     In May 2009, Becker and Allard signed a CCJJ GSC for Subgrant 9AR02 to receive JAG-ARRA funding from Grant 90045 to retain or rehire 10-11 clerical staff positions. From June 2009 to September 2012, AOC received $585,000 in JAG-ARRA

20

First Amended Complaint
No. 2:15-cv-00054-RJS

funds based on the 9AR02 GSC. Becker and Allard knew 9AR02 was federally funded because the GSC stated the funds were from the "JAG-ARRA Federal Stimulus Program."

61.    Becker and Allard stated in their application that budget reductions "could result in significant downsizing of clerical operations." The Application claims that AOC could lose clerk job positions "cut" by the Legislature, which were actually paid vacant positions lost due to a hiring freeze. There was no reduction of actual court personnel. From 2009 to 2012, the Legislature budgeted more for AOC personnel than AOC could spend.

62.    Once awarded JAG-ARRA funds, Allard submitted claims for the following existing AOC employees: Mandi Rohrer, Lisa Pickering, Jackie Taylor, Lacie Downs, Brady Petersen, Ashlee Wilson, Jay Mills, Earline Matheson and Lorene Childs. Despite knowing that the Legislature appropriated to AOC enough funds to ensure that the above AOC employees' salaries were paid from 2009 to 2012, Allard and Becker sought reimbursement for the same salaries from the federal government.

**Subgrant 9AR03**

63.   In May 2009, Townsend and Rapich signed a CCJJ GSC for Subgrant 9AR03 to receive JAG-ARRA funding from Grant 90045 to retain two computer forensic examiners and one ICAC investigator. In June 2009, CCJJ awarded DPS $453,861 to

21

First Amended Complaint
No. 2:15-cv-00054-RJS

fund 9AR03. Townsend and Rapich knew 9AR03 was federally funded because the GSC stated the funds were from the "JAG-ARRA Federal Stimulus Program."

64.     Townsend and Rapich stated in their 9AR03 application that "due to budgetary cutbacks at the DPS the lack of funding sources would eliminate these positions." The claim in the application that DPS was experiencing budgetary cutbacks was false. From 2009 to 2011, the 9AR03 performance period, the DPS had an average budget surplus of $27 million.

65.     Once CCJJ awarded DPS JAG-ARRA funds, Fraughton submitted claims for the salaries of existing DPS employees Steve Gamvroulas, Terry Sparks and Daniel Hooper. The Legislature appropriated to DPS enough funds to create millions of dollars in budget surpluses, including the salaries of Gamvroulas, Sparks and Hooper, yet Frauthton sought reimbursement for the same salaries from the federal government.

**Subgrant 9AR04**

66.     In June 2009, Maldonado and Darais signed a CCJJ GSC for Subgrant 9AR04 to receive JAG-ARRA funding from Grant 90045 to restore 13 positions cut by the Legislature. In June 2009, CCJJ awarded DJJ $928,630 to fund 9AR04. Maldonado and Darais knew 9AR04 was federally funded because the GSC stated the funds were from the "JAG-ARRA Federal Stimulus Program."

67.     Maldonado and Darais stated in their application that "13 people providing

22

First Amended Complaint<br>No. 2:15-cv-00054-RJS

services… was cut by the Utah Legislature over the past year." Darais submitted the names of the 13 persons that were cut to CCJJ. None of the 13 individuals identified by Darais were cut, instead, they were internally transferred within the DJJ. The representation made in the application of personnel cuts was false. From 2009 through 2010, the grant performance period, DJJ had an average budget surplus of $1 million.

68.     Once CCJJ awarded DJJ JAG-ARRA funds, Darais submitted claims for the salaries of existing DJJ employees: K. Storey, P. Hill, K. Havea, J. Coggins, M. Murry, C. Turk, D. Nuno, J. Sanchez, T. Rodriguez, A. Allsup, S. Lupeamanu and W. Singletary. The Legislature appropriated enough funds to create a million-dollar surplus and pay the salaries of the above DJJ existing employees, yet Darais sought reimbursement for the same salaries from the federal government.

**Subgrant 9AR05**

69.     In June 2009, Williams and Miller signed a CCJJ GSC for Subgrant 9AR05 to receive JAG-ARRA funding from Grant 90045 to hire 6 Employment Placement Project ("EPP") agents. In June 2009, CCJJ awarded UDC $957,442 to fund 9AR05 to hire the agents. Williams and Miller knew 9AR05 was federally funded because the GSC stated the funds were from the "JAG-ARRA Federal Stimulus Program."

70.     Williams and Miller stated in their application that "due to budget shortfalls the Institutional Parole Office ("IPO"), was eliminated." The representation made in the

23

application that UDC experienced budget shortfalls were false. In 2009, UDC received a $22 million budget increase and from 2008 to 2012 UDC amassed a $25.2 million budget surplus.

71. Once CCJJ awarded UDC JAG-ARRA funds, Worthington submitted claims for existing employees T. Cottrel, J. Williams, J. Wilson, C. Gunderson, T. Cressall and E. Price. The Legislature appropriated UDC enough funds to amass millions of dollars in budget surpluses, fund hundreds of vacant positions and pay the salaries of the EPP agents yet Worthington sought reimbursement for the *same* salaries from the federal government.

72. The solicitation for award of JAG-ARRA funding expressly required CCJJ to monitor "subawards under the grant in accordance with all applicable statutes, regulations, OMB circulars, and guidelines including the OJP Financial Guide." Gordon and Ziebarth were "responsible for oversight of sub awardee spending and monitoring of specific outcomes and benefits attributable to use of Recovery Act Funds."

73. Gordon and Ziebarth knowingly failed to monitor subawardees UAGO, AOC, DPS, DJJ and DOC Defendants for violations of the non-supplanting requirements contained in 42 U.S.C. §3752(1), 90045's solicitation and GSC, the OJP Financial Guide and the Certified Assurances of the GSC. Gordon and Ziebarth knew and/or acted in deliberate ignorance or reckless disregard of the falsity in CCJJ's 90045 application to

24

First Amended Complaint
No. 2:15-cv-00054-RJS

BJA that 45 jobs would be created, retained or restored by the "Quick Start" Project. Gordon and Ziebarth took no reasonable steps to ensure subgrantees did not supplant state funds with federal funds. It was the responsibility of Gordon and Ziebarth to verify the subgrantees' claims regarding budget cuts and job losses.

74. The implied and express certifications made in 90045's application were materially false. Gordon and Ziebarth knew they were required by the Office of Justice Programs ("OJP") Financial Guide to monitor subgrantees for compliance with the non-supplanting requirement. Agreement to comply with the non-supplanting requirements while meeting the objectives of creating, retaining and restoring jobs were the essential underpinnings of the BJA's decision to award CCJJ 90045 funding.

75. By failing to properly monitor subgrantees, Gordon and Ziebarth condoned, fostered, and concealed a pattern and practice of supplanting by subgrantees and in so doing caused CCJJ to receive JAG-ARRA funds to which it was not entitled. In 2009, the DOJ barred 25 state and local law enforcement agencies from receiving BJA grants for violating the non-supplanting requirements. Had the federal government known of the false statements in Gordon and Ziebarth's grant application regarding budget cuts and job losses, the federal government would not have awarded CCJJ 90045 funding.

/
/
/

25

First Amended Complaint
No. 2:15-cv-00054-RJS

**Fraud Under 90045 Subgrants 9AR01-9AR05 by UAGO, AOC, DPS, DJJ and UDC Subgrantee Defendants**

76.     The primary objectives and goals articulated by the federal government to justify making awards under JAG-ARRA were to fund public safety services subject to budget cuts in 2009/2010 and to create, retain or restore criminal justice jobs. CCJJ developed a standard grant application for subgrantees that included JAG-ARRA performance measures, budgets and certifications to meet reporting requirements. To obtain an award, state officials were required to submit an application to CCJJ that became a GSC if approved.

77.     Each GSC required sub awardees to submit quarterly reports to the Bureau of Justice Assistance ("BJA") that reported the number of jobs created, retained or restored. In the GSC, job creation/restoration/retention is defined as: creating a new job; using JAG funds to restore jobs and services lost due to budget cuts and using JAG funds to retain existing personnel who are still employed by an agency but will be lost later due to budget cuts. Sub awardees signed a certification acknowledging that the receipt of funds "will be contingent on meeting the Recovery Act reporting requirement."

78.     Each GSC contained certified assurances which required sub awardees to follow the non-supplanting requirement, follow all federal laws, not divert funds for non-approved uses, properly account for grant fund usage and comply with the OJP Financial

26

First Amended Complaint
No. 2:15-cv-00054-RJS

Guide. Additionally, each sub awardee's Project Director signed a supplanting certification ("SC") which clearly defined the 3 allowable scenarios to use JAG-ARRA funds. The SC allowable uses were limited to the following scenarios:

a.      Creating a New Position with JAG-ARRA Funding. Funding is used to hire a person to fill a position approved in the JAG grant awarded by CCJJ. In a created position scenario, a new hire is added to existing staff of the agency. The cost of an existing position from the agency is not merely transferred to the grant.

b.      Retaining a Position Lost Due to Budget Cuts. Funding can be used to maintain a staff position that would have been lost due to budget cuts. Funding a position that "might" be lost is not allowable. If funding is used to pay the salary for a position that ended up not being cut from the agency budget, then supplanting is occurring. In this case, the agency will have to immediately back-fill the old position or terminate the grant and return any JAG funding that was used to pay salary.

c.      Use an Existing Employee to Fill a JAG-ARRA Funded Position and Back-fill the Old Position.  An Agency can pay the salary of an existing employee with grant funds. The position the existing employee vacated to take the JAG-ARRA position will need to be back-filled immediately with an agency funded new hire

27

First Amended Complaint
No. 2:15-cv-00054-RJS

to avoid supplanting. No grant funding should be used to pay the salary of an existing employee until the back-fill is hired and being paid from agency funds. Failing to hire the back-fill position for vacated position is supplanting.

79.     At all times material to the allegations of this action, sub awardee defendants violated the non-supplanting statutes, regulations, guidelines and certifications of the BJA's JAG program. Defendants used JAG-ARRA funds for expenditures not allowable under the GSC and SC. Specifically, Defendants presented a mosaic of false statements and documents which misrepresented that UAGO, AOC, DPS, DJJ and UDC experienced Legislature mandated budget cuts and jobs losses. Defendants used JAG-ARRA funds to pay salaries of existing state employees, knowing the Legislature had already approved funding for the same employee salaries.

80.     Defendants' illegal employment practices violated the non-supplanting requirements because federal funds must be used to supplement existing funds for program activities and not replace those funds that would be appropriated for the same purpose, in the absence of federal funds.

81.     As set forth below, the sub awardee Defendants violated the FCA by submitting fraudulent grant applications and falsely certifying, or causing to be falsely certified, compliance with the GSC and SC requirements. The FCA imposes civil liability where a person "knowingly presents or causes to be presented to the federal government "a false

28

First Amended Complaint<br>No. 2:15-cv-00054-RJS

or fraudulent claim for payment or approval" (31 U.S.C.§ 3729(a)(1)(A)), "or knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim, (*Id*. §3729(a)(1)(B)) or conspires to commit a violation of subparagraph (A) or (B)," (*Id*. §3729(a)(1)(C)).

82.     It has been the plan and intent of the sub awardee Defendants to obtain grants from the BJA's JAG program based on false pretenses since at least 2008 to the present by knowingly misrepresenting their compliance with non-supplanting laws on grant application contracts to induce payment of government funds.

83.     It has been the plan of the sub awardee Defendants to fraudulently obtain JAG program funds by submitting or causing the submission of false and fraudulent reports, Assurances and Certifications to BJA grantee CCJJ.

84.     It has always been the plan and purpose of the sub awardee Defendants to avoid disclosure of Defendants' non-compliance with non-supplanting requirements to fraudulently obtain JAG-ARRA funds.

85.     Sub awardee Defendants have made or caused to be made misrepresentations and false certifications in their applications for JAG-ARRA funds, and on the Certified Assurances of the GSCs and SC forms, which have resulted in the awarding of millions of dollars in federal funds because of these numerous implied and express false certifications. As set forth below, the sub awardee Defendants fraudulently induced an

29

First Amended Complaint
No. 2:15-cv-00054-RJS

award of the following subgrants from JAG 90045.

**Subgrant 9AR01**

86. In June 2009, Torgensen and Lucey signed 9AR01's GSC with CCJJ to receive JAG-ARRA funds to form the SECUR Taskforce within the UAGO. CCJJ awarded UAGO $1,783,000 to hire three new full-time employees and retain the jobs of three existing employees. The GSC required task force members to be 100 percent dedicated to SECUR activities. SECUR focused its efforts detecting, investigating, deterring and eradicating criminal activity related to illegal immigration and human trafficking, illegal documents, drugs and gangs.

87. CCJJ's primary requirement for awarding JAG-ARRA funds for 9AR01 was "job creation, retention or restoration" of the project. "Special emphasis will be placed on jobs lost due to budgets resulting from the economic slowdown."

