# EXHIBIT 1

Jason W. Hardin (8793)
Jeffery B. Setness (20026)
Stephen P. Horvat (6249)
J. Mason Kjar (14227)
Trevor J. Adkins (18297)
FABIAN VANCOTT
95 South State Street, Ste. 2300
Salt Lake City, Utah 84111
Telephone: (801) 531-8900
jhardin@fabianvancott.com
jsetness@fabianvancott.com
shorvat@fabianvancott.com
mkjar@fabianvancott.com
tadkins@fabianvancott.com

Bradley R. Blackham (8703)
Andrew R. Hopkins (13748)
Assistant Utah Attorneys General
Derek E. Brown (10476)
Utah Attorney General
160 East 300 South, 6th Floor
PO Box 140856
Salt Lake City, UT 84114-0856
Telephone: (801) 366-0100
bblackham@agutah.gov
arhopkins@agutah.gov

*Attorneys for Kaytlin Virginia Beckett*

---

**UNITED STATES DISTRICT COURT**
**DISTRICT OF UTAH**

---

| | |
|---|---|
| IN THE MATTER OF THE SEARCH WARRANT TO SEIZE AND SEARCH PROPERTY INVOLVED IN THE INVESTIGATION OF RUBICON CONTRACTING, LLC (RUBICON) PREVIOUSLY SEIZED BY THE UTAH ATTORNEY GENERAL'S OFFICE | **DECLARATION OF AAG KAYTLIN V. BECKETT**<br><br>Case No. 2:25-MC-00068-CMR<br><br>Magistrate Judge Cecilia M. Romero |

1. I, Kaytlin Virginia Beckett, declare and state as follows: [1]

   a. I am over eighteen years of age and am competent to testify in a court of law.

[1] I do not have access to the full federal investigation file and have been unable to obtain information from the federal investigators and lawyers involved in the investigation. Accordingly, this declaration is based on my recollection and the documents in my possession from the investigation. To the extent Movants dispute any of the facts set forth herein, I would welcome the opportunity to obtain and present evidence from the federal investigators and lawyers.

b. The statements contained herein are based on my personal knowledge or information that has been made available to me.

c. If called upon by a court of competent jurisdiction, I would testify as to the truthfulness of each and every statement contained herein.

2. I joined the Utah Attorney General's Office in February of 2020. I was hired as the lead Human Trafficking Prosecutor in the SECURE Section.[2] SECURE was initially created by statute to combat large scale identification document fraud amongst undocumented persons.[3]

3. This section at the Utah Attorney General's Office (UAGO) is partially budgeted through a federal grant under the Office for Victims of Crime.

4. Through that grant, the Unit is part of an "Enhanced Collaborative Model (ECM)" state/federal task force.

5. To my knowledge, the grant in question is not based on the number of victims, cases, or convictions the unit can generate. At no point was I given a directive by anyone at UAGO to increase case numbers, victims, or convictions to increase federal funding. The goal of the grant and the Utah Trafficking in Persons Task Force is to increase capacity-building for smaller agencies by making the UAGO an available resource, generate interoffice cooperation, educate the general public, and increase awareness of human trafficking-related issues specific to Utah.

---

[2] I had 4+ years of criminal defense work prior to this position. In law school and undergrad I had done significant independent research projects that dealt with international human trafficking and anti-human trafficking initiatives. I also taught at-risk youth in socio-economically disadvantaged schools for several years prior to going to law school who dealt with similar issues.

[3] SECURE's acronym stood for Statewide Enforcement of Crimes by or against Undocumented REsidents. The unit was so successful at its initial mandate that they expanded into focusing more on the exploitation of undocumented persons or immigrants, including illicit massage parlors, labor exploitation, and sex trafficking. The acronym was later changed to Strategic Enforcement to Combat Unlawful Racketeering and Exploitation.

6. The task force model requires that the SECURE Section often work with federal investigators, agencies, and prosecutors throughout their process.

7. In 2021, myself and another former AAG working in the SECURE Section were cross-designated as Special Assistant United States Attorneys (SAUSAs).

8. This was nothing new; the Unit had had a cross-designated SAUSA for several years before I joined.

9. Because the Unit handles cases that often have a federal nexus, such as crimes involving an undocumented person, having a SAUSA was the most efficient and effective way to handle certain cases; including document fraud, aggravated re-entry, drug trafficking, and possession of a dangerous weapon by a restricted person.