88. The UAGO Defendants' application stated the funding for the award is "from federal funds from the American Recovery and Reinvestment Act pursuant to HR1, 111th United States Congress." It was the intent of the UAGO Defendants to conspire to defraud the United States of JAG-ARRA funds.

89. At all times relevant to this First Amended Complaint, Torgensen was the UAGO official authorized to sign 9AR01's GSC and was responsible for ensuring all information presented in the application was correct. Torgensen was responsible for

First Amended Complaint
No. 2:15-cv-00054-RJS

ensuring UAGO complied with all the GSC's Certified Assurances.

90. From June 2009 to about March 2010, Lucey was the Project Director for 9AR01, and was responsible for planning, operation, reporting and administration under the GSC.

91. Ken Wallentine, UAGO's Chief of Law Enforcement, was responsible for implementation of 9AR01. Wallentine performed staff assignments and resource management for 9AR01.

92. Torgensen, Wallentine and Lucey were charged with knowledge of UAGO's budget appropriations, staffing requirements and resource management for 9AR01, including ensuring UAGO follows JAG-ARRA non-supplanting statutes, regulations, certified assurances and certifications.

93. The core objective of awarding JAG-ARRA funds was creating, retaining and restoring jobs. Compliance with the non-supplanting requirements while meeting the objectives of creating, retaining and restoring jobs was the underpinning of CCJJ and BJA's decision to provide UAGO JAG-ARRA funding.

94. The GSC expressly notified the UAGO Defendants of the non-supplanting requirements, for example, a notice in the Budget Tables states:

31

First Amended Complaint
No. 2:15-cv-00054-RJS

"Supplanting – JAG-ARRA stimulus funding cannot be used to replace or supplant any budget item that is currently approved for funding by your legislative body. Be certain in your budget not to request JAG funding to replace any positions or items that are already approved for funding in your current budget."

95. Torgensen signed the Certified Assurances representing that UAGO officials complied with the GSC's non-supplanting assurance:

The applicant assures that grant funds awarded under the [JAG] program, authorized by Congress and administered by the [DOJ-BJA] will not supplant state or local funds, must be used to supplement existing funds for program activities and not replace those funds that have been appropriated for the same purposes.

96. In March 2010, McQuiston replaced Lucey as 9AR01's Project Director, and was responsible for 9AR01's quarterly reporting and day-to-day administration of the subgrant.

97. In June 2010, McQuiston signed a SC which stated: "JAG-ARRA funding can be used to maintain a staff position within the grant award agency that would otherwise have been lost due to budget cuts. Having a position that 'might' be lost is not allowable. If an agency was awarded JAG-ARRA funding and paid a salary for a position that ended up not being cut from the agency budget, then supplanting is occurring."

98. The SC also stated: "An agency can pay the salary of an existing employee with JAG-ARRA grant funding, but the position that the existing employee vacated to take the JAG-ARRA position will need to be back-filled immediately with an agency-funded

32

First Amended Complaint
No. 2:15-cv-00054-RJS

new hire to avoid supplanting. No grant funding should be used to pay the salary of an existing employee until the back-fill position is hired and being paid from agency funds."

99. In seeking an award of JAG-ARRA funding, Torgensen and Sexton's application induced CCJJ to believe funds would be used "to preserve existing jobs for three full time employees" by falsely representing that job losses occurred. Wallentine submitted a letter to CCJJ stating that the jobs of Lucey and Skinner "would have been subject to RIF if not for JAG-ARRA funds." The UAGO Defendants knew claims of "budget cuts" and "job loss" would influence grant reviewers to award grant funding.

100. The representations in the application that Lucey and Skinner's positions were subject to RIF or that UAGO experienced budget cuts were false. The UAGO Defendants schemed to merely transfer the salaries of existing positions from UAGO to JAG-ARRA funding. Lucey and Skinner's positions were never subject to RIF. Nor did UAGO officials comply with the SC's requirement to back-fill any positions by making "new hires" for the positions vacated by Lucey and Skinner. The UAGO Defendants, having full knowledge of the agency's budget, knew the Legislature provided funding for Lucey and Skinner's salaries in absence of grant funding.

101. Defendants' claim that DPS employee C. Herrin's position was subject to RIF was

33

First Amended Complaint
No. 2:15-cv-00054-RJS

also false. First, DPS experienced no budget cuts from 2009 to 2011. DPS had an average $27 million carry forward budget surplus from 2009 to 2011. Second, Herrin did not participate in SECUR operations, even though the GSC and SC required agents to be 100 percent dedicated to the task force.

102. Again, UAGO Defendants schemed to simply transfer Herrin's salary from DPS to UAGO's JAG-ARRA funding. There was no accounting for any of the hours or duties charged to the grant for Herrin. DPS officials simply submitted a quarterly payment request and UAGO paid with JAG-ARRA funds. After illegally obtaining grant funds, UAGO over-billed for Herrin's salary costs. For example, Herrin's salary was budgeted at $18.22 per hour, in March, July and October 2010, but Herrin was paid $52,000, $19,000, and $12,000 for those months, respectively.

103. 9AR01's Certified Assurances required UAGO Defendants to account for grant funds by asserting proper fiscal control. UAGO Defendants did not account for any of the SECUR personnel's time. In most instances, SECUR personnel only worked for six months on grant activities, then were re-assigned to other UAGO positions. Yet UAGO Defendants sought reimbursement for SECUR personnel salaries from JAG-ARRA funds for the entire year.

104. Sexton prepared the financial reports for 9AR01 for submission to CCJJ and BJA

34

First Amended Complaint
No. 2:15-cv-00054-RJS

by Lucey, McQuiston and Reilly. Sexton was charged with knowledge of UAGO's budget and knew the Financial Status Reports ("FSR"), and Ledgers of Expense ("LOE") he prepared for JAG-ARRA funds sought funds which UAGO was not entitled to receive.

105. From August 2009 to January 2010, Lucey submitted FSRs, LOEs and quarterly performance measure reports ("PMT") to CCJJ and BJA seeking reimbursement from JAG-ARRA funds for SECUR personnel salaries, knowing UAGO was not entitled to receive funding for the salaries of Lucey, Skinner or Herrin.

106. From May 2010 to January 2011, McQuiston submitted FSRs, LOEs, and PMTs to CCJJ and BJA seeking reimbursement from JAG-ARRA funds for SECUR personnel salaries, knowing UAGO was not entitled to receive funding for the salaries of McQuiston, Call, Varoz, or Mutter.

107. From April 2011 to April 2012, Reilly submitted FSRs, LOEs and PMTs to CCJJ and BJA seeking reimbursement from JAG-ARRA funds for SECUR personnel salaries, knowing UAGO was not entitled to receive funding for existing employees of UAGO.

108. Recipients of JAG-ARRA funds were required to submit quarterly reports under Pub.L.111-5 Section 1512(c). Receipt of funds was contingent upon meeting the JAG-ARRA reporting requirements. Section 1512(c)(3)(D), required recipients to provide an

35

First Amended Complaint
No. 2:15-cv-00054-RJS

estimate of the number of jobs created and the number of jobs retained by the project.

109.  Recipients of JAG-ARRA funds were also required to submit quarterly progress reports ("PR"), which provided updates of all grant activity to CCJJ and BJA. The PR is uploaded as an attachment to the FSR. The PR also reported the number of jobs created, retained or restored.

110.  Finally, recipients of JAG-ARRA funds were required to submit the FSR, which contained the actual costs incurred during the quarter and LOE which contained invoice details of salaries and items purchased.

111.  The UAGO Defendants' claims for JAG-ARRA funds were not merely requests for payment, but the attached LOE, PR and PMT documents made specific representations that the funds were used to create, retain or restore jobs. In submitting the FSRs and LOEs for payment, Defendants Lucey, McQuiston, Reilly and Sexton failed to disclose that UAGO sustained no budget cuts, was not subjected to a RIF and was in noncompliance with material statutory, regulatory and contractual terms of the non-supplanting agreement.

112.  The implied and express certifications made in the GSC, SC and requests for payment were materially false. UAGO Defendants knew, or it was reasonably foreseeable, that their misrepresentations in the application, specifically representations

36

First Amended Complaint
No. 2:15-cv-00054-RJS

regarding "budget cuts," "job losses" and violation of the SC's non-supplanting requirements, would lead to submission of false claims to the federal government, and fraudulent receipt of JAG-ARRA grant funds.

**Subgrant 9AR02**

113. In May 2009, Becker and Allard signed 9AR02's GSC with CCJJ for JAG-ARRA funds to "retain or rehire 10-11 clerical staff positions." CCJJ awarded AOC $585,000 to be used for "replacing positions lost due to budget cuts." The goal of the project was to prevent a backlog of pending cases in Utah state district courts by deploying the clerical positions to court locations in greatest need.

114. CCJJ awarded AOC JAG-ARRA 9AR02 funding to retain and restore jobs, especially jobs lost due to budget cuts. Becker and Allard knew from the GSC that the federal government was providing the funding for 9AR02. It was the intent of Becker and Allard to defraud the federal government by misrepresenting AOC's budget status.

115. Becker was the AOC official authorized to sign 9AR02's GSC and was responsible for ensuring all information presented in the application was correct and that AOC complied with all the GSC's Certified Assurances.

116. Allard was the 9AR02 Project Director, responsible for planning, operation, reporting and administration under the GSC.

37

First Amended Complaint
No. 2:15-cv-00054-RJS

117. Becker and Allard were charged with knowledge of AOC's budget appropriations, staffing requirements and resource management for 9AR02, including ensuring AOC officials follow JAG-ARRA non-supplanting statutes, regulations, certified assurances and certifications. Compliance with the non-supplanting requirements while meeting the JAG-ARRA's core objective to create, retain and restore jobs were the essential underpinnings of CCJJ's and BJA's decision to award AOC 9AR02 funds.

118. The GSC notified Becker and Allard that "JAG-ARRA stimulus funding cannot be used to replace or supplant any budget item that is currently approved for funding by your legislative body."

119. In April 2010, Allard signed a SC for 9AR02s which allowed AOC officials to use JAG-ARRA funding to pay the salaries of existing AOC employees. The SC did not permit AOC officials to "merely transfer the cost of an existing position from the agency to the JAG-ARRA grant. " The SC specified that if JAG-ARRA Funding is paying for a position that ended up <u>not</u> being cut from the [AOC] budget then the supplanting is occurring."

120. In seeking award of JAG-ARRA funding, Allard's application induced CCJJ to believe funds would be used for "replacing positions lost due to budget cuts." Becker and Allard knew their claims of "budget cuts" and "job losses" would influence grant

38

reviewers to award AOC grant funding.

121. Representations in the application that existing AOC employees Rohrer, Pickering, Taylor, Downs, Petersen, Wilson, Mills, Matheson and Childs, had lost or would lose their positions at AOC, or that AOC experienced budget cuts, were false. Having full knowledge of AOC's budget, Becker and Allard knew the Legislature provided AOC funding for all the court clerks' salaries paid with JAG-ARRA funding. Becker and Allard schemed to transfer the costs of the above existing AOC employees to federal grant funding, knowing AOC had budget surpluses averaging $1 million in 2009 and 2010.

122. From October 2009 to October 2012, Allard submitted FSR, LOE, PR and PMT documents to CCJJ and BJA, seeking reimbursement of the above existing AOC employees from JAG-ARRA funds, knowing AOC was not entitled to those funds.

123. Allard's claims for JAG-ARRA funds were not merely requests for payment, but the attached LOE, PR and PMT documents made representations the funds were used to replace positions "lost due to budget cuts." In submitting claims for JAG-ARRA funds, Allard failed to disclose RIF was largely achieved through attrition and hiring freezes. AOC was able to reduce vacant positions without reducing actual court personnel from 2009 to 2012. The PR and PMT documents failed to disclose AOC Defendants' non-

39

First Amended Complaint
No. 2:15-cv-00054-RJS

compliance with material statutory, regulatory and contractual terms of the non-supplanting requirements.

124. The implied and express certifications made in 9AR02's GSC, SC, and requests for payment, were materially false. AOC Defendants knew, or should have known as it was reasonably foreseeable, that the misrepresentations in the application, specifically claims regarding "positions lost due to budget cuts" and violation of the non-supplanting requirements, would lead to submission of false claims to the federal government, and fraudulent receipt of JAG-ARRA grant funds.

**Subgrant 9AR03**

125. In May 2009, Townsend and Rapich signed 9AR03's GSC, with CCJJ to receive JAG-ARRA funding to retain the positions of two computer forensic examiners and an Internet Crimes Against Children ("ICAC") investigator. The 9AR03 application stated that "due to budgetary cutbacks at the [DPS] the lack of funding sources would eliminate these positions." CCJJ awarded DPS $453,996 to retain 3 DPS positions.

126. Townsend and Rapich knew from the GSC that the federal government provided funding for 9AR03 activities. It was Townsend's and Rapich's intent to defraud the federal government of JAG-ARRA funding by misrepresenting that DPS employees would lose jobs due to budget cuts without JAG-ARRA funding.