10. I was promoted to Director of the SECURE Section in September of 2022 and tasked with supervising another prosecutor and a paralegal.

11. As a federal grant recipient we are required to attend training every year that deals specifically with human trafficking. I have attended dozens of training sessions and presented at several as well, in the state of Utah, nationally, and internationally. I have also taught Human Trafficking 101 at Salt Lake Community College's Police Academy since 2021.

12. In late June/early July of 2023, I was made aware of a tip that the SECURE Section had received on May 23, 2023. This tip came through the National Human Trafficking Hotline and was received by multiple parties, including our task force partners at Homeland Security Investigations (HSI).

13. I was notified of this tip by the assigned investigator, Special Agent Adam Jeter. Per procedure, SA Jeter had done some preliminary follow-up to determine if the tip itself was

viable and wanted to schedule a meeting with me to keep me involved in the process.[4] The structure of our ECM requires law enforcement, victim services coordinators, and prosecutors to be looped in on cases as early as possible. All parties agreed that the tip appeared viable and SA Jeter would conduct the investigation.

14. The tip came from a paralegal at a non-profit agency, Utah Legal Services, and it identified the potential victim (ADLP) as a 19-year-old male who had been recruited in Mexico by Adam Perea to come work for Rubicon Contractors, LLC, in Utah.

15. The tip stated ADLP reported that (i) Rubicon had helped him obtain an H-2B visa, (ii) the visa had since expired, (iii) the visa was set to be renewed by May 15, 2023, but Perea had told ADLP that it would not be renewed until July 11, (iv) Perea threatens [ADLP] with deportation if they complain about the work conditions, and (v) these threats are made to prevent [ADLP] from reporting the company.

16. I met with SA Jeter an estimated two more times prior to the case being screened for charges. SA Jeter's investigative reports showed the following:

a. SA Jeter made contact with the paralegal at Utah Legal Services, who further told him that ADLP was being given little or no work, he was being charged $700.00 to sleep in a shared room, and he was threatened that if he tried to go work for another company, Rubicon would make sure ADLP was deported.

b. SA Jeter interviewed ADLP in June and obtained a hand-written statement from ADLP in July. ADLP reported, among other things, that Perea's cousin Iram told

[4] These tips are not vetted by the National Trafficking Hotline. Sometimes the information in the tip itself comes from an unconnected third party and the information cannot be verified. Sometimes the tips contain little identifying information and investigators spend time trying to identify people, places, and basic information. Rather than bring every tip to prosecutors and victim services coordinators, investigators will work to verify basic information prior to beginning a full investigation where other parties are brought in.

Case 2:24-cv-00968 Document 79-1 Filed 08/24/24 PageID.868 Page 5 of 20

ADLP in Mexico that Rubicon was offering forty hours of work per week at $20.13 per hour, but he had to sign a rent deduction contract and work and pay policies or he would not be hired. ADLP further reported that despite the assurance of full time work, he and the other Rubicon H-2B workers actually ended up going days or weeks without work. They had to go to food banks and LDS churches for food and clothes. He was being housed with six other workers, each of whom was being charged $350 every two weeks for rent—which did not even include beds. If he did not make enough during one pay period to cover the rent deduction, the debt would carry over to the next check.

c. ADLP also reported that his H-2B visa had expired on March 31, 2023. Rubicon told him that an extension would be given to them, but he did not receive anything other than "memorandums and letters" from the company.

d. ADLP and some others ultimately left Rubicon on May 23 due to the low pay: many of his co-workers were receiving less than $50 per bi-week.

e. Also during this time period, a then-current Rubicon office employee reached out to HSI to report that Rubicon was engaged in trafficking. This employee asked to remain anonymous because they feared retaliation from Rudy Larsen, Rubicon's owner.

f. SA Jeter and an HSI agent met with this anonymous employee on June 14, 2023.[5]

[5] It is my understanding that there was another individual who also went to HSI at or before this time to report Rubicon's activities. That person was apparently interviewed only by HSI. Because I do not have access to the full federal investigative file from HSI, I cannot provide complete information about that witness.

g. The anonymous employee reported that Rubicon was part of a network of businesses Larsen owned, which together employed 25-50 individuals full-time apart from the H-2B visa workers.