40

First Amended Complaint
No. 2:15-cv-00054-RJS

127. Townsend was the DPS official authorized to sign 9AR03's GSC and was responsible for ensuring all information presented in the application was correct and that DPS officials complied with all the GSC's Certified Assurances.

128. Rapich was the 9AR03 Project Director responsible for planning, operation, reporting and administration under the GSC. Rapich submitted the FSR, LOE, PR, and PMT documents to CCJJ and BJA, to receive reimbursement for existing DPS employees' salaries from JAG-ARRA funding.

129. Townsend, Rapich and Fraughton were charged with knowledge of the DPS budget appropriations, staffing requirements and resource management for 9AR03, including ensuring DPS complied with JAG-ARRA non-supplanting statutes, regulations certified assurances and certifications.

130. Compliance with the non-supplanting requirements, while meeting the JAG-ARRA core objective to retain jobs, went to the essence of the bargain of CCJJ's and BJA's decision to award DPS 9AR03 funds.

131. The GSC notified Townsend and Rapich that grant funds could "not replace those funds that have been appropriated for the same purpose." Townsend signed 9AR03's Certified Assurances, representing that the DPS complied with the GSC's non-supplanting requirements.

41

First Amended Complaint
No. 2:15-cv-00054-RJS

132.  In April 2010, Rapich signed a SC for 9AR03 allowing DPS officials to use JAG-ARRA funding to pay the salaries of existing DPS employees Gamvroulas, Sparks, and Hooper, if their positions "would otherwise have been lost due to budget cuts." "Funding a position 'that might' be lost [was] not allowable." Using federal grant funds to pay for a position that was not cut is supplanting.

133.  Townsend and Rapich knew claims of "budgetary cutbacks" and elimination of job positions would influence grant reviewers to award DPS JAG-ARRA funding to prevent the claimed job losses.

134.  The application's statements that existing DPS employees Gamvroulas, Sparks, and Hooper, would have their positions eliminated and DPS experienced budgetary cutbacks were knowingly false. Townsend and Rapich had full knowledge of the DPS budget and knew the Legislature had, and would, provide funding for the salaries of Gamvroulas, Sparks, and Hooper, in absence of JAG-ARRA funding.

135.  Townsend, Rapich and Fraughton schemed to transfer the costs of existing DPS employees to JAG-ARRA funding, knowing the Legislature had or would appropriate funds for those employees and DPS had an average carryforward budget surplus of $27 million from 2009 to 2010.

136.  From July 2009 to March 2011, Fraughton prepared FSRs and LOEs and Rapich

42

First Amended Complaint
No. 2:15-cv-00054-RJS

submitted the FSR, LOE, PR and PMT documents to CCJJ and BJA, seeking reimbursement of existing DPS employee salaries from JAG-ARRA funds, knowing DPS was not entitled to those funds.

137. Rapich's and Fraughton's claims for JAG-ARRA funds were not merely requests for payment, but the attached LOE, PR and PMT documents represented that the funds were used to retain 3 DPS jobs subject to elimination without grant funds. The DPS Defendants failed to disclose that Gamvroulas, Sparks and Hooper would not, and did not, lose their jobs due to budget cuts and the DPS officials' non-compliance with material statutory, regulatory and contractual terms of the non-supplanting requirements.

138. The implied and express certifications made in 9AR03's GSC, SC and requests for payment were materially false. Townsend, Rapich and Fraughton knew or it was reasonably foreseeable that the misrepresentation in the application that DPS had budget cutbacks and known violations of the non-supplanting requirements, would lead to submission of false claims to the federal government.

**Subgrant 9AR04**

139. In June 2009, Maldonado and Darais signed the 9AR04 GSC, with CCJJ to receive JAG-ARRA funding for "[DJJ] to restore the full operational functionality that existed... before the recent legislative cuts []" by restoring 13 positions that were cut.

43

First Amended Complaint
No. 2:15-cv-00054-RJS

CCJJ awarded DJJ $928,630 in JAG-ARRA funds to restore the 13 positions claimed to be lost due to budget cuts.

140. Maldonado and Darais knew from the GSC that the federal government provided JAG-ARRA funding for 9AR04 activities. It was Maldonado's and Darais' intent to defraud the federal government of JAG-ARRA funding by misrepresenting in their grant application that 13 DJJ employees lost jobs due to budget cuts.

141. Maldonado was the DJJ official authorized to sign 9AR04's GSC and was responsible for ensuring all information presented in the application was correct and that DJJ complied with all the GSC's Certified Assurances.

142. Darais was 9AR04's Project Director responsible for planning, operation, reporting and administration under the GSC. Darais submitted the FSR, LOE, PR and PMT documents to CCJJ and BJA, to receive reimbursement for existing DJJ employees' salaries from JAG-ARRA funding.

143. Maldonado and Darais were charged with knowledge of the DJJ budget appropriation, staffing requirements and resource management for 9AR04, ensuring whether DJJ complied with JAG-ARRA non-supplanting statutes, regulations, certified assurances and certifications.

144. Compliance with the non-supplanting requirements, while meeting the JAG-

44

First Amended Complaint
No. 2:15-cv-00054-RJS

ARRA core objective to restore job losses, were essential underpinnings of CCJJ's and BJA's decision to award DJJ 9AR04 funds.

145.  The GSC notified Maldonado and Darais "not to request JAG funding to replace any positions or items that are already approved for funding in [DJJ's] current budget." Maldonado signed 9AR04's Certified Assurances, assuring DJJ complied with the GSC's non-supplanting requirements.

146.  In April 2010, Darais signed a SC for 9AR04, allowing DJJ officials to use JAG-ARRA funding to pay salaries of existing DJJ employees' positions lost due to budget cuts and existing employees, if their positions "would otherwise have been lost due to budget cuts." Funding a position "that 'might' be lost [was] not allowable." If a non-budget cut, existing employee is transferred to JAG-ARRA funding, "the position that the existing employee vacated to take the JAG-ARRA position will need to be back-filled immediately with an agency funded (time limited) new hire in order to avoid supplanting."

147.  Maldonado and Darais knew their application's claims that "13 people...[were] cut by the Utah Legislature over the past year" would bolster their qualifications for grant funds and influence grant reviewers to award JAG-ARRA funding to restore/retain the claimed job losses.

First Amended Complaint
No. 2:15-cv-00054-RJS

148.  Maldonado and Darais schemed to transfer the costs of existing DJJ employees Storey, Havea, Coggins, Murry, Turk, Nuno, Rodriguez, Allsup and Lupeamanu to JAG-ARRA funding by creating, causing to be created and submitting or causing to be submitted, false or fraudulent back-fill documents identifying existing DJJ employees Black, Mateaki, Spencer, Kunz, Mendenhall and Cruz as "new hires" used to back-fill DJJ vacancies.

149.  Maldonado and Darais had full knowledge of the DJJ budget and knew Utah's Legislature had and would appropriate funding for the salaries of the grant-funded employees, in absence of JAG-ARRA funding. The application's representations of legislative cuts were knowingly false. From 2009 to 2012 DJJ had an average carryforward budget surplus of $1.5 million.

150.  From October 2009 to January 2013, Darais submitted the FSR, LOE, PR and PMT documents to CCJJ and BJA, seeking reimbursement of existing DJJ employees' salaries from JAG-ARRA funds knowing DJJ was not entitled to those funds.

151.  Darias' claims for JAG-ARRA funds were not merely requests for payment, but the attached LOE, PR and PMT documents represented that the funds were used to retain or restore 13 DJJ jobs subject to legislative cuts. Darais failed to disclose that most of the persons claimed to be cut were transferred to other DJJ positions and that

46

First Amended Complaint
No. 2:15-cv-00054-RJS

DJJ officials violated the SC by back-filling grant paid employees' vacated positions with existing DJJ employees, instead of new hires.

152. The implied and express certifications made in 9AR04's GSC, SC and requests for payment were materially false. Darais knew or it was reasonably foreseeable that the misrepresentations made in the application, that DJJ cut 13 employees due to budget cuts and known violations of the supplanting requirements, would lead to submission of false claims to the federal government.

**Subgrant 9AR05**

153. In May 2009, Williams and Miller signed the 9AR05 GSC, with CCJJ to receive JAG-ARRA funding for the UDC "due to budget shortfalls the Institutional Parole Office was eliminated." CCJJ awarded DOC $957,442 to hire 6 EPP agents to assist offenders with employment placement.

154. UDC Defendants Chesnut, Haddon, Miller, Nelson, Williams, Wilson and Worthington knew from the GSC that the federal government provided JAG-ARRA funding for 9AR05 activities. It was the UDC Defendants' intent to defraud the federal government of JAG-ARRA funding by misrepresenting that grant funds would be used to retain or restore UDC jobs.

155. Williams was the UDC official authorized to sign 9AR05's GSC and was

47

First Amended Complaint
No. 2:15-cv-00054-RJS

responsible for ensuring all information presented in the application was correct and that UDC officials complied with the non-supplanting requirements.

156.  Chesnut, Miller, Nelson and Wilson were Project Directors for 9AR05, responsible for planning, operation, reporting and administration under the GSC. Chesnut, Miller, Nelson and Wilson prepared the PR and PMT documents submitted to CCJJ and BJA, to receive reimbursement for existing UDC employees' salaries from JAG-ARRA funding.

157.  Chesnut, Haddon, Miller, Williams and Worthington were charged with knowledge of the UDC budget appropriations, staffing requirements and resource management for 9AR05, including ensuring that UDC complied with JAG-ARRA non-supplanting statute, regulations, certified assurances and certifications.

158.  Compliance with non-supplanting requirements, while meeting JAG-ARRA core objectives to retain or restore jobs were essential underpinnings of CCJJ's and BJA's decision to award UDC 9AR05 funds.

159.  In May 2010, the CCJJ Grants Monitor submitted a SC to Chesnut that allowed UDC to use JAG-ARRA funding to pay salaries of UDC employees' positions lost or would be lost due to budget cuts. Funding a position that might be lost was not allowed. The SC allowed UDC officials to transfer an existing employee to a grant funded

48

position if the employees' vacated position is "back-filled immediately with an agency funded... new hire in order to avoid supplanting."

160. In response to the Grants Monitor, Worthington submitted a document identifying existing UDC employees T. Cottrell, J. Williams, J. Wilson, C. Gunderson, T. Cressall and E. Price to be transferred to JAG-ARRA funded position and employees T. Green, E. Price, T. Shock, T. Lewis and M. Gardner to back-fill the vacated positions of transferred employees. Worthington did not inform the Grants Monitor that the back-filling employees were existing UDC employees. The Relator had observed employee Gardner working throughout the prison for years, before and during performance of 9AR05.

161. Worthington informed the Grants Monitor that the SC could not be signed without consulting Haddon. In July 2010, after consulting Haddon and Chesnut, Worthington submitted the SC, signed by Chesnut, to the Grants Monitor and Ziebarth. Worthington attached the identical back-fill document, that identified the persons used as back-fill employees.

162. Chesnut, Haddon, Miller, Williams and Worthington knew the application's false claims of UDC budget shortfalls and certifications to back-fill EPP agents' vacated positions with new hires would influence grant reviewers to award JAG-ARRA funding

49

to retain or restore UDC job losses.

163. Chesnut, Haddon and Worthington schemed amongst themselves to obtain JAG-ARRA funds by creating or causing to be created and submitting or causing to be submitted a false or fraudulent SC and back-fill document that purported to identify the "new hires" back-filling the vacated positions of EPP agents. Knowing UDC sustained no budget cuts, that the EPP agents' positions were not subject to RIF and that UDC had not and would not hire new employees, Haddon approved Chesnut's signing the SC and Worthington's submission of the SC and back-fill documents to CCJJ.

164. Chesnut, Haddon, Miller, Nelson, Williams and Wilson had full knowledge of UDC's budget, made manpower decisions to transfer existing UDC employees to grant positions and back-fill positions knowing the Legislature had appropriated funding for the salaries of EPP agents in absence of JAG-ARRA funding. The application's statements regarding budget short-falls were knowingly false. From 2008 to 2010, UDC amassed a $19.6 million budget surplus through savings from funded, vacant, positions.

165. In January 2012, Worthington informed Ziebarth that grant-funded EPP agent positions were not subject to RIF, as represented in the application and SC, admitting the EPP agents would be transferred to paid vacancies when the several federal grants' funding expired. As the author of CCJJ's non-supplanting notices/instructions in the

50

First Amended Complaint
No. 2:15-cv-00054-RJS

GSC and SC, Ziebarth knew and/or acted in deliberate ignorance of, the fact that the Utah Legislature provided funding for EPP agents' salaries in the form of hundreds of state paid vacancies.

166. Ziebarth had the authority to require UDC Defendants to return JAG-ARRA funds for violating non-supplanting requirements, and the duty to report UDC Defendants' non-supplanting violations to BJA. Ziebarth's failures to halt UDC Defendants' violations of the non-supplanting requirements, and reporting to BJA, caused false claims to be submitted to the federal government for 9AR05 funds.