h. They reported that Rubicon paid its visa workers on a "flat-rate" system, where if Rubicon quotes a customer ten hours for a certain job, but it actually takes the employees thirteen hours to complete, the employees are paid only for the ten hours. In other words, workers were not being paid for all the time they worked.

i. The employee further reported that the housing situation for the visa workers was "not good," with workers being charged up to $400 bi-weekly with no beds, no furniture, and no dishes. There were generally four to eight workers in each rental property; at a property they visited in Tooele County in the middle of winter, the gas had been turned off.

j. Among other things, the employee also reported that Rubicon did not provide all the equipment the workers needed and also required the visa workers to buy a phone so they could use a Rubicon App to clock in and out of work.

k. SA Jeter conducted interviews of current and former H-2B employees and office employees and obtained documents from those employees and others, such as forms Rubicon provided its visa workers, communications between Rubicon and the visa workers, and Rubicon's Temporary Labor Certification filings.[6]

l. A review of those interviews showed that the witnesses told very similar stories, most of which included the following: Rubicon had promised workers full time work at good wages; Rubicon had failed to consistently provide that work;

---

[6] To my knowledge, HSI (including SA Hatch) was not involved during this time, other than that initial interview with the anonymous Rubicon employee at the HSI facility.

Rubicon failed to pay workers for work the hours they worked; many employees had to rely on food banks and churches to eat; Rubicon housed its visa workers in woefully substandard lodging; Rubicon deducted $650 to $700 per month from each visa worker for this substandard lodging; workers were forced to find beds that were being thrown away or given away; when workers tried to find housing on their own, Rubicon told them they had to keep paying for Rubicon housing; Rubicon mocked and mistreated its workers; Rubicon deducted money for tools, or if a job had to be finished by another crew, or if a truck or piece of equipment was damaged; Rubicon regularly threatened workers that they would be sent home and face serious legal consequences for minor disciplinary infractions, for complaining about conditions, or for even trying to find work elsewhere; and Rubicon promised its workers their visas would be extended but never actually provided extensions.

m. Witnesses also reported that Rubicon had been creating shell companies to obtain more H-2B visas for workers who would actually be shuffled over to work for Rubicon.

n. In October 2023, SA Jeter obtained a copy of Rubicon's Application for Temporary Employment Certification, which included the Job Order. Review of these documents revealed that Rubicon had only obtained permission to have H-2B workers through the end of March 2023; Rubicon promised to pay an hourly wage ($17.21 per hour); forty hours per week or more; Rubicon "guarantee[d]" to offer at least three-fourths of those work hours; and that Rubicon did not disclose that they would deduct worker pay would be deducted for housing, tools, damage,

or anything beyond deductions required by law; Rubicon promised "assistance finding lodging … if needed, at no additional cost to the worker"; and that "H2B workers would be reimbursed by check for visa and related fees in the first workweek."

17. On November 17, 2023, UAGO obtained ten search warrants for Rubicon's premises and other locations and arrest warrants for Movants Larsen, Perea, and other Rubicon managers. I did not sign, draft, or file these affidavits. Per office procedure, I reviewed the affidavits in accordance with my knowledge of the case to determine if there was enough probable cause for what was being requested. I believe there was more than sufficient probable cause to seek these warrants.

18. The warrants were issued on the basis of warrant affidavits signed by SA Jeter (the "State Affidavit").

19. State charges were ultimately filed against individual managers of Rubicon for aggravated human trafficking for labor under Utah Code Ann. § 76-5-310 and related charges.

20. Per procedure, I drafted the charging instrument directly from the investigative reports. SA Jeter approved the probable cause affidavits and signed them as a witness.

21. After the initial arrests and charges, UAGO was contacted by multiple other victims and witnesses.

22. UAGO sought federal assistance at that time. However, UAGO was informed that a supervisory special agent for the local HSI's human trafficking unit was likely conflicted off the case due to a personal connection with certain defense counsel. As a result, the State was unable to obtain federal assistance.

23. On March 13, 2024, the defendants in the criminal case filed a Joint Motion to Void Search Warrants, Suppress Evidence, Return Seized Assets, and for a *Franks* Hearing, asserting that the State Affidavit contained "multiple false statements and omissions, which were material to the magistrates' finding of probable cause."