167. From July 2009 to June 2011, Chesnut prepared FSR, LOE, PR and PMT documents for submission to CCJJ and BJA to receive 9AR05 Funds. From June 2011 to February 2012, Nelson prepared FSR, LOE, PR and PMT documents for submission to CCJJ and BJA to receive 9AR05 funds. From February 2012 to December 2012, Wilson prepared FSR, LOE, PR and documents for submission to CCJJ and BJA to receive 9AR05 funds. Worthington submitted all FSR, LOE, PR and PMT documents to CCJJ and BJA to receive JAG-ARRA funding for existing UDC employees' salaries, knowing UDC was not entitled to those funds.

168. The UDC Defendants' FSR claims for JAG-ARRA funds were not merely requests for payment, but the attached LOE, PR and PMT documents represented that

51

First Amended Complaint
No. 2:15-cv-00054-RJS

the funds were used to retain, restore or create jobs for the EPP. Chesnut, Nelson, Wilson and Worthington failed to disclose to BJA that UDC sustained no budget cuts, suffered no job losses and made no new hires to back-fill vacated positions of transferred EPP agents.

169. The implied and express certifications made in 9AR05's GSC, SC and requests for payment were materially false. Chesnut, Haddon, Miller Nelson, Williams, Wilson and Worthington knew, or it was reasonably foreseeable, that the misrepresentations made in the application, that UDC experienced "budget shortfalls" and known violations of the supplanting requirements, would lead to submission of false claims to the federal government.

170. Worthington also defrauded the federal government by the way he reported performance under 9AR05. Worthington often knowingly reported false information on the BJA website. The JAG-ARRA required recipients to report on two mandatory federal performance measures: 1. the number of jobs created with project funds; and 2. the number of jobs retained or restored with project funds. Each quarter, throughout implementation of the EPP, Worthington falsely reported up to six jobs were retained with project funds. Each quarter, throughout implementation of the EPP, Worthington falsely reported JAG-ARRA funding was used to retain EPP agents. For example, in

52

First Amended Complaint
No. 2:15-cv-00054-RJS

January 2010, July 2011, and January 2012, Worthington falsely reported UDC "retained" six employees with JAG-ARRA funding. The GSC expressly defined job retention as retaining "existing personnel who are still employed by your agency but will be lost at a later date due to budget cuts." None of the EPP agent positions were subject to loss due to budget cuts. UDC experienced no budget cuts from 2008 to 2012; as such, EPP agent positions did not meet the GSC's criteria for "job retention."

171. Worthington knew the definition of job retention, UDC experienced no budget cuts and none of the EPP agent positions were subject to RIF. Despite knowing EPP agent positions did not meet the definition of job retention, Worthington repeatedly and falsely reported to BJA that UDC officials used JAG-ARRA funding to retain jobs. Worthington knew providing false performance information that grant funds allowed the retention of jobs, would influence CCJJ and BJA to continue to provide JAG-ARRA funding to UDC.

172. The federal government was also defrauded in June 2011 when Chesnut submitted a grant adjustment request ("GAR"), form to CCJJ seeking to use $31,518 to purchase equipment and supplies ("ESO"), from 9AR05 funds. No ESO was purchased. Chesnut knew no ESO would be purchased because EPP activities were scheduled to end in 23 days. To conceal the disappearance of the $31,518, in January 2012 Worthington falsely

53

First Amended Complaint
No. 2:15-cv-00054-RJS

reported that UDC Defendants used the funds for wage increases of EPP agents to Ziebarth. Worthington knew all EPP agents received wage increases in May 2011, before Chesnut submitted the GAR. In January 2012, Worthington and Ziebarth conspired to conceal using JAG-ARRA funding to supplant EPP agents' wage increases by modifying budgeting documents to appear pre-approved.

173. JAG-ARRA subgrantees must comply with the statutory, contractual and certifications' non-supplanting requirement that prohibits using grant funds to replace state funds that would, in absence of federal funds, be made available for the same purposes. In this instance, the non-supplanting requirements mandated budget cuts, RIF or back-fills with new hires. The UAGO, AOC, DPS, DJJ and UDC Defendants knowingly failed to comply with the non-supplanting requirements and failed to disclose the noncompliance to the federal government.

174. Had the federal government known of the Defendants' violations of the non-supplanting requirements, it would not have allowed federal funds to be used to pay the salaries of existing UAGO, AOC, DPS, DJJ and UDC employees. The Defendants knew that the federal government consistently refuses to pay claims in cases where noncompliance with the non-supplanting requirement is an issue because, in 2009, DOJ barred 25 state and local law enforcement agencies from receiving federal grants for

54

First Amended Complaint
No. 2:15-cv-00054-RJS

violations of non-supplanting requirements.

### Fraud Under JAG Formula Grant 2011-DJBX-2082 ("2082")

175.    In about July 2011, Ziebarth wrote and Gordon submitted the 2082 grant application to BJA, seeking $2,096,024 in JAG funding. In August 2011, BJA approved and awarded CCJJ all funding in Ziebarth's and Gordon's application request. Gordon signed the 2082 Special Conditions that included compliance with the OJP Financial Guide's administrative requirements, requiring sub awardees to comply with BJA requirements and ensuring that BJA funding would not supplant state and local funding. Grant 2082 funding included $650,000 for UDC's EPP.

176.  Grant 2082 was awarded by BJA under the JAG program. As a JAG, 42 U.S.C. Section 3752 (1), the OJP Financial Guide's and 2082's Special Conditions imposes a non-supplanting requirement which prohibits using federal funds to pay for items appropriated by the Utah Legislature, in absence of federal funds. In accepting 2082 funding, Gordon and Ziebarth impliedly certified compliance with 42 U.S.C. Section 3752(1)'s non-supplanting requirements and federal laws and regulations to monitor subgrantees compliance with BJA requirements.

177.  Gordon and Ziebarth fraudulently induced the BJA to award Grant 2082 funding by making a variety of misrepresentations to comply with 0318 funding grant

First Amended Complaint
No. 2:15-cv-00054-RJS

conditions, OJP Financial Guide requirements, the BJA non-supplanting requirements and the BJA requirements to monitor subgrantee performance. Ziebarth and Gordon developed and submitted the 2082 application with the intent to knowingly supplant state funds with federal funds by failing to prevent and report subgrantees' known, fraudulent obtainment and use of 2082 funding.

178. The instances below demonstrate fraudulent conduct by Grant 2082 subgrantees:

a. In July 2013, UDC's Stromberg and Wilson and CCJJ's Gordon signed a GSC to award UDC $650,000 to fund Subgrant 11A27. Gordon notified Wilson that violation of 11A27 terms and conditions subjects the award to termination and that 11A27 was awarded in support of the JAG program.

b. Since at least October 2009, Gordon and Ziebarth knew from UDC officials' emails, requests for payment and quarterly reports that existing UDC employees' salaries were paid using JAG funding. In January 2012, Worthington informed Ziebarth that the Utah Legislature appropriated "several vacancies waiting to be filled" by EPP agents. Despite knowing that UDC was paying the salaries of existing employees, Gordon and Ziebarth took no action to monitor for or prevent violations of the non-supplanting requirements. From July 2013 to August 2014, Ziebarth and Weyland processed the requests for payment for 11A27 funds knowing UDC was not

56

First Amended Complaint
No. 2:15-cv-00054-RJS

entitled to those funds.

c.    Gordon, Ziebarth and Weyland acted in reckless disregard of the falsity that UDC officials were complying with the non-supplanting requirement. Gordon and Ziebarth acted in deliberate ignorance of their duty to monitor UDC officials' compliance with the material conditions of the OJP Financial Guide requirements. Gordon and Ziebarth's application misrepresented that Evidence Based Program Set-aside funding would be used in compliance with federal laws and BJA regulations.

d.    Gordon's and Ziebarth's application for Grant 2082 funding was not merely a request for payment of JAG funding, the application also represented that grant recipients would monitor subgrantees for and prevent violations of the JAG non-supplanting requirements. Knowing that compliance with the non-supplanting requirements would influence the federal government to award grant funding and pay their false claims, Gordon and Ziebarth failed to disclose the supplanting violations to the BJA.

e.    Gordon and Ziebarth violated 2082's implied and express certifications of 42 U.S.C. § 3752(1), the OJP Financial Guide and the Special Conditions of the award to comply with the non-supplanting requirements. They also failed to comply with 28 CFR § 66, 28 CFR § 70, 2 CFR § 215, 2 CFR §176, 31 U.S.C. §7502 and the OJP

57

First Amended Complaint
No. 2:15-cv-00054-RJS

Financial Guide's requirements to monitor grant subrecipients' compliance with federal laws and BJA regulations, knowing it was reasonably foreseeable that UDC officials' receipt of 11A27 funding would lead to submission of false claims to the federal government. Had the BJA known of the described violative conduct, it would not have awarded CCJJ 2082 funding. The federal government has repeatedly refused payment and debarred state agencies from JAG funding for violating the non-supplanting requirements.

179. Gordon and Ziebarth knew from UDC officials' emails and quarterly reports that the same existing UDC employees from subgrants 9AR05 and 10A27 were used in JAG funded positions for 11A27. As early as January 2012, Worthington informed Ziebarth that the Legislature appropriated "several vacancies waiting to be filled" by EPP agents in absence of federal funding.

180. Gordon and Ziebarth took no action to monitor for, or prevent violation of, the JAG non-supplanting requirements, despite knowing the Legislature had, or would, provide funding for EPP agent's salaries in absence of federal funding.

181. Gordon's and Ziebarth's grant application for 2082 funding was not merely a request for payment of JAG funds, the application also represented that grant recipients would monitor sub grantees for and prevent violations of the JAG non-supplanting

First Amended Complaint
No. 2:15-cv-00054-RJS

requirements. Gordon and Ziebarth failed to disclose to the federal government that 2082 sub grantees violated the JAG non-supplanting requirements.

182. Gordon and Ziebarth violated 2082's implied and express certification of 42 U.S.C. § 3752(l) and the BJA Financial Guide, to comply with the non-supplanting requirements knowing it was reasonably foreseeable that UDC officials' receipt of 10A27 and 11A27 funds to pay salaries of existing employees, would lead to submission of false claims to the federal government. The federal government has repeatedly refused payment of and debarred from JAG funding, state agencies that violate the JAG program's non-supplanting requirements.

### Fraud Under 2082 Subgrants 10A27 and 11A27 by UDC Defendants

183. To justify award of Grant 2082 by the federal government, Gordon's and Ziebarth's application declared that EPP funds were "to be used exclusively for the development of proven programs." The application identified the EPP as an evidence-based program that "will increase the effectiveness of the [UDC's] transition/re-entry responsibility." The goal of EPP was to reduce parole recidivism by increasing parolee employment.

184. In awarding UDC sub awards 10A27 and 11A27, CCJJ required UDC officials to sign a GSC which contained Certified Assurances that all information in the Defendants'

First Amended Complaint
No. 2:15-cv-00054-RJS

application for funding was correct and UDC would comply with the JAG program's non-supplanting requirement. UDC officials received $1,423,442 for Phases 2 and 3 of the EPP for 10A27 and 11A27 funding.

185. UDC officials knowingly and fraudulently induced award of federal government funds by knowingly violating the non-supplanting requirements and making false statements in its requests in their applications for federal funds. UDC officials knowingly submitted false PR and PMT data to CCJJ and BJA to conceal their fraudulent conduct and to further induce the federal government to continue to pay 10A27 and 11A27 false claims. The examples in the paragraphs below describe UDC officials' actions to fraudulently obtain and utilize federal government funding.

186. In October 2011, Williams and Wilson signed 10A27 GSC's to receive $700,000, later increased to $773,442, from CCJJ under the JAG program. The funding was used to pay the salaries of EPP agents. The GSC contained a specific Certified Assurance stating funds can "not replace those funds that have been appropriated for the same purpose." Williams separately signed the Assurance, indicating she reviewed the Assurance and would ensure UDC officials complied with the same.

187. UDC officials submitted claims for 10A27 funds, knowing that using federal funds to pay salaries of state-funded existing UDC employees violated the non-supplanting

First Amended Complaint
No. 2:15-cv-00054-RJS

requirements. In January 2012, Worthington submitted a claim to Ziebarth at CCJJ for $130,008 in 10A27 funds for reimbursement of salaries of existing UDC employees: A. Hansen, J. Williams, M. Landolfi, J. Kelley and D. Parcell as EPP agents. Most EPP agents were employed by UDC for ten or more years. Worthington submitted all the claims for payment until all $773,442 of the grant were exhausted in June 2013.

188.   Worthington knew and informed Ziebarth that UDC had several paid vacancies to transfer EPP agents when grant funding expired, before submitting the first request for payment. Williams, Wilson and Worthington were charged with knowledge of UDC's budget and knew the Legislature was appropriating funding for the same UDC employees funded with 10A27 funds as EPP agents.