24. Acting in my role as prosecutor representing the State of Utah, I researched the legal and factual issues addressed in the *Franks* motion. The State opposed the *Franks* motion and filed a lengthy response, including a fully footnoted version of the challenged affidavit outlining the basis for every statement within the affidavit.

25. After meeting with several newly identified victims and witnesses, the State chose to amend the charges adding the conduct applying to each identified victim prior to the preliminary hearing. This is a common practice when newly available evidence comes up and the parties prefer to only have a single preliminary hearing.

26. Before the Motion to Void Warrants was argued, a preliminary hearing on the state charges took place before Second District Judge Rita M. Cornish from May 20-24, 2024. Over the objection of the State, defense counsel for the Larsens attempted to turn the preliminary hearing into a *de facto Franks* hearing, using recent modifications to the State rules regulating preliminary hearings. The State was prohibited from responding to the substance of those arguments due to the constraints of the preliminary hearing.

27. At that hearing, the State was similarly hamstrung by the Department of Labor's failure to timely respond to my repeated request that the Department furnish an expert witness who could explain the H-2B Program's requirements and the ways Rubicon violated them.[7]

---

[7] I was on medical leave for most of February 2024 when the preliminary hearing was scheduled. Upon my return I made contact with the Department of Labor to obtain *Touhy* authorization for a witness to appear as an expert at the scheduled preliminary hearing. I was in regular contact with DOL to coordinate the necessary testimony from March until the week before the preliminary

28. The State was even forced to rely on arguments based on the Code of Federal Regulations and DOL's Wage and Hour Division's Guidance for the H-2B Program and judicial notice rules.

29. Judge Cornish recognized that the defendants "may have run afoul" of the federal regulations.

30. The Motion to Void Search Warrants was heard by Second District Court Judge Rita M. Cornish, who issued a ruling on August 1, 2024. Over the State's objections, the Court allowed the Movants to rely on the incomplete preliminary hearing transcript without allowing the issue to be briefed.

31. Soon after the preliminary hearing, following discussions with the DOL and the inability to obtain necessary evidence for the preliminary hearing, I made contact with the United States Attorney's Office for the District of Utah in my role as a SAUSA.

32. I also made contact with a non-profit organization, Aequitas, that works in conjunction with federal human trafficking grantees to provide technical training and assistance on complex legal issues in the realm of human trafficking, sexual violence, stalking, and domestic violence.

33. My contact at Aequitas and another USAO contact referred me to the U.S. Department of Justice Civil Rights Division's Human Trafficking Prosecution Unit (HTPU).

34. On July 1, 2024, I emailed HTPU Deputy Director William Nolan to introduce myself and request federal assistance, explaining that "the case is rather large and involves several federal agencies that were proving difficult to get into state court, so that is the impetus for moving matters federally."

---

hearing when DOL stopped responding. They reached out to me after the preliminary hearing to offer assistance at trial.

35. On July 10, 2024, after we had talked, Deputy Director Nolan emailed me, Assistant United States Attorney Roberson, and a local ranking AUSA with experience prosecuting trafficking cases, stating that he had assigned the case to AUSA Roberson. AUSA Roberson is a Trial Attorney from HTPU's Criminal Section. It is my understanding that Director Nolan and AUSA Roberson both made contact with local USAO prior to assigning anyone to assist on a potential federal investigation and indictment.

36. HTPU involved HSI's Center for Countering Human Trafficking (CCHT), which began investigating the matter. As federal bodies, HTPU and CCHT have access to resources, information, witnesses, agencies, and evidence to which UAGO would not otherwise have access.

37. Right from the start, USAO and HTPU recognized that the Rubicon case was potentially a good case for federal charges.

38. I was approached by HSI Supervisory Special Agent Nick Minckler at a meeting for the ECM Task Force. SSA Minckler inquired about CCHT's involvement and what local HSI could do to assist given the large number of victims and incoming information. SSA Minckler assigned Special Agent Jared Hatch to the federal investigation alongside AUSA Roberson.

39. Both SSA Minckler and SA Hatch were informed of the procedural posture of the state case, including the pending *Franks* issues. SA Hatch referenced seeing news articles regarding accusations against myself and SA Jeter on more than one occasion.

40. Until that point, I do not believe SA Hatch had been involved in the investigation, other than the initial meeting at the HSI office in June 2023.