189.   Williams and Wilson knowingly provided false and fraudulent information in the application, designed to induce award of federal funding to which UDC was not entitled. Wilson and Williams' false statements in the application included: EPP "offenders who started new employment increased 174%"; UDC had the "ability to gather data" regarding offender participation in the EPP; and "data gathered from the EPP participants will facilitate research." All the UDC Defendants' misrepresentations were known to be false when they were made. The above statements were made to artificially bolster UDC's qualifications to receive federal funds.

First Amended Complaint
No. 2:15-cv-00054-RJS

190.  The federal government was defrauded when Worthington repeatedly double billed for EPP agents' salaries from 10A27 funds. On August 1, 2011, Worthington submitted an FSR (request for payment) and LOE for $18,042 for pay period April 16, 2011 to April 29, 2011 and April 30, 2011 to May 13, 2011 for $18,042. The LOE also contained a request for $18,402 for the pay period April 20, 2011 to May 13, 2011. Worthington knew or deliberately ignored the fact that UDC had received reimbursement of EPP agent salaries for April 20, 2011 to May 13, 2011 over the previous pay periods.

191.  On October 23, 2012, Worthington submitted an FSR and LOE for $20,044 for the pay period ending October 12, 2012. In January 2013, Worthington again submitted an FSR and LOE for $20,044 for same pay period ending October 12, 2013. Worthington knew or deliberately ignored the fact that UDC had received reimbursement of EPP agent salaries for October 2012.

192.  Despite knowing of the double billing of 10A27 funds, Worthington took no action to self-report the double billing to CCJJ or reimburse the federal government for the double billed costs.

193.  In July 2013, Stromberg and Wilson signed 11A27's GSC to receive $650,000 from CCJJ under the JAG program. "JAG funding for the [EPP] will be used exclusively

62

First Amended Complaint
No. 2:15-cv-00054-RJS

to fund the positions of six Employment Specialists" according to the application. The GSC contained a specific Certified Assurances stating funds can "not replace those funds that have been appropriated for the same purpose." Stromberg separately signed the Assurance, indicating he reviewed the Assurance and would ensure UDC officials complied with the same.

194. UDC officials submitted claims for 11A27 funds, knowing that using federal funds to pay salaries of state-funded existing UDC employees violated the non-supplanting requirements. In July 2013, Worthington submitted a claim to Ziebarth at CCJJ for $20,728 in 11A27 funds for reimbursement of salaries of existing UDC employees: R. Eckman, A. Hansen, J. Kelley, M. Landolfi, D. Parcell and B. Smalling as EPP agents. From October 2013 to December 2014, Shreve submitted FSRs and LOEs for $630,000 in 11A27 funds to reimburse the salaries of substantially the same existing UDC employees, assigned as EPP agents, to Ziebarth at CCJJ.

195. Ziebarth knew UDC had several legislatively-funded vacancies to transfer EPP agents in absence of grant funding, before approving UDC's officials' first request for payment of 11A27 funds. Wilson made, and Stromberg approved, transfer and assignment of existing UDC employees to 11A27 funded positions. Stromberg, Wilson and Shreve were charged with knowledge of UDC's budget and knew the Legislature

63

was appropriating funding for the same UDC employees funded with 11A27 funds as EPP agents.

196. Stromberg and Wilson knowingly failed to comply with the GSC's Certified Assurance to not replace state funded personnel costs with federal funds. Stromberg and Wilson knew existing UDC employees would be used to fill grant funded positions and that using existing employees would likely lead to violation of the non-supplanting requirements.

197. The FSRs submitted by Worthington and Shreve to receive 10A27 and 11A27 funding were not merely requests for payment, but the attached LOE, PR and PMT documents represented that UDC officials had and would continue to comply with the JAG program's non-supplanting requirements. Worthington and Shreve failed to disclose to BJA of UDC officials' non-compliance with the non-supplanting requirements.

198. The implied and express certifications made in 10A27's and 11A27's GSCs and requests for payment, to comply with the non-supplanting requirements and assure fiscal control of grant funds were material to the federal government's decisions to award grant funding or reimburse the costs of the grant purpose. Had the federal government known of UDC officials' violations of the non-supplanting requirement and double billing conduct, it would not have allowed CCJJ to award UDC 10A27 and 11A27 funding to

64

First Amended Complaint
No. 2:15-cv-00054-RJS

UDC. In 2009, DOJ barred 29 law enforcement agencies from receiving BJA funding for violating non-supplanting requirements.

**Fraud Under JAG Formula Grant 2009-DJBX-0657 ("0657")**

199. In 2009, Ziebarth wrote 0657's grant application seeking $2,642,837 in JAG program funds. Gordon signed the application, certifying all information in the application was correct. In October 2009, BJA awarded CCJJ the full amount requested. The application included $427,000 for an evidence-based program set aside to be used for development of proven programs and fidelity evaluations. This included $239,000 for a fidelity evaluation ("FE") of UDC's Moral Reconation Therapy ("MRT") program.

200. Grant 0657 was awarded under the JAG program which required grantees to comply with the Office of Justice Program's Financial Guide that requires compliance with the non-supplanting requirements, subrecipient monitoring and procurement standards. In accepting JAG funding, Gordon and Ziebarth impliedly certified compliance with the Financial Guide's requirements.

201. According to the Financial Guide "the purpose of subrecipient monitoring is to ensure that federal program funds are being spent in accordance with the federal program and grant requirements, laws, and regulations." Subrecipient monitoring can be found in: 28 CFR §66, 28 CFR §70, 2 CFR §215, 2 CFR §176 and 31 U.S.C. § 7502.

65

First Amended Complaint
No. 2:15-cv-00054-RJS

202. Gordon and Ziebarth deliberately failed to monitor subrecipients for, or acted in reckless disregard, that subrecipients spent federal program funds in violation of program and grant requirements, laws and regulations. The following instances demonstrate Gordon and Ziebarth's failure to comply with subrecipient monitoring requirements:

**Subgrant 9A21**

203. In about September 2010, Patterson and Haddon signed a GSC with CCJJ to receive $239,000 under subgrant 9A21. In September 2010, Gordon notified Haddon that 9A21 funding was awarded "in support of the Moral Reconation Therapy Fidelity Evaluation...," to conduct the FE.

204. The FE covered the following aspects: identify the proper implementation of the MRT program and assess proper implementation of the MRT program across UDC's Adult Probation and Parole regions. The UDC did not have the expertise to conduct the FE, therefore, the GSC required UDC officials "to submit a Request for Proposal (RFP) nationally and award a contract to the successful bidder to conduct the [FE]."

205. The OJP Financial Guide requires award recipients and subrecipients to "conduct all procurement transactions in an open, free and fair competition." In accepting 9A21 funding, UDC officials expressly and impliedly certified to comply with the adequate

66

competition requirements of Title 28 CFR §66.36. Regulations permit awarding a contract on a sole source basis only when a subrecipient can document: the service is available only from a single source; a true public exigency or emergency exists; or, after competitive solicitation, competition is considered inadequate. OJP's Financial Guide requires all sole source procurements in excess of $100,000, "must receive prior approval from the awarding agency."

206.  In November 2010, Worthington compiled a "vendors list" of at least six "potential vendors who responded and stated interest" in performing the RFP to conduct the FE. At least two vendors submitted actual bids for the RFP. In January 2011, Burr, Christensen and Haddon formed the committee assigned to evaluate bids to perform the FE.

207.  Despite knowing several vendors expressed interest in performing the FE and at least two bids were received, Burr, Christensen and Haddon evaluated only one vendor and awarded the FE contract on a sole source basis, without open, free and fair competition. UDC and CCJJ officials did not seek and did not receive prior approval from BJA to award the FE contract on a sole source basis.

208.  In September 2010, Worthington consulted with Ziebarth "about the RFP as it relates to using federal funds." Worthington also submitted a copy of the RFP to

67

Ziebarth. In December 2010, Worthington informed Ziebarth that the RFP process was posted on the Internet. Ziebarth was aware of the FE RFP process and the OJP Financial Guide's open competition requirement.

209. Gordon and Ziebarth knowingly failed to monitor UDC officials' procurement processes, or acted in reckless disregard of UDC officials' award of a federally funded contract in violation of grant requirements, laws and regulations, by not complying with the implied certification, laws, regulations and the OJP's Financial Guide to comply with subrecipient monitoring requirements.

210. The federal government was defrauded when Gordon and Ziebarth knowingly allowed UDC officials to submit claims for items and wages unnecessary in the performance of the FE. For instance, in August 2011 and November 2011, UDC officials submitted grant adjustment forms ("GAF"), seeking $52,248 for MRT training, a suicide prevention system and service training software. In February 2012, a UDC official submitted another GAF seeking $37,389 to pay wages of existing UDC employees. The GAF costs were unallowable for the following reasons:

a. MRT training is provided by Correctional Counseling, Inc. ("CCI"), through a proprietary, sole source contract. The August 2011 and November 2011 GAFs sought and received $33,675 for MRT training sessions in December 2011, June

68

2012 and September 2012. In October 2009, UDC officials entered into a contract with CCI, which expired in October 2012, to provide the same MRT training sessions which UDC officials received payment from federal government funding.

b.      The guard tour system is designed for logging the rounds of prison guards monitoring prisoners' housing areas. UDC officials' GAFs requested a Guard 1 Plus system to install in UDC's mental health unit to prevent prisoner suicides. The August and November 2011 GAFs received $14,253 for the Guard 1 Plus System from federal government funding. The OJP Financial Guide prohibited using JAG funds for purposes and activities not covered in the subgrantee's approved activities budget.

c.      The existing employees funded were six scanning technicians. The August and November 2011 GAFs sought and received $37,389 to pay the salaries of the technicians. The scanning technician's duties were not used in any way to support the FE. JAG funding for scanning technician's salaries was not covered in the sub grantees' approved activities and budget.

211.  The implied and express certifications made in 0657's grant application were material to the federal government's decision to award grant funding. Had the federal government known that Gordon and Ziebarth would not monitor subrecipients to ensure proper use of federal funds, it would not have awarded CCJJ 0657 funding. The federal

69

First Amended Complaint
No. 2:15-cv-00054-RJS

government has repeatedly terminated JAG funding of state and local law enforcement agencies for similar violations of the subrecipient monitoring requirements.

### Fraud Under 0657 Subgrant 9A21 by UDC Defendants

212. In awarding UDC subaward 9A21, CCJJ required UDC officials to sign a GSC which contained Certified Assurances to comply with the non-supplanting requirement and the OJP Financial Guide. UDC officials received $239,000 to perform a FE on the MRT. UDC officials Patterson and Haddon signed the GSC.

213. In signing the GSC, Patterson and Haddon agreed to comply with the Certified Assurances of the GSC and implied certifications of the OJP Financial Guide. The GSC contained specific obligations "to submit a [RFP] nationally and award a contract to the successful bidder to conduct the [FE]."

214. UDC officials knowingly violated the express and implied certifications to comply with laws, regulations and the Financial Guide's requirement to conduct all procurement transactions in an open, free and fair competition; and follow the non-supplanting requirement.

215. In May 2010, Patterson and Haddon signed 9A21's GSC to receive $239,000 in JAG funding. Patterson's signature certified he would assure that the applicable certified assurances and grant conditions will be complied with by UDC officials. Haddon's

70

signature represented that he, as the subgrant's Program Director, was responsible for program planning, operation, reporting and administration of the subgrant.

216.  Knowing federal procurement regulation 28 CFR §66.36(c) requires open and fair competition, Worthington and Haddon conspired to induce the federal government to believe that the FE contract award met the material procurement requirements. Worthington and Haddon knew appearing to award the FE contract through competition would influence the federal government to continue to pay 9A21's fraudulent claims.

217.  In September 2010, Worthington and Christensen developed the RFP for the FE and submitted the RFP to Haddon and Ziebarth for approval in October 2010. After the RFP was developed, Haddon and Ziebarth approved implementing the RFP.

218.  To implement the RFP Worthington and Christensen developed a "vendors lists" to identify qualified potential bidders as required by 28 CFR §66.36(c)(4). Worthington and Christensen identified six "potential vendors who responded [to the RFP] and stated their interest." The GSC required UDC officials to submit the RFP nationally and comply with the requirement to have multiple bidders required by 28 CFR §66.36(d)(2)(i)(B) or 28 CFR §66.36 (d)(3)(iii). Bach was not included on the vendors list.

219.  In January 2011, Burr, Christensen and Haddon were assigned to the FE Evaluation Committee to select the successful bidder for the FE contract. Worthington

71

First Amended Complaint
No. 2:15-cv-00054-RJS

informed Haddon of at least two vendors, Bach and the Institute for Criminal Justice Research and Consulting ("ICJR"). Despite knowing ICJR was interested in performing the FE, Worthington deliberately withheld ICJR's FE contract bid from the Evaluation Committee and awarded Bach the FE contract without competition.

220. 28 CFR § 66.36 (d)(4)(i), only permits sole source procurement if: (A) the service is available only from a single source; (B) the public exigency or emergency will not permit a delay for competitive bidding; (C) the awarding agency authorizes a sole source purchase; or (D) after solicitation, competition is determined inadequate. UDC officials knew and did not notify CCJJ or BJA, that the FE contract award did not meet the sole source procurement criteria outlined in 28 CFR Section 66.36 (d) (4) (i) (A)-(D).