41. I personally informed AUSA Roberson of the Motion to Void Warrants and the unwarranted accusations contained in Movants' filings. I also personally provided AUSA

Roberson copies of the briefings on *Franks* issue prior to initiating the federal inquiry and informed her of the Court's written rulings after the motion hearing.

42. In August 2024, AUSA Roberson traveled to Utah to conduct wholly new interviews of victims and witnesses. She was in Utah for multiple days.

43. I sat in on most of those interviews, in my role as a cross-designated Special Assistant United States Attorney. AUSA Roberson explained that her unit generally worked with a "local shepherd" who can assist in local procedure and protocol. AUSA Roberson reached out to the local USAO multiple times to schedule meetings and invite them to the interviews or to sit down and discuss the case.

44. AUSA Roberson took the lead in most victim and witness interviews. She would often speak directly with Spanish-speaking witnesses in Spanish, which I do not speak. At the end of interviews she would ask if I had any other questions; I generally did not have questions as AUSA Roberson is very skilled and thorough.

45. AUSA Roberson also put me in touch with many federal resources previously unavailable to UAGO, such as information from the U.S. Diplomatic Security Service, information from DOL, and information from USCIS. Those agencies provided information and resources I did not know were available or know how to obtain prior to AUSA Roberson's assistance. In fact, many of those agencies were not in a position to provide data and information to a state agency and only provided such because the investigation was being conducted by federal authorities.

46. In August 2024, after AUSA Roberson made these federal resources available, UAGO was informed by a USCIS Immigration Officer in Denver that the petition Rubicon had filed in April 2023, which supposedly "extended" the H-2B workers' visas, did not actually

extend the visas at all, but instead appeared to have been filed "to show to workers as evidence of having filed something for them."

47. In October 2024, AUSA Roberson returned to Utah to interview more witnesses and victims. Some of these interviews were of new witnesses and victims, others were re-interviews of people who had been interviewed before.

48. On November 4, 2024, AUSA Roberson emailed the local USAO to inquire about "the grand jury's schedule for the remainder of the year."

49. Roberson reported that she was "seeing a pretty good federal forced labor case taking shape, along with potential visa fraud and other possible immigration charges against the Defendants."

50. She reported that the victims had "consistently explained" the company's promises and "consistently depicted how the actuality of what happened when they arrived in Utah was starkly different."

51. AUSA Roberson traveled to Utah later that week to conduct yet another round of interviews and meetings with a local AUSA.

52. SA Hatch was also present for and involved in multiple interviews.

53. After concluding the November interviews, AUSA Roberson, SA Hatch, and I discussed next steps. After consulting with local AUSAs, it was decided that UAGO would seek dismissal of the state criminal charges without prejudice in favor of a formal federal investigation and grand jury process.

54. I spoke directly with a local AUSA, the head of the Criminal Division of the local USAO, at this time and informed him of the status of the state case and Judge Cornish's ruling on the Motion to Void Warrants.

55. It is not unusual for a case to have begun as a state prosecution and then evolve into a federal one.

56. To the contrary, UAGO has moved many cases to federal prosecution.

57. An attorney may not unilaterally move a case to federal prosecution, however. Cases still must be screened by the USAO before they will proceed. This is not something done on a whim or without approval from multiple parties.

58. On November 13, 2024, HSI formally assigned a specific federal HSI case number to the investigation it had been conducting.

59. During this process there were repeated discussions about how to handle the evidence obtained by the state search warrant that had not been reviewed. Both the UAGO and HSI realized that HSI would need to be the party reviewing the evidence as part of the federal investigation and thus HSI needed to take custody of the evidence before UAGO dismissed the state charges, to prevent the Movants from destroying relevant evidence.

60. On November 19, AUSA Roberson emailed the local AUSA noting that "we are investigating the case in the federal system," and explaining the need for a federal warrant to appropriately move the evidence into federal custody.

61. I personally made contact with the local USAO Criminal Chief to discuss the procedural posture of the state case, explain the nature of *Franks* issues, and request direction on whether or not to seek a warrant. During this call he was also made aware of blanket attorney-client privilege claims made in state court and the need to employ taint/filter team protocols.