221. In August 2011, Williams submitted a GAF to CCJJ seeking $52,248 to purchase MRT training sessions, a guard tour system and e-learning software. In November 2011, Burr resubmitted the same GAF with minor stylistic changes. The GAF's purchases were approved by Ziebarth.

222. Williams and Burr were charged with knowledge of UDC's budget including resource management to procure service contracts for UDC. Williams and Burr knew or deliberately ignored that the Legislature had provided UDC funding to purchase the guard tour system and e-learning software which UDC officials charged the federal government. Additionally, Williams and Burr knew or deliberately ignored the fact that

72

the guard tour system and e-learning software served no purpose to perform the FE.

223. In February 2012, Ingle submitted a GAF to CCJJ seeking $37,389 to pay the salaries of six scanning technicians. The scanning technicians were existing UDC employees: N. Kasemmongkol, K. Burnham, S. Kelvington, K. Clements, M. Walker and N. Atherly. Ingle knew or deliberately ignored the fact that the Legislature had or would provide funding for the scanning technicians salaries in the absence of federal funding. Despite this knowledge, Ingle billed the federal government for the scanning technicians' salaries. Ingle knew the duties performed by the scanning technicians served no purpose to perform the FE. Ziebarth approved the GAF.

224. In December 2010, Bach submitted its bid to perform the FE for UDC. Harrison prepared and submitted Bach's bid to perform the FE. The FE RFP required Bach to submit references to demonstrate Bach had *previously* performed similar work as described in the RFP.

225. During evaluation of Bach's FE bid, it was determined at least one of the references submitted by Harrison was false. Harrison knew or deliberately ignored the fact that he provided references. Harrison knew providing false references would influence UDC officials to award Bach the FE contract and provided a False reference to bolster its qualifications to win the FE RFP.

73

226. Worthington submitted all the FSRs (requests for payment) and GAFs to CCJJ for 9A21 funds. The FSRs and GAFs impliedly and expressly certified UDC officials would comply with the OJP Financial Guide, regulations and GSC's requirements to award subcontracts by open and fair competition, to follow the non-supplanting requirements and to utilize JAG funding only for purposes and activities covered by the subgrant. Ziebarth approved all 9A21 FSRs and GAFs. Worthington and Ziebarth knew or deliberately ignored that procurement, non-supplanting and funds utilization violations were occurring and failed to disclose the violations to the federal government.

227. Compliance with the OJP Financial Guide, regulations and GSC requirements were material to the federal government's decisions to award grant funding or pay the costs of the grant purpose. The federal government has repeatedly debarred law enforcement agencies for violations of the procurement, non-supplanting and utilization requirements.

### Fraud Under DOJ's Internet Crime Against Children ("ICAC") Program

228. The ICAC program provides funding to state and local law enforcement agencies to identify, interdict and apprehend child sex criminals operating on the Internet. ICAC program funds were provided under the ARRA.

229. UAGO officials used ICAC funding to pay salaries of at least three UAGO agents.

First Amended Complaint
No. 2:15-cv-00054-RJS

The UAGO received $221,300 in 2009, $82,400 in 2010, $221,300 and $77,600 in 2011 from the ICAC program. UAGO officials Torgensen and Lucey submitted the ICAC program grant applications, request for payments and reports to the federal government.

230.  All recipients of BJA grant funds are required by the Financial Guide to establish and maintain adequate accounting systems and financial records and to accurately account for funds awarded to them. The grantee's financial management system must maintain and accurately report expenditure of grant funds.

231.  Torgensen was the UAGO official that signed the ICAC grant applications and GSCs, and who was responsible for ensuring UAGO personnel complied with the Financial Guide requirements. Lucey was responsible for the day-to-day operations of the ICAC program operations including planning, operation, reporting and administration. Sexton was the UAGO Grant Manager and was responsible for writing the ICAC grant applications and prepared the request for payment source documents.

232.  The federal government was defrauded when the UAGO Defendants knowingly failed to comply with the Financial Guide's requirement to adequately maintain accounting systems to record expenditure of ICAC funds. ICAC program funds were purportedly used to pay UAGO agent salaries but Sexton and Lucey failed to accurately track and charge the agents' time. Sexton prepared FSRs and LOEs for $602,600 and

75

First Amended Complaint
No. 2:15-cv-00054-RJS

Lucey submitted the requests for payment for that amount for ICAC program funds, knowing that agents were not assigned to the ICAC program for the time charged to the ICAC grants. Torgensen failed to ensure that Sexton and Lucey complied with 28 CFR Part 66, Uniform Administrative Requirements for Grants and Cooperative Agreements and the Financial Guide regarding standards for financial management systems when ICAC agents' grant expenditures were not tracked.

233. The implied and express certifications to accurately account for grant expenditures, contained in the ICAC's GSC, Financial Guide and 28 CFR Part 66, Uniform Administrative Requirements for Grants and Cooperative Agreements and the Financial Guide regarding standards for financial management systems were violated.

234. The implied and express certifications contained in the ICAC's GSC, Financial Guide and 28 CFR Part 66, to comply with the standards for financial management systems were material to the federal government's decisions to award UAGO ICAC program grants and pay the grants' requests for payment. Had the federal government known that UAGO Defendants would not accurately track ICAC expenditures it would not have awarded UAGO ICAC funding.

235. The UAGO Defendants knew from the Financial Guide and regulations that appearing to comply with the standards of financial management would influence the

76

First Amended Complaint
No. 2:15-cv-00054-RJS

federal government's decisions to award ICAC grants and approve the requests for payment under the grant. UAGO Defendants failed to notify the federal government of their non-compliance with laws, regulations and GSC financial tracking terms. The federal government had no actual knowledge of the Defendants' non-compliance. The federal government has previously debarred state law enforcement agencies from grant programs for being unable to account for grant fund usage.

**Fraud Under Grant 2009-SC-B9-0140 ("0140")**

236. In April 2009, Sexton wrote 0140's grant application seeking $880,882 in JAG-ARRA funding for the Mortgage Fraud Task Force, ("MFTF"). Torgensen was the UAGO official authorized to sign 0140's GSC, certifying he would ensure UAGO employees complied with the laws, regulations, the OJP Financial Guide and GSC terms and conditions regarding the material award and payment requirements of the federal government. In September 2009, BJA awarded UAGO the full $880,882 for 0140.

237. The MFTF grant application stated, "funds will be used to hire one (1) full-time attorney and two (2) full-time criminal/financial investigators for approximately 28 months." This statement was knowingly false when made by Sexton. Torgensen and Sexton knew from 0140 solicitation that claims to "hire" new employees would induce the federal government to award the grant and pay the grant's requests for payment and

First Amended Complaint
No. 2:15-cv-00054-RJS

made those statements to bolster their application for JAG-ARRA funding.

238. The primary goals of the ARRA were to create jobs and support economic recovery. MFTF funding purportedly established the Utah Preservation of Asset Seizure and Forfeiture Team ("UPAST"). UPAST purportedly identified, located and preserved assets early in investigations to provide victim restitution. The application repeatedly and falsely claimed UPAST would "immediately create three jobs within the [UAGO]" to combat mortgage fraud.

239. The federal government was defrauded when Torgensen knowingly failed to require that an attorney and two (2) investigators for UPAST be hired. Torgensen knew when he signed 0140's GSC that no employees would be hired to support UPAST because a hiring freeze was in place at UAGO. Existing UAGO employees were merely transferred to MFTF positions.

240. Gallegos submitted all UAGO requests for payment and progress reports to the federal government to receive 0140 funds. Gallegos knew creating jobs was a material condition of receiving 0140 funding and he knew UAGO had not hired any employees to support UPAST each time he submitted a claim for 0140 funds.

241. From December 2009 to March 2013, Gallegos submitted claims for 0140 funds every 90 days but failed to disclose to the BJA that UAGO officials made no hires as

78

First Amended Complaint
No. 2:15-cv-00054-RJS

claimed in its application. Gallegos knowingly sought and received payments from the federal government for UAGO which UAGO was not entitled. In submitting the claims, Gallegos violated the FCA.

242. The Defendants knew from the laws, regulations, OJP Financial Guide and the 0140 GSC that hiring the claimed UPAST employees was a material requirement to receive payment claims. The UAGO Defendants knew the federal government would not pay the requests for payment if it knew no employees were hired, therefore the UAGO Defendants concealed the failure to hire from the federal government. The federal government has consistently refused to pay claims of state law enforcement agencies that violate grant employment requirements.

**Fraud Under JAG Formula Grant 2010-DJ-BX-0318 ("0318")**

243. In about June 2010, Ziebarth wrote and Gordon submitted the 0318 grant application to BJA, seeking $2,541,633 in JAG funding. In August 2010, BJA approved and awarded CCJJ all funding requested in Ziebarth's and Gordon's application. Gordon signed the 0318 Special Conditions that included compliance with the OJP Financial Guide's administrative requirements which required sub awardees to comply with BJA requirements and ensure that BJA funding would not supplant state and local funding. Grant 0318 funding included $773,442 for UDC's EPP.

79

First Amended Complaint
No. 2:15-cv-00054-RJS

244. Grant 0318 was awarded by BJA under the JAG program. As a JAG, funding could not be used to supplant budget items approved for funding by the Utah Legislature. In accepting 0318 Funding, Gordon and Ziebarth impliedly certified compliance with 42 U.S.C. §3752(1)'s non-supplanting requirement.

245. Gordon and Ziebarth fraudulently induced the BJA to award 0318 funding by making a variety of misrepresentations to comply with 0318 grant conditions, the OJP Financial Guide requirements and the BJA non-supplanting requirements. Gordon and Ziebarth developed and submitted the 0318 application with the intent to knowingly supplant state funds with federal funds by failing to prevent and report subgrantees' known, fraudulent obtainment and use of 0318 funding.

246. Grant 0318 awarded CCJJ $719,551 to fund an Evidence Based Programming set-aside. In November 2011, Gordon notified UDC's Wilson that CCJJ awarded UDC $700,000, later increased to $773,472 to fund sub-grant 10A27 "in support of the Second Phase of [EPP]…"

247. Since at least October 2009, Gordon and Ziebarth knew UDC officials were violating the non-supplanting requirements by paying the salaries of existing UDC employees with 10A27 Funding. To place UDC officials on notice of the non-supplanting requirements, Weyland submitted a SC to UDC officials that required the

80

vacated positions of grant-funded, existing UDC employees to be back-filled with new hires, but Gordon and Ziebarth took no action to monitor or ensure compliance with the SC. Gordon and Ziebarth also knew from UDC officials Quarterly reports that existing UDC employees were paid with 10A27 funding.

248. In January 2012, Worthington informed Ziebarth that the Utah Legislature appropriated funds for "several vacancies waiting to be filled" by EPP agents, in absence of federal funding. Ziebarth and Weyland processed and approved all 10A27 requests for payment, which identified the same existing UDC employees as grant-funded employees in the 9AR05 and 10A27 LOEs.

249. Gordon, Ziebarth and Weyland acted in reckless disregard of the falsity that UDC officials were complying with the non-supplanting requirements. Gordon and Ziebarth acted in deliberate ignorance of their duty to monitor UDC officials' compliance with OJP Financial Guide's requirements. Gordon's and Ziebarth's application misrepresented that evidence-based programs set-aside funding would be used in compliance with federal laws and BJA regulations.

250. Gordon and Ziebarth's application for 0318 funding was not merely a request for payment of JAG funds, the application also represented that grant recipients would monitor subgrantees for and prevent violations of the JAG non-supplanting

81

First Amended Complaint
No. 2:15-cv-00054-RJS

requirements.

251. Gordon and Ziebarth violated 0318's implied and express certifications of 42 U.S.C. §3752(1), the OJP Financial Guide and the Special Conditions of the award to comply with 28 CFR §66, 28 CFR §70, 2 CFR §215, 2 CFR §176, 31 U.S.C.§7502 and the OJP Financial Guide's requirements to monitor subgrantees compliance with federal laws and BJA regulations, knowing it was reasonably foreseeable that UDC officials' receipt of 11A27 funding would lead to submission of false claims to the federal government. Had the BJA known of the described violative conduct, it would not have awarded CCJJ 2082 funding. The federal government has repeatedly refused payment and debarred state agencies from JAG funding for violating the non-supplanting requirements.

**Defendants Retaliated Against Relator for Investigating and Reporting the False Claims Act Violations Alleged Herein, in Violation of the First Amendment to the U.S. Constitution.**

252. In August 2012, Relator Williams submitted an administrative grievance to UDC reporting that UDC officials failed to comply with the non-supplanting requirements of GSCs 9AR05 and 10A27. Relator Williams reported that vacated positions of EPP agents were improperly back-filled. UDC officials denied the allegations in September 2012.