62. During AUSA Roberson's email exchange with local AUSAs, I made the local AUSAs aware that the defendants had claimed privilege over the seized materials and that UAGO had a taint team awaiting approval to begin reviewing those materials. During related

Case 2:25-mc-00963-HCN-JCB Document 7-1 Filed 05/04/26 PageID.878 Page 15 of 20

discussions, I also made the local USAO aware of the Motion to Void Warrants, Judge Cornish's ruling granting the *Franks* hearing, and the allegations that had been made against myself and SA Jeter.

63. After being approved by local USAO and being provided the necessary direction, SA Hatch began drafting a federal search warrant and affidavit.

64. SA Hatch submitted his draft to AUSA Roberson and myself on December 12. I made a few minor editing changes and added comments and forwarded that draft to AUSA Roberson the next day. I did so with the specific intent of taking a back seat as much as possible, while still providing necessary support and guidance as a "local shepherd."

65. AUSA Roberson made significant changes to that draft to create a near-final version, which was then sent to SA Hatch and myself with some questions being asked of me (e.g. was the company headquartered in Davis County?).

66. I emailed her responses to SA Hatch and AUSA Roberson noting, "I answered what I could, but as it's your affidavit and I am not the one swearing to it, please correct me if anything is wrong or overstated."

67. SA Hatch then revised based on that information and sent a subsequent draft to AUSA Roberson and myself. AUSA Roberson made some changes.

68. This version was provided to the local USAO Criminal Chief and the local AUSA referenced above.

69. The local AUSA approved the draft and wanted the Criminal Chief to weigh in. The Criminal Chief suggested additional changes.

70. After another conversation between AUSA Roberson and SA Hatch, AUSA Roberson sent a final version of the affidavit to SA Hatch and myself on December 23, which was submitted to the federal court to be sworn out on Thursday, December 26.

71. I did not sign the warrant affidavit or application, nor was I responsible for giving final approval for its filing.

72. I was very familiar with the case and primarily worked in a support role providing background and research assistance. SA Hatch and AUSA Roberson were better situated to prepare the appropriate documentation to obtain a federal warrant based on probable cause to investigate federal crimes.

73. Lacking access to the investigative file and unable to speak with SA Hatch, I am not a position to cite all the evidence SA Hatch relied on to support his statements regarding access to worker accounts in his affidavit.

74. SA Hatch was fully aware of the *Franks* issues raised in the state court, and I recall that SA Hatch had obtained sufficient corroboration. I was and remain confident that SA Hatch would not have made that statement, and AUSA Roberson would not have allowed it to remain in the affidavit, if it was not adequately supported.

75. When the court clerk indicated that an AUSA needed to be present for the warrant swearing, I asked both the Criminal Chief and the primary local AUSA how they would like to handle it, as AUSA Roberson had not yet been authorized to practice in Utah.

76. As the primary local AUSA was not available to appear that week, it was decided that I would appear for the swearing, in my cross-designated role as SAUSA.

77. The federal warrant was issued on December 26, 2024, and the evidence transferred into the custody of HSI.

78. Because HSI was facing unique issues with regard to evidence storage, the evidence physically remained in possession of the UAGO, though the evidence locker was only accessible to SA Hatch. This was done at the specific direction of the USAO Criminal Chief.

79. To my knowledge, no one from HSI, HTPU, or USAO accessed or reviewed the materials at that time due to the defendants' previously raised privilege claims.

80. On January 24, 2025, after the standard 30-day delayed notice, SA Hatch informed all parties to the state proceedings that HSI had taken legal custody of the evidence. SA Hatch notified the parties that HSI was aware of the privilege claims and would not review the seized evidence until a formal filter protocol or order was obtained allowing HSI to view it.

81. I am not aware of any party having reviewed that evidence or having accessed it while awaiting a formal taint/filter review process from USAO.

82. All parties were notified that I would be acting in my capacity as a SAUSA and would answer questions about the federal investigation. AUSA Roberson requested I not provide her (AUSA Roberson's) contact information to other parties until AUSA Roberson had grand jury authorization to appear in Utah.

83. Counsel for some defendants reached out to me directly to clarify the posture of the federal investigation. Some even wished to discuss potential immunity or proffer. I informed those parties the lead AUSA would be in contact. I relayed all information to AUSA Roberson and SA Hatch. Counsel for the Larsens did not reach out, but instead chose to attempt to obtain AUSA Roberson's name and contact information through other means.