253. In October 2012, the Relator again used the UDC grievance process to report that

First Amended Complaint
No. 2:15-cv-00054-RJS

UDC officials had conspired to fraudulently obtain and use JAG funding. Defendants Bigelow and Casper responded to the October 2012 grievance by demanding that the Relator withdraw his grievance reporting EPP official's violations of the JAG program's requirements and conspiracy to fraudulently obtain and use federal funds. Bigelow and Casper threatened to take administrative action against the Relator, if the grievance was not withdrawn.

254. In November 2012, the Relator again filed a grievance reporting that the EPP performance violated the terms and conditions of the JAG program. The Relator's grievance specifically identified UDC Defendants Worthington, Chestnut, Williams, Haddon and Patterson as the individuals directly responsible for the fraudulent conduct to obtain and use JAG funding. Defendant Garner responded to Relator's third Grievance regarding the EPP stating Relator's grievance must "alleg[e] personal injury, loss or harm..." In addition, Garner sanctioned the Relator for filing the grievances regarding the EPP by suspending Relator's privileges to file grievances.

255. A few days after Garner sanctioned the Relator for filing the EPP grievances, Relator observed Defendants Hansen and Woodall talking and gesturing toward the Relator, which included pointing and a throat slashing motion, in Relator's work area. After Hansen left the area, Woodall came to the Relator asking Relator what his problem was with the EPP and Hansen. Woodall stated he did not like prisoners that filed

83

First Amended Complaint
No. 2:15-cv-00054-RJS

grievances. Woodall "joked" that he would not fire the Relator until after the Print Shop's Christmas party. In January 2013, Woodall fired Relator for filing grievances against the EPP.

256. Defendants Hansen and Woodall combined to engage in a conspiracy to retaliate against the Relator for investigating and reporting the fraudulent conduct of UDC officials to obtain and use federal funds, by terminating or causing the Relator to be terminated from his employment in the UDC Print Shop. Hansen and Woodall's actions caused the Relator the loss of $2,500 per year in wages.

257. The loss of paid employment would chill a person of ordinary firmness from investigating and reporting fraud by prison officials. Due to the close proximity in time of Hansen's and Woodall's meeting, while gesturing towards the Relator and Woodall's statement of displeasure with prisoners filing grievances, Woodall's firing of the Relator, was designed to retaliate against the Relator. But for Hansen's and Woodall's intention to retaliate against the Relator for filing grievances on the EPP, the Relator would not have been fired.

258. Defendants Casper, Bigelow and Garner combined to engage in a conspiracy to retaliate against the Relator for investigating and reporting JAG program violations of the EPP by suspending Relator's privileges to file grievances. The Defendants' actions to suspend the Relator's grievance privileges would and was designed to chill a person of

84

First Amended Complaint
No. 2:15-cv-00054-RJS

ordinary firmness from investigating and reporting wrongdoing by prison officials.

Without his grievance privileges the Relator was unable to challenge being fired from

his job. But for Casper's, Bigelow's and Garner's intention to retaliate against the Relator

for filing grievances against the EPP, the Relator could have used the grievance process

to overturn the loss of his job. There was no legitimate penological interest to suspend

Relator's grievance privileges.

### False Claims Act Damages and Penalties

259. At all times relevant to this complaint, if the United States knew of the fraudulent

conduct alleged herein, the United States would not have awarded the JAG funding or

pay any of the claims submitted by the Defendants.

260. Knowing the United States would not award or pay claims from JAG funding, the

Defendants fraudulently induced award of federal funds and concealed or deliberately

failed to disclose their illegal conduct from the United States as a means of defrauding

the federal government.

261. At all times relevant to this complaint, it was a violation of federal law to

fraudulently induce the federal government to award grant funding which the recipient

was not entitled to receive and to submit a false or fraudulent claim for payment or

approval by the federal government.

262. At all times relevant to this complaint, it was a violation of federal law to make,

85

First Amended Complaint
No. 2:15-cv-00054-RJS

use or cause to be made or used, a false record or statement material to a false or fraudulent claim paid or approved by the federal government and conspire to commit a violation of the False Claims Act.

263. Under the False Claims Act, the United States is entitled to treble damages and penalties up to $11,000 per violation of the FCA.

**Damages and Penalties Under Grant 2009-SUB-90045**

264. By the acts described above, Defendants presented false or fraudulent claims to the federal government for payment or approval, made and used or caused to be made and used a false grant application, material to the federal government's decision to award Grant 90045, constituting violations of the FCA, with associated penalties:

| Month, Year | FSR | Claim Amount | FCA Penalty |
|---|---|---|---|
| Apr-Jun, 09 | 2 | $ 47,033.79 | $11,000.00 |
| Jul-Sep, 09 | 3 | $ 525,683.49 | $11,000.00 |
| Oct-Dec, 09 | 4 | $ 321,572.89 | $11,000.00 |
| Jan-Mar, 10 | 5 | $ 974,478.04 | $11,000.00 |
| Apr-Jun, 10 | 6 | $ 547,999.26 | $11,000.00 |
| Jul-Sep, 10 | 7 | $1,005,437.19 | $11,000.00 |
| Oct-Dec,10 | 8 | $1,004,887.96 | $11,000.00 |

86

First Amended Complaint
No. 2:15-cv-00054-RJS

| | | | |
|---|---|---|---|
| Jan-Mar, 11 | 9 | $1,027,599.54 | $11,000.00 |
| Apr-Jun, 11 | 10 | $ 969,869.37 | $11,000.00 |
| Jul-Sep, 11 | 11 | $ 647,850.80 | $11,000.00 |
| Oct-Dec,11 | 12 | $1,064,110.51 | $11,000.00 |
| Jan-Mar,12 | 13 | $1,036,897.50 | $11,000.00 |
| Apr-Jun, 12 | 14 | $ 474,499.69 | $11,000.00 |
| Jul-Sep,12 | 15 | $ 126,233.80 | $11,000.00 |
| Oct-Dec,12 | 16 | $ 190,437.17 | $11,000.00 |
| Totals: | | $9,964,861.00 | $176,000.00 |

Treble Damages:        $29,894,583.00

**Damages and Penalties Under Grant 2011-DJBX-2082**

265.  By the acts described above, Defendants submitted false or fraudulent claims to the federal government for payment or approval, made and used or caused to be made and used a false grant application, material to the federal government's decision to award Grant 2082. Each of the following FSRs describe the reimbursements of expenses for Grant 2082, constituting violations of the FCA, with associated penalties:

87

First Amended Complaint
No. 2:15-cv-00054-RJS

| Month, Year | FSR | Claim Amount | FCA Penalty |
|---|---|---|---|
| Oct-Dec, 11 | 5 | $  18,836.75 | $11,000.00 |
| Jan-Mar, 12 | 6 | $ 425,577.74 | $11,000.00 |
| Apr-June, 12 | 7 | $  85,248.53 | $11,000.00 |
| Jul-Sep, 12 | 8 | $  21,630.68 | $11,000.00 |
| Oct-Dec, 12 | 9 | $1,517,730.30 | $11,000.00 |
| Totals: | | $2,096,024.00 | $55,000.00 |
| Treble Damages: | | $6,288,072.00 | |

**Damages and Penalties Under Grant 2009-DJBX-0657**

266.  By the acts described above, Defendants submitted false or fraudulent claims to the federal government for payment or approval, made and used or caused to be made and used a false grant application, material to the federal government's decision to award Grant 0657. The following FSR is a representative example for reimbursements of expenses for Grant 0657, constituting violations of the FCA, with associated penalties:

/

88

| Month, Year | FSR | Claim Amount | FCA Penalty |
|---|---|---|---|
| Oct-Dec 12 | 17 | $169,461.23 | $11,000.00 |
| Totals: | | $2,642,837.00 | $11,000.00 |
| Treble Damages: | | $7,928,511.00 | |

### Damages and Penalties Under Internet Crimes Against Children Grants

267. By the acts described above, Defendants presented false or fraudulent claims to the federal government for payment or approval, made and used or caused to be used false records, material to the federal government's decision to award ICAC program funding. The following supplemental payments describe the reimbursements of expenses for the ICAC program, constituting violations of the FCA, with associated penalties:

| Month, Year | FSR | Claim Amount | FCA Penalty |
|---|---|---|---|
| July, 2009 | 1 | $ 221,300.00 | $11,000.00 |
| July, 2010 | 2 | $ 82,400.00 | $11,000.00 |
| July, 2011 | 3 | $ 221,300.00 | $11,000.00 |
| July, 2012 | 4 | $ 77,600.00 | $11,000.00 |

89

First Amended Complaint
No. 2:15-cv-00054-RJS

| | | | |
|---|---|---|---|
| Totals: | | $ 602,600.00 | $44,000.00 |
| | | | |
| Treble Damages: | | $1,807,800.00 | |

## Damages and Penalties Under Grant 2009-SC-B9-0140

268. By the acts described above, Defendants presented false or fraudulent claims to the federal government for payment or approval, made and used or caused to be made or used false records, material to the federal government's decision to award Grant 0140 funding. The following supplemental payments describe the reimbursements of expenses for 0140, constituting violations of the FCA with associated penalties:

| Month, Year | FSR | Claim Amount | FCA Penalties |
|---|---|---|---|
| July, 2009 | 1 | $ 198,300.00 | $11,000.00 |
| July, 2010 | 2 | $ 216,200.00 | $11,000.00 |
| July, 2011 | 3 | $ 267,200.00 | $11,000.00 |
| July, 2012 | 4 | $ 483,200.00 | $11,000.00 |
| Totals: | | $1,164,700.00 | $44,000.00 |
| Treble Damages: | | $3,494,100.00 | |

/

90

**Damages and Penalties Under Grant 2010-DJ-BX-0318**

269. By the acts described above, Defendants submitted false or fraudulent claims to the federal government for payment or approval, made and used or caused to be made and used a false grant application, material to the federal government's decision to award Grant 0318, constituting violations of the FCA, with associated penalties:

| Month, Year | FSR | Claim Amount | FCA Penalties |
| --- | --- | --- | --- |
| Sept., 2010 | 4 | $ 32,856.91 | $11,000.00 |
| Dec., 2010 | 5 | $141,537.41 | $11,000.00 |
| Mar., 2011 | 6 | $481,222.49 | $11,000.00 |
| Jun., 2011 | 7 | $384,771.43 | $11,000.00 |
| Sept., 2011 | 8 | $149,167.71 | $11,000.00 |
| Dec., 2011 | 9 | $ 54,863.17 | $11,000.00 |
| Mar., 2012 | 10 | $ 27,166.67 | $11,000.00 |
| Jun., 2012 | 11 | $499,058.30 | $11,000.00 |
| Sept., 2012 | 12 | $112,398.45 | $11,000.00 |
| Dec., 2012 | 13 | $159,505.29 | $11,000.00 |

91

First Amended Complaint
No. 2:15-cv-00054-RJS

| Mar., 2013 | 14 | $497,344.80 | $11,000.00 |
| Jun., 2013 | 16 | $ 1,740.37 | $11,000.00 |
| Totals: | | $2,541,633.00 | $132,000.00 |
| Treble Damages: | | $7,624,899.00 | |

### Damages and Penalties Under CCJJ subgrants

270. By the acts described above, Defendants presented false or fraudulent claims to the federal government *grantee* for payment or approval, made and used or caused to be made and used false grant applications and subcontracts, material to the federal government's grantee decisions to pay the reimbursement costs of the subgrants. The following FSRs describes the reimbursed expenses for the subgrants, constituting violations of the FCA, with associated penalties:

Subgrant 9AR01

| Month, Year | FSR | Claim Amount | FCA Penalty |
| --- | --- | --- | --- |
| Apr-Jun, 09 | 1 | $ 44,158.89 | $11,000.00 |
| Jul-Sep, 09 | 2 | $ 122,993.26 | $11,000.00 |

92

| Sep-Dec, 09 | 3 | $ 122,913.40 | $11,000.00 |
| Jan-Mar, 10 | 4 | $ 160,002.63 | $11,000.00 |
| Apr-Jun, 10 | 5 | $ 166,227.63 | $11,000.00 |
| Jul-Sep, 10 | 6 | $ 169,903.82 | $11,000.00 |
| Oct-Dec, 10 | 7 | $ 183,624.53 | $11,000.00 |
| Jan-Mar, 11 | 8 | $ 164,040.59 | $11,000.00 |
| Apr-Jun, 11 | 9 | $ 196,636.42 | $11,000.00 |
| Jul-Sep, 11 | 10 | $ 179,226.14 | $11,000.00 |
| Oct-Dec,11 | 11 | $ 135,658.52 | $11,000.00 |
| Jan-Mar, 12 | 12 | $ 136,614.17 | $11,000.00 |
| Totals | | | $132,000.00 |

Subgrant 9AR02

| Month, Year | FSR | Claim Amount | FCA Penalty |
| --- | --- | --- | --- |
| Jul-Sep, 09 | 1 | $ 68,935.79 | $11,000.00 |
| Oct-Dec, 09 | 2 | $ 59,770.70 | $11,000.00 |