84. On January 28, 2025, the defendants' counsel filed a motion to unseal the federal search warrant and to restrict the DOJ, HSI, and USAO from reviewing the evidence.

85. Therein, Movants leveled the same baseless and scurrilous accusations against myself and SA Jeter as they had leveled previously in their filings and press releases.

86. Given Rubicon's decision to turn a criminal matter so intensely personal, I asked AUSA Roberson and the local Criminal Chief if either of them would be better situated to appear for the United States at that motion hearing. I did not want a hearing on a valid, federal warrant and federal investigation to be hindered by any personal animus toward me.

87. As AUSA Roberson still had not been approved to appear in Utah, the local Criminal Chief decided to attend the hearing, but he instructed me to take the lead role in court as I was more familiar with the case and the issues. AUSA Roberson, HTPU, and local USAO also assisted in drafting the response to that motion.

88. The local Criminal Chief and I appeared at that hearing, and the Court ordered the warrant application to remain sealed.

89. In the spring of 2025, AUSA Roberson went on leave. AUSA Trial Attorney Jessica Arco, also of the Civil Rights Division's HTPU, stepped into AUSA Roberson's shoes. AUSA Arco similarly traveled to Utah to meet with local USAO and HSI as part of the federal investigation.

90. I was informed that in May 2025, Movants' counsel began pushing for a meeting with federal prosecutors in hopes of obtaining a letter declining to prosecute and closing the investigation.

91. I was provided a copy of a voicemail Jake Taylor left with the local Criminal Chief, asking for a meeting with him and Acting U.S. Attorney Felice John Viti.

92. The Criminal Chief responded by email to Mr. Taylor, declining the request for a meeting and asking that counsel address their concerns to AUSA Arco.

93. On June 11, a lawyer from Larson LLP, a firm out of Los Angeles hired by the Larsens, emailed a letter to AUSAs Arco and Roberson asking for a meeting to discuss the investigation.

94. I am aware that a meeting took place in Utah on July 15. I did not attend that meeting, nor was I a party to the correspondence that led to it. Instead, the Movants' lawyers dealt exclusively with the Criminal Chief and AUSA Arco, but I was provided a copy of those communications for situational awareness.

95. The July 15 meeting did not lead to a declination letter from the DOJ or the USAO. I was informed that the Criminal Chief made it very clear that what occurs in a state prosecution does not inform how a federal case will be handled and that it is common practice for state cases to be voluntarily dismissed in lieu of federal process. I was also told, after this meeting, the Criminal Chief was intending to find local resources to conduct the taint/filter review and instructed SA Hatch to forestall making the request for resources through his chain of command at HSI.

96. The Criminal Chief involved left the USAO in September 2025. After he left, local USAO declined to commit the taint/filter team resources that prosecuting the case would have required.

97. Ultimately, with the change of administration and new priorities, the Civil Rights Division HTPU was unable to proceed with the taint/filter review or to take the case to a grand jury. They instead left the matter to the local USAO. Accordingly, on April 8, the DOJ provided Movants' counsel with what purports to be a letter from the DOJ stating that the DOJ would decline prosecution and close the matter.

98. At no time did anyone from the USAO, HTPU, or any other federal body state to me that they felt the case against Movants was weak. Quite the opposite, HTPU made it clear to me that the declination had nothing to do with the strength or validity of the case, but specifically with the delay in being able to review evidence and lack of local resources to commit to the taint/filter process. They expressed similar frustration with the case being declined.

99. Not once throughout this entire process did I believe I needed a federal warrant to protect myself from a § 1983 claim or to launder evidence seized through an allegedly improper state warrant. At all times, I wholeheartedly disagreed with the assertions made by defense counsel in the state criminal case and believed in the veracity of the case and the information I was provided or I would not have supported any aspect of the case that required my involvement. As is often the case in an adversarial system, prosecutors and defense attorneys do not agree on what the evidence establishes and it is my role to advocate based on my position as a representative of the state tasked with enforcing prosecution of criminal law violations.

100. I declare under penalty of perjury that the foregoing is true and correct. Executed on May 4, 2026.

*/s/ Kaytlin Virginia Beckett*
Kaytlin Virginia Beckett
e-signed by Stephen P. Horvat with permission