93

| Jan-Mar, 10 | 3  | $ 81,954.31 | $11,000.00 |
| Apr-Jun, 10 | 4  | $ 88,812.88 | $11,000.00 |
| Jul-Sep, 10 | 5  | $ 65,310.19 | $11,000.00 |
| Oct-Dec,10  | 6  | $ 74,128.82 | $11,000.00 |
| Jan-Mar, 11 | 7  | $ 36,330.59 | $11,000.00 |
| Apr-Jun,11  | 8  | $ 22,876.18 | $11,000.00 |
| Jul-Sep, 11 | 9  | $ 12,255.24 | $11,000.00 |
| Oct-Dec, 11 | 10 | $ 30,849.28 | $11,000.00 |
| Jan-Mar, 12 | 11 | $ 13,629.36 | $11,000.00 |
| Apr-Jun, 12 | 12 | $ 14,110.38 | $11,000.00 |
| Jul-Sep, 12 | 13 | $  5,396.28 | $11,000.00 |
| Totals:     |    |             | $143,000.00 |

Subgrant 9AR03

| Month, Year | FSR | Claim Amount | FCA Penalty |
| --- | --- | --- | --- |
| Jul-Sep, 09 | 1 | $ 63,475.62 | $11,000.00 |

94

First Amended Complaint
No. 2:15-cv-00054-RJS

| Oct-Dec,09 | 2 | $ 108,078.66 | $11,000.00 |
| Jan-Mar, 10 | 3 | $ 92,816.34 | $11,000.00 |
| Apr-Jun, 10 | 4 | $ 97,069.90 | $11,000.00 |
| Jul-Sep, 10 | 5 | $ 12,445.13 | $11,000.00 |
| Oct-Dec, 10 | 6 | $ 16,704.37 | $11,000.00 |
| Totals: | | | $66,000.00 |

Subgrant 9AR04

| Month, Year | FSR | Claim Amount | FCA Penalty |
| --- | --- | --- | --- |
| Oct-Dec, 09 | 2 | $ 14,155.85 | $11,000.00 |
| Jan-Mar, 10 | 3 | $ 12,822.96 | $11,000.00 |
| Apr-Jun, 10 | 4 | $ 20,331.35 | $11,000.00 |
| Jul-Sep, 10 | 5 | $ 63,893.36 | $11,000.00 |
| Oct-Dec, 10 | 6 | $ 68,610.09 | $11,000.00 |
| Jan-Mar, 11 | 7 | $ 117,177.02 | $11,000.00 |
| Apr-Jun, 11 | 8 | $ 126,038.20 | $11,000.00 |

95

First Amended Complaint
No. 2:15-cv-00054-RJS

| | | | |
|---|---|---|---|
| Jul-Sep, 11 | 9 | $ 94,859.41 | $11,000.00 |
| Oct-Dec, 11 | 10 | $ 90,721.51 | $11,000.00 |
| Jan-Mar, 12 | 11 | $ 113,046.17 | $11,000.00 |
| Apr-Jun,12 | 12 | $ 94,128.08 | $11,000.00 |
| Jul-Sep, 12 | 13 | $ 97,189.88 | $11,000.00 |
| Oct-Dec, 12 | 14 | $ 15,656.00 | $11,000.00 |
| Totals: | | | <u>$143,000.00</u> |

Subgrant 9AR05

| Month, Year | FSR | Claim Amount | FCA Penalty |
|---|---|---|---|
| Oct-Dec, 09 | 2 | $ 89,178.16 | $11,000.00 |
| Jan-Mar, 10 | 3 | $ 97,994.71 | $11,000.00 |
| Apr-Jun, 10 | 4 | $ 114,379.12 | $11,000.00 |
| Jul-Sep, 10 | 5 | $ 101,599.33 | $11,000.00 |
| Oct-Dec, 10 | 6 | $ 71,432.23 | $11,000.00 |
| Jan-Mar, 11 | 7 | $ 108,253.38 | 11,000.00 |

96

First Amended Complaint
No. 2:15-cv-00054-RJS

| Apr-Jun, 11 | 8 | $ 146,108.44 | $11,000.00 |
| Jul-Sep, 11 | 9 | $ 139,830.13 | $11,000.00 |
| Oct-Dec,11 | 10 | $ 89,696.21 | $11,000.00 |
| Totals: | | | $99,000.00 |

Subgrant 10A27

| Month, Year | FSR | Claim Amount | FCA Penalty |
| --- | --- | --- | --- |
| Jan-Mar, 12 | 2 | $ 130,008.08 | $11,000.00 |
| Apr-Jun, 12 | 3 | $ 144,898.79 | $11,000.00 |
| Jul-Sep, 12 | 4 | $ 128,530.05 | $11,000.00 |
| Oct-Dec, 12 | 5 | $ 120,517.79 | $11,000.00 |
| Jan-Mar, 13 | 6 | $ 140,329.49 | $11,000.00 |
| Apr-Jun, 13 | 7 | $ 109,209.79 | $11,000.00 |
| Totals: | | | $77,000.00 |

Subgrant 11A27

| Month, Year | FSR | Claim Amount | FCA Penalty |
| --- | --- | --- | --- |

97

First Amended Complaint
No. 2:15-cv-00054-RJS

| Apr-Jun, 13 | 1 | $ 20,728.13 | $11,000.00 |
| Jul-Sep, 13 | 2 | $ 83,477.06 | $11,000.00 |
| Oct-Dec, 13 | 3 | $ 107,639.88 | $11,000.00 |
| Jan-Mar, 14 | 4 | $ 130,440.90 | $11,000.00 |
| Apr-Jun, 14 | 5 | $ 131,229.79 | $11,000.00 |
| Jul-Sep, 14 | 6 | $ 161,502.11 | $11,000.00 |
| Oct-Dec, 14 | 7 | $ 17,631.03 | $11,000.00 |
| Totals: | | | $77,000.00 |

Subgrant 9A21

| Month, Year | FSR | Claim Amount | FCA Penalty |
| --- | --- | --- | --- |
| Jul-Sep, 11 | 4 | $ 15,770.22 | $11,000.00 |
| Oct-Dec,11 | 5 | $ 25,626.23 | $11,000.00 |
| Jan-Mar,12 | 6 | $ 40,912.87 | $11,000.00 |
| Apr-Jun, 12 | 7 | $ 66,500.53 | $11,000.00 |
| Jul-Sep, 12 | 8 | $ 86,189.75 | $11,000.00 |

98

First Amended Complaint
No. 2:15-cv-00054-RJS

Totals:                                        $55,000.00

## Counts One and Two

### Violation of False Claims Act
### 31 U.S.C. Sections 3729(a)(1) and (a)(2)
### Against All Defendants

271.  Relator realleges and incorporates by references the allegations contained in this First Amended Complaint.

272.  This First Amended Complaint seeks treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq. (2010) as amended.

273.  By the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment, made to the United States, a grantee of federal funds or other recipient of federal funds.

274.  By the acts described above, Defendants knowingly made, used or caused to be made or used false or fraudulent records or statements material to the United States' decisions to award grant funding and pay Defendants' request for payment.

275.  By the acts described above, Defendants' knowingly concealed the existence of their illegal conduct from the United States to induce JAG program funding awards and payment of their false and fraudulent claims to the United States.

99

First Amended Complaint
No. 2:15-cv-00054-RJS

276. The United States, unaware of the Defendants' wrongdoing or the falsity of the records, statements or claims made by the Defendants, awarded grants and paid claims the United States would not have paid. The United States has repeatedly refused to award JAG funding, refused to reimburse requests for payment and debarred grant recipients for committing the identical wrongdoing alleged against the Defendants.

### Count Three

**Violation of False Claims Act**
**31 U.S.C. Section 3729(a)(3)**
**Against All Defendants**

277. Relator realleges and incorporates by references the allegations contained in this First Amended Complaint.

278. This First Amended Complaint seeks treble damages and penalties under the False Claims Act, 31 U.S.C. Section 3729, et seq. (2010) as amended.

279. By the acts described above, the Utah State officials authorized to sign JAG program applications, monitor subgrantees, submit progress reports and submit requests for payment for federal government funding conspired between and amongst each other for the purposes of presenting or causing to be presented multiple false or fraudulent claims for payment or approval by the United States.

280. By the acts described above, the Utah State officials authorized to create and

100

First Amended Complaint
No. 2:15-cv-00054-RJS

submit JAG program applications, create and submit progress reports, create and submit requests for payment and sign and submit certifications of compliance conspired to defraud the United States by making, using or causing to be made or used, false records or statements material to the United States' decisions to award grant funding and pay Defendants' requests for payments.

281. By the acts described above, Defendants knowingly conspired to conceal the existence of their illegal conduct from the United States to further induce the United States to award Utah state agencies additional JAG program funding and continue to pay claims for which Utah state agencies were not entitled.

282. The United States, unaware of the Defendants' conspiracies, awarded grant funding and paid claims the United States would not have otherwise paid.

## Count Four

### Violation of the First Amendment of the US Constitution
### Against All Defendants

283. Relator realleges and incorporates by reference the allegations contained in this First Amended Complaint.

284. This is a claim for compensatory and punitive damages under 42 U.S.C. §§ 1983, 1985 and 1986.

101

First Amended Complaint
No. 2:15-cv-00054-RJS

285. Based on the acts described above, Defendants' retaliated against the Relator for investigating and reporting the False Claims Act violations alleged in this complaint.

286. Based on the acts described above, Relator was engaged in constitutionally protected activities; Defendants' actions were designed to chill a person of ordinary firmness from exercising his right to free speech; Defendants' actions caused the Relator injury; but for the Defendants' intentions to retaliate against the Relator, Defendants would have taken no action against the Relator for investigating and reporting violations of the False Claims Act.

287. Based on the acts described above, Defendants Bigelow, Casper, Garner, Hansen and Woodall combined to engage in a conspiracy to commit the acts of retaliation against the Relator, concealed the same or failed to intervene in or report said conspiracy.

## PRAYER FOR RELIEF

WHEREFORE, the United States and the Relator request that:

1. This Court enter a judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' violations of the False Claims Act;

102

First Amended Complaint
No. 2:15-cv-00054-RJS

2.     This Court enter a judgment against Defendants for a civil penalty of $11,000 for each of Defendants' violations of the False Claims Act;

3.     Relator Reginald Williams recover all costs of this action, with interest, including the cost to the United States government for its expenses related to this action;

4.     All reasonable attorneys' fees in bringing this action be awarded;

5.     In the event the United States government proceeds with this action, Relator Williams be awarded an amount as provided by statute;

6.     In the event the United States government does not proceed with this action, Relator Williams be awarded an amount for bringing this action as provided by statute;

7.     Relator Williams be awarded prejudgment interest;

8.     Compensatory damages to Relator Williams for the loss of employment income and for reinstatement of Relator Williams' employment, or assignment to a comparable position;

9.     A trial by jury be held on all issues so triable; and

10.    Relator Williams and the United States of America receive all relief to which either or both may be entitled at law or in equity.

Dated:  May 4, 2018                     WILLIAM L. SCHMIDT,
                                        ATTORNEY AT LAW, P.C.
                                        ____/s/ William L. Schmidt_____
                                        William L. Schmidt
                                        Attorney for Plaintiff

103

                                        First Amended Complaint
                                        No. 2:15-cv-00054-RJS

# TABLE OF ACRONYMS

**AOC:**          **Administrative Office of the Courts**

**ARRA:**      **American Recovery Reinvestment Act of 2009**

**BJA:**          **Bureau of Justice Assistance**

**CCI:**           **Correctional Counseling Inc.**

**CCJJ:**       **Commission on Criminal and Juvenile Justice**

**DJJ:**          **Division of Juvenile Justice**

**DOJ:**         **Department of Justice**

**DPS:**         **Department of Public Safety**

**EPP:**          **Employment Placement Project**

**ESO:**         **Equipment and Supplies**

**FCA:**         **False Claims Act**

**FE:**            **Fidelity Evaluation**

**FSR:**         **Financial Status Reports**

**GAF:**         **Grant Adjustment Form**

**GAR:**        **Grant Adjustment Request**

**GSC:**        **Grant Subcontract**

**ICAC:**       **Internet Crimes Against Children**

104

First Amended Complaint
No. 2:15-cv-00054-RJS

**ICJR:**      **Institute for Criminal Justice Research and Counseling**

**IPO:**       **Institutional Parole Office**

**JAG:**       **Justice Assistance Grant**

**LOE:**       **Ledger of Expenses**

**MFTF:**     **Mortgage Fraud Task Fund**

**MRT:**       **Moral Reconation Therapy**

**OJP:**        **Office of Justice Programs**

**PMT:**       **Performance Measure Reports**

**PPACA:**   **Patient Protection and Affordable Care Act**

**PR:**         **Progress Reports**

**RFP:**       **Request For Proposal**

**RIF:**        **Reduction In force**

**SC:**         **Supplanting Certification**

**SECUR:**   **Statewide Enforcement of Crimes by Undocumented Resident**

**Task Force**

**UAGO:**    **Utah Attorney General's Office**

**UDC/UDOC: Utah Department of Corrections**

**UPAST:**    **Utah Preservation of Asset Seizure and Forfeiture Team**

